2014-1527

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

CLEARCORRECT OPERATING, LLC, and
CLEARCORRECT PAKISTAN (PRIVATE), LTD.,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

ALIGN TECHNOLOGY, INC.,

Intervenor.

---

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-833.

---

# BRIEF OF APPELLEE
# INTERNATIONAL TRADE COMMISSION

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

WAYNE W. HERRINGTON
Assistant General Counsel
Telephone (202) 205-3090

SIDNEY A. ROSENZWEIG
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 708-2532

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED CASES ........................................................ 1

STATEMENT OF ISSUES ........................................................................ 3

STATEMENT OF THE CASE ................................................................... 4

    A.    Procedural Background ................................................................. 4

    B.    The Field of Art .......................................................................... 7

    C.    ClearCorrect's Conduct .............................................................. 8

    D.    The Asserted Patents ................................................................. 10

    E.    Commission Findings ................................................................ 13

SUMMARY OF ARGUMENT ................................................................. 17

ARGUMENT ........................................................................................... 18

I.      STANDARD OF REVIEW ............................................................. 18

II.    SECTION 337 COVERS IMPORTATION OF THE DIGITAL
       MODELS AT ISSUE IN THIS INVESTIGATION .......................... 19

    A.    The Legislative History Supports a Broad Interpretation
        of "Articles" ............................................................................. 19

    B.    The Term "Articles" Includes the Digital Models Here .......... 25

    C.    The Commission's Authority Is Consonant with That of
        Other Agencies ........................................................................ 31

    D.    This Court's Decision in *Bayer v. Housey* Is Not to the
        Contrary ................................................................................... 34

(continued on the next page)

# TABLE OF CONTENTS
(continued from the previous page)

Page

    E.    Questions About Section 101 Should Be Presented As Part of An Invalidity Defense, and No Such Defense Was Presented Here.......................................................................... 40

    F.    The *Amicis*' Concerns Regarding Internet Service Providers Have Nothing to Do with This Case........................ 41

III.    ALIGN'S PATENTS ARE INFRINGED ......................................... 43

    A.    ClearCorrect Infringes the Group I Patent Claims................... 43

        1.    The Commission Properly Found That There Are No Substantial Noninfringing Uses for the Digital Models........................................................................... 44

        2.    Contributory Infringement Does Not Require the Same *Mens Rea* as Inducement ..................................... 46

        3.    The Accused Digital Models Are "a Material" Used in the Patented Processes....................................... 47

        4.    The Commission Acted Within Its Discretion to Find that ClearCorrect Had Waived Reliance on an Alleged License ............................................................ 55

        5.    ClearCorrect's "Time of Importation" Arguments Depend on This Court's *En Banc* Decision in *Suprema* ....................................................................... 55

    B.    ClearCorrect Infringes the Group II Patent Claims ................. 58

IV.    CLEARCORRECT DID NOT PRESENT CLEAR AND CONVINCING EVIDENCE OF OBVIOUSNESS ........................... 59

V.    THE COMMISSION ACTED WITHIN ITS DISCRETION TO FIND CLEARCORRECT'S ESTOPPEL DEFENSE WAIVED ...... 61

CONCLUSION ............................................................................................ 62

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1 (1976) .. 19

*Ajinimoto Co. v. ITC*, 597 F.3d 1267 (Fed. Cir. 2011)................................. 18

*Align Tech., Inc. v. ITC¸* 771 F.3d 1317 (2014) ..................................... 1, 5, 6

*Allied Corp. v. USITC*, 850 F.2d 1573 (Fed. Cir. 1988) ............................. 58

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) ............................................. 41

*Arris Grp., Inc. v. British Telecomms. PLC*,
    639 F.3d 1368 (Fed. Cir. 2011)................................................................. 54

*Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427 (1932) ...... 30

*Bakelite v. United States*, 16 C.C.P.A. 378 (1928)...................................... 26

*Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367 (Fed. Cir. 2003).... *passim*

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) (en banc)............................... 50, 51, 52, 54

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ................................................................................. 19

*CNET Networks, Inc. v. Etilize, Inc.*,
    528 F. Supp. 2d 985 (N.D. Cal. 2007) ................................................. 38, 39

*Corning Glass Works v. ITC*, 799 F.2d 1559 (Fed. Cir. 1986) ................... 19

*DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006) ................... 47

(continued on the next page)

# TABLE OF AUTHORITIES
(continued from the previous page)

*Eurodif  S.A. v. United States*, 411 F.3d 1355 (Fed. Cir. 2005),
   *aff'd on rehearing*, 423 F.3d 1275 ............................................................ 33

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
   216 F.3d 1027 (Fed. Cir. 2000) ................................................................. 18

*Finnigan Corp. v. ITC*, 180 F.3d 1354 (Fed. Cir. 1999) ....................... 18, 60

*Frischer & Co. v. Bakelite Corp.*, 39 F.2d 247 (C.C.P.A. 1930) ........... 22, 23

*Fuji Photo Film Co. v. ITC*, 474 F.3d 1281 (Fed. Cir. 2007) ...................... 42

*Gamut Trading Co. v. USITC*, 200 F.3d 775 (Fed. Cir. 1999) .................... 42

*GemStar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352 (Fed. Cir. 2004) ........ 18

*General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581 (2004) .............. 30

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ........................................... 61

*Hodosh v. Block Drug Co.*, 833 F.2d 1575 (Fed. Cir. 1987) ....................... 44

*Hyundai Elecs. Indus. Co. v. USITC*, 899 F.2d 1204 (Fed. Cir. 1990) ........ 58

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   697 F.3d 154 (2d Cir. 2012) ..................................................................... 30

*In re Amtorg*, 75 F.2d 826 (C.C.P.A. 1935) ................................................ 23

*In re Frischer & Co.*, 16 U.S. Cust. App. 191 (1928) ................................. 32

*In re Northern Pigment Co.*, 71 F.2d 447 (C.C.P.A. 1934) .................. 23, 24

*In re Orion Co.*, 71 F.2d 458 (C.C.P.A. 1934) ...................................... 22, 23

(continued on the next page)

# TABLE OF AUTHORITIES
(continued from the previous page)

*In re von Clemm*, 229 F.2d 441 (C.C.P.A. 1955) ................................... 23, 24

*International News Serv. v. Associated Press*, 248 U.S. 215 (1918) ..... 27, 48

*Junge v. Hedden*, 146 U.S. 233 (1892).......................................................... 28

*Kontrick v. Ryan*, 540 U.S. 443 (2004)......................................................... 41
*Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014). .. 57

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009)......... 52

*McRO, Inc. v. Namco Bandai Games America, Inc.*,
   23 F. Supp. 3d 1113 (C.D. Cal. 2013)...................................................... 40

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007)........................... 49, 50

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005). .................................................................................. 36

*Ninestar Tech. Co. v. ITC*, 667 F.3d 1373 (Fed. Cir. 2012) ........................ 30

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005)........................................................... 38, 39

*Ormco Corp. v. Align Tech., Inc.*,
   609 F. Supp. 2d 1057 (C.D. Cal. 2009)...................................... 39, 40, 51

*Perrin v. United States*, 444 U.S. 37 (1979)................................................. 25

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007)........................................................... 53, 54

*Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)................................ 41

*Reno v. Condon*, 528 U.S. 141 (2000)........................................................ 27

(continued on the next page)

# TABLE OF AUTHORITIES
(continued from the previous page)

*Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325 (Fed. Cir. 2008) ......... 46

*Robinson v. Shell Oil*, 519 U.S. 337 (1997) ................................................. 30

*Robocast, Inc. v. Microsoft Corp*, 21 F. Supp. 3d 320 (D. Del. 2014)......... 51

*Senne v. Village of Palatine,* 695 F.3d 617 (7th Cir. 2012) ........................ 28

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006)................................................................. 60

*Spansion, Inc. v. ITC*, 629 F.3d 1331 (Fed. Cir. 2010) ......................... 18, 46

*Suprema, Inc. v. ITC*, 742 F.3d 1350 (Fed. Cir. 2013)................................ 57

*TianRui Grp. Co. v. ITC*, 661 F.3d 1322 (Fed. Cir. 2012). .................... 23, 24

*Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358 (Fed. Cir. 2012).......... 40, 44

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975)............. 25, 48

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) ................ 41

*United States v. Eimer & Amend*, 28 C.C.P.A. 10 (1940)............... 26, 27, 28

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)............................... 33, 34

*United States v. Mead Corp.*, 533 U.S. 218 (2001)..................................... 19

*Veritas Operating Corp. v. Microsoft Corp.*,
   562 F. Supp. 2d 1141, 1275 (W.D. Wash. 2008)...................................... 51

*Vizio, Inc. v. ITC*, 605 F.3d 1330 (Fed. Cir. 2010)..................................... 18

*Western Union Tel. Co. v. Pendleton*, 122 U.S. 347 (1887) ....................... 24

(continued on the next page)

# TABLE OF AUTHORITIES
(continued from the previous page)

*WesternGeco L.L.C. v. Ion Geophysical Corp.*,
  No. 4:09-cv-1827, 2011 WL 3608382 (S.D. Tex. Aug. 16, 2011) ........... 40

*Yangaroo Inc. v. Destiny Media Techs. Inc.*,
  720 F. Supp. 2d 1034 (E.D. Wis. 2010) .................................................. 40

*Yingbin-Nature (Guangdong) Wood Indus. Co. v. ITC*,
  535 F.3d 1322 (Fed. Cir. 2008) ............................................................... 58

*Zond v. Toshiba Corp.*, No. 13-cv-11581-DJC,
  2014 WL 4056024 (D. Mass. Aug. 14, 2014) .......................................... 40

**Statutes**

5 U.S.C. § 557 ............................................................................................... 59

5 U.S.C. § 706 ............................................................................................... 18

15 U.S.C. § 45 ............................................................................................... 32

19 U.S.C. § 1337 .................................................................................. *passim*

19 U.S.C. § 1337a (1940) ............................................................................. 23

19 U.S.C. § 1673 ........................................................................................... 33

19 U.S.C. § 316 (1922) ....................................................................... *passim*

35 U.S.C. § 101 ....................................................................................... 40, 41

35 U.S.C. § 271(c) ............................................................................... *passim*

35 U.S.C. § 271(f) ................................................................. 49, 50, 51, 52

35 U.S.C. § 271(g) ............................................................................... *passim*

35 U.S.C. § 282 ............................................................................................. 40

(continued on the next page)

# TABLE OF AUTHORITIES
(continued from the previous page)

**Rules**

19 C.F.R. § 210.13 ......................................................................... 61

19 C.F.R. § 210.43 ................................................................... 59, 60

19 C.F.R. § 210.75 ........................................................................... 5


**Administrative Decisions & Federal Register Notices**

*Certain Electronic Devices with Image Processing Systems, Components
   Thereof, and Associated Software*, Inv. No. 337-TA-724, 2012 WL
   3246515 (Dec. 21, 2011) ............................................................ 56

Notice, 71 Fed. Reg. 66973 (Nov. 17, 2006) .................................... 5

Notice, 77 Fed. Reg. 25747 (May 1, 2012) ...................................... 5

**Administrative Publications**

Fifth Annual Report of the U.S. Tariff Commission (1921) ......................... 20

Nineteenth Annual Report of the United States
   Tariff Commission (1935) ............................................................ 31

Second Annual Report of the Tariff Commission (1919) ...................... 19, 20

Sixth Annual Report of the United States Tariff Commission (1922) ......... 21

Thirteenth Annual Report of the United States
   Tariff Commission (1929) ............................................................ 22

U.S. Tariff Commission, Information Concerning Dumping
   and Unfair Competition in the United States and Canada's
   Anti-Dumping Law (1919) ............................................................ 20

(continued on the next page)

# TABLE OF AUTHORITIES
(continued from the previous page)

## Legislative History

Act of July 2, 1940, ch. 515, 54 Stat. 724 (1940).........................................23

Conf. Rep. No. 67-1223 (1922).....................................................................20

Conf. Rep. No. 67-253 (1922).......................................................................20

Emergency Tariff Act of 1921, ch. 14, 42 Stat. 9 (1921). ..........................29

Omnibus Trade and Competitiveness Act of 1988
    Pub. L. No. 100-418, 102 Stat. 1107 (1988)...........................................29

S. Rep. No. 67-595 (1922)......................................................................20, 25

S. Rep. No. 93-1298 (1974).........................................................................29

Tariff Act of 1922, Pub. L. No. 67-318 42 Stat. 858 (1922).......................21

Tariff Act of 1930, Pub. L. No. 71-361, ch. 497, 46 Stat. 590 (1930).........21

Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 (1979) ....29

## Other Authorities

Neil W. Averitt, *The Meaning of "Unfair Methods of Competition"
    in Section 5 of the Federal Trade Commission Act*,
    21 B.C. L. Rev. 227 (1980). ...................................................................32

Black's Law Dictionary (9th ed. 2009) .......................................................48

Black's Law Dictionary (10th ed. 2014). .....................................................48

Giles S. Rich, *Infringement Under Section 271 of the Patent Act
    of 1952*, 35 J. Pat. & Trademark Off. Soc'y 476 (1953)...........................47

## STATEMENT OF RELATED CASES

In addition to the related cases recited in Appellants' opening brief, Appellee U.S. International Trade Commission ("the Commission") notes that there is a companion appeal to this appeal, with separate but simultaneous briefing, that challenges other Commission findings in the same underlying investigation. *Align Tech., Inc. v. ITC*, No. 2014-1533 (Fed. Cir.).

The Brief of the Appellants (pp. 59-60) and the Brief of *Amicus Curiae* Internet Association (pp. 12-15) urge reversal of the Commission decision here as to the so-called Group I asserted patent claims based upon arguments regarding the Commission's authority under 19 U.S.C. § 1337(a)(1)(B)(i) over contributory infringement. That issue has been raised to the *en banc* Court in *Suprema, Inc. v. ITC*, No. 2012-1170 (argued Feb. 5, 2015). *See* Brief of *Amicus Curiae* Microsoft Corporation in Support of Neither Party at 18-22, Suprema, Inc. v. ITC, No. 2012-1170 (Fed. Cir. Aug. 18, 2014). Similarly, the Internet Association brief in the present appeal (pp. 15-18) argues that 19 U.S.C. § 1337(a)(1)(B)(i) provides no remedy for infringement of method claims. Microsoft also made that argument in its *amicus* brief in *Suprema* (pp. 5-14).

In addition, Microsoft is the intervenor in *Motorola Mobility LLC v. ITC*, No. 2013-1518 (Fed. Cir.). That case has been fully briefed, and Microsoft there made the same arguments it made in *Suprema*. Non-Confidential Brief of Intervenor Microsoft Corporation at 52-55, Motorola

Mobility LLC v. ITC, No. 2013-1518 (Fed. Cir. Feb. 11, 2014).  On May 19, 2014, approximately three weeks prior to the calendared oral argument, the Court, acting *sua sponte*, stayed the *Motorola* appeal pending the outcome of the *Suprema* rehearing (No. 2013-1518, ECF No. 75).

# STATEMENT OF ISSUES

(1)    Whether the accused digital models of teeth—each of which represents one patient's tooth alignment, just as a plaster mold does—are "articles" within the scope of section 337, 19 U.S.C. § 1337.

(2)    For the so-called Group I asserted patent claims, whether the digital models of a patient's teeth are "a material" under 35 U.S.C. § 271(c) for use in practicing the claimed methods for manufacturing orthodontic appliances from those models.

(3)    Whether the Commission properly rejected ClearCorrect's obviousness and estoppel arguments.

## STATEMENT OF THE CASE

To present an accurate description of the proceedings below, the Commission provides its own statement of the case.

### A.    Procedural Background

On April 5, 2012, the Commission instituted Investigation No. 337-TA-833, *Certain Digital Models, Digital Data, and Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, and Methods of Making the Same*, based on a complaint filed by Align Technology, Inc. ("Align").  Align's complaint alleged a violation of 19 U.S.C. § 1337 by reason of infringement of certain claims of seven patents.[1]  A24704-06.  The respondents were ClearCorrect Operating, LLC ("ClearCorrect USA" or "CCUS") and ClearCorrect Pakistan (Private), Ltd. ("ClearCorrect Pakistan" or "CCPK") (collectively, "ClearCorrect").

That investigation relates to an earlier Commission investigation, Investigation No. 337-TA-562, *Certain Incremental Dental Positioning Adjustment Appliances and Methods of Producing Same* ("the 562 investigation"), which was instituted in 2006.  In the 562 investigation,

---

[1] U.S. Patent Nos. 6,217,325 ("the '325 patent") (A80316); 6,722,880 ("the '880 patent") (A80282); 8,070, 487 ("the '487 patent") (A80450); 6,471,511 ("the '511 patent") (A80265); 6,626,666 ("the '666 patent") (A80344); 6,705,863 ("the '863 patent") (A80364), and 7,134,874 ("the '874 patent") (A80398).

Align asserted the infringement of the '880 patent asserted here as well as eleven other patents not asserted in the present investigation. *Align Tech., Inc. v. ITC¸* 771 F.3d 1317, 1319 (2014). The respondents in that investigation included OrthoClear, Inc. (of the United States) and OrthoClear Pakistan Pvt, Ltd. (collectively, "OrthoClear"). *Id.* at 1318. Shortly after the institution of the 562 investigation, OrthoClear agreed to the issuance of a consent order (to terminate the investigation). *Id.* at 1319; *see also* Notice, 71 Fed. Reg. 66973, 66974 (Nov. 17, 2006).

On the same day that Align filed its complaint in the present investigation, it also filed a complaint at the Commission for an enforcement proceeding, *see* 19 C.F.R. § 210.75, alleging violation of the consent order issued in the 562 investigation. *Align*, 771 F.3d at 1320. The enforcement proceeding included ClearCorrect USA and ClearCorrect Pakistan. *Id.*; *see also* Notice, 77 Fed. Reg. 25747 (May 1, 2012). Align alleged that the two ClearCorrect respondents were the successors, assigns, or agents of the earlier OrthoClear respondents. *Align*, 771 F.3d at 1321.

Thus, the Commission conducted two proceedings, one (the present 833 investigation) alleging a violation of section 337, and the other (the 562 enforcement proceeding) alleging a violation of a consent order. The 562 enforcement proceeding ended first. There, the Commission terminated the enforcement proceeding because the consent order did not expressly cover the digital data sets transmitted into the United States, and such express inclusion was required. *See Align*, 771 F.3d at 1321. In Align's appeal of

the 562 enforcement proceeding, this Court found the Commission's termination to be procedurally improper, reinstated the proceeding, and remanded it to the Commission for further proceedings. *Id.* at 1324-26. Remand proceedings are ongoing.

Returning to the present investigation, the presiding ALJ conducted an evidentiary hearing in February 2013. On May 6, 2013, the ALJ issued the final ID, finding infringement of all asserted patents except for the '666 patent. A1069; A1881-83. The ALJ recommended that the Commission issue cease and desist orders directed to ClearCorrect to prohibit the importation of digital data sets. A1874-75.

ClearCorrect and Align filed petitions for Commission review. The Commission determined to review the final ID in its entirety, and solicited briefing from the parties on the issues under review and from the parties and the public on remedy and the public interest. A97171-72. No non-parties responded to this invitation for briefing. The Commission extended its deadline and issued another notice soliciting further briefing, including from the public. A97739-41. In response to that notice, the Commission received briefing from nonparties the Association of American Publishers; Google Inc.; Andrew Katz; the Motion Picture Association of America; and Nokia Corp. A199.7.

On April 3, 2014, the Commission terminated the investigation with a finding that certain claims of five of the seven asserted patents were infringed and not invalid. A212-14. The Commission issued cease and

desist orders directed to ClearCorrect that prohibited, *inter alia*, "importing (including through electronic transmission)" the "digital models, digital data, and treatment plans for use in making incremental dental positioning adjustment appliances or the appliances therefrom" that infringe the specific claims found to be infringed and not invalid. A215; A224. The Commission subsequently granted ClearCorrect's motion to stay the cease and desist orders pending resolution of this appeal, A101520-23; A101526-36; no party has sought judicial review of the Commission's stay.[2]

Align and ClearCorrect timely filed notices of appeal as to the portions of the Commission determination that were adverse to each.

### B.    The Field of Art

The asserted patents disclose methods for producing orthodontic appliances, and all rely for priority, at least in part, on a provisional application filed on June 20, 1997.

Historically, teeth were moved by braces, which are attached to the teeth. *See* A80304 col. 1 lines 24-55. The brace on each tooth, or a "bracket," is attached to an adjacent tooth by wire. The '880 patent describes the typical prior-art practice after braces are first fitted, with an

---

[2] While not pertinent to the present appeal, after the Commission stayed its remedial orders, the Commission granted ClearCorrect's request for clarification whether the orders covered "wholly domestic conduct." A101541-42. The Commission explained that the orders "proscribe only activities involving imported covered products," and that because the orders were already clear, they did not need further clarification. A101545.

orthodontist periodically tightening the wires between braces on teeth. A80304 col. 1 line 66 – col. 2 line 4.

The patented invention involves a succession of appliances, in lieu of braces. A80282 (abstract). Each appliance is made by preparing a digital model of the teeth, *i.e.*, a data set that represents the tooth alignment desired for that appliance. *See, e.g.*, A80287 (Fig. 2). Each appliance is preferably "a polymeric shell having the teeth-receiving cavity formed therein, typically by molding." A80305 col. 3 lines 24-25. Each appliance puts pressure on misaligned teeth and corrects them bit by bit until the patient is ready for a successive appliance or until the treatment is complete. A80305 col. 3 lines 25-36. The benefits over the prior art include less time needed for planning and oversight by the orthodontist, as well as less visible and more comfortable orthodontia for the patient. A80304 col. 2 lines 12-19.

## C.    **ClearCorrect's Conduct**

The facts in this case are undisputed. ClearCorrect makes orthodontic aligners that are provided to patients through dental professionals. *See, e.g.*, A2134-35. As with the '880 patent description, *supra*, ClearCorrect's aligners are incremental, and each patient wears a series of ClearCorrect aligners until the desired tooth positions are achieved. *Id.*

ClearCorrect's accused products are the "digital models, digital data and treatment plans, expressed as digital data sets, which are virtual three-dimensional models of the desired positions of patients' teeth at various stages of orthodontic treatment." A199.21. The Commission's undisputed

findings include a step-by-step description of ClearCorrect's process. A199.21-.24. In short, CCUS scans physical models of a patient's teeth to create a data set of the patient's initial tooth arrangement. A199.22. That original data set is transmitted to Pakistan, where the position of each tooth is manipulated to create a final tooth position, called the "treatment setup." A199.23. CCPK then proceeds to a "stepping process," which consists of creating digital models of "intermediate tooth positions," *i.e.*, one for each incremental orthodontic appliance, to move the teeth from their initial position to the final position. A199.24. CCPK uploads to a CCUS server the series of models, *i.e.*, data sets, it created, thereby transmitting the digital data sets to CCUS. A199.24. Each data set, or digital model, when displayed on a screen looks roughly like this:



A199.21.

CCUS uploads the data sets into a software program that, in conjunction with a 3D printer, is used to make a physical model of tooth

positions for each step in the orthodontic treatment. A48; A97160; A101532 n.7. The physical models look like teeth, *i.e.*, like dentures:



A199.22. An aligner is made by thermoplastic molding over the physical model. A199.22.

### D.    The Asserted Patents

Two of the asserted patents—the '666 patent (A80344) and the '325 patent (A80316)—share a common specification. The other asserted patents all have specifications different from one another. The differences among the patent specifications are not germane to this appeal, however. Instead, the parties and the Commission grouped the asserted patent claims together based upon the claimed subject matter:

**Group I**:  methods of forming dental appliances

      '325 patent:  claims 21 and 30
      '880 patent:  claim 1

**Group II**:  methods of producing digital data sets

      '325 patent:  claims 31-32
      '863 patent:  claims 1, 4-8
      '666 patent:  claims 1, 3, 7, 9
      '487 patent:  claims 1, 3, 5

**Group III**:  a treatment plan (*i.e.*, a series of digital data sets)
           on a storage medium

      '487 patent:  claims 7-9

**Group IV**:  methods of producing dental appliances

      '325 patent:  claims 1-3, 11, 13-14, 21, 30-35,
             38-39
      '880 patent:  claims 1, 3
      '511 patent:  claim 1
      '874 patent:  claims 1-2, 38-39, 41, 62

*See* A199.20.  The Commission found the Groups I and II patent claims (which overlap with some of the Group IV claims) to be infringed and not invalid.[3]  A214.  These are the patent claims at issue in the present appeal. The Commission found all of the Group III claims and all of the remaining Group IV claims (*i.e.*, not also in Groups I or II) beyond the scope of Commission authority under section 337.  Those patent claims are at issue in

---

[3] The nature of the overlap is not pertinent to this appeal, but is discussed in the Commission's brief in Align's companion appeal.

Align's companion appeal, in which the Commission has filed a separate brief.

For the Group I claims, claim 1 of the '880 patent is representative. Claim 1 of the '880 patent recites a series of steps of "obtaining" digital data sets, culminating in "fabricating a predetermined series of dental incremental position adjustment appliances" based upon those data sets. A80314 col. 22 lines 15-28. The steps of that claim correspond to ClearCorrect's activity in the United States. A199.22-.24. Claim 21 of the '325 patent (as amended in reexamination) is to the same effect, corresponding to ClearCorrect's activity in the United States that results in "producing" a dental appliance. A80342 col. 2 lines 1-14. For this reason, Align's infringement theory for these claims was that CCUS directly infringes these patents in the United States and that CCPK contributes to that infringement by the importation of the digital data sets. A199.105, A199.107-108.

The Group II claims differ from Group I claims in two principal ways. First, each claim stops short of the production or fabrication of appliances. Instead, the claimed methods end with the creation of digital data sets or when the digital data sets are "provided" to a fabricator. *See, e.g.*, '487 patent claim 5 (A80466); '325 patent claim 31 (A80342). Second, the claims correspond to ClearCorrect's activities in Pakistan. A199.22-.24. Align's infringement theory for these claims was based on the Commission's process-patent authority under 19 U.S.C. § 1337(a)(1)(B)(ii). A199.94.

The Group III patent claims (claims 7-9 of the '487 patent) are directed to "an orthodontic treatment plan for repositioning a patient's teeth" that resides "on a computer readable storage media." A80466 col. 11 lines 26-29. Those claims are not at issue in this appeal.

The Group IV claims in general focus on production of dental appliances. As noted above, the Commission found claims 21 and 30-32 of the '325 patent and claim 1 of the '880 patent infringed and not invalid as part of the Commission's findings concerning Groups I and II. A214. The remaining Group IV claims include an additional limitation for fabricating appliances, *see, e.g.*, '880 patent claim 1 (A80314); '325 patent claim 33 (A80342), and are not at issue in this appeal.

### E.    Commission Findings

Based upon the testimony and evidence presented at the February 2013 hearing, as well as upon the thousands of pages of briefing presented to him, the ALJ issued his findings in an 815-page opinion. A239. The ALJ found that Align satisfied section 337's domestic industry requirement. A1012-13; *see* 19 U.S.C. § 1337(a)(3)(A)-(B). The ALJ found that the Commission has the authority to order ClearCorrect to stop importing the digital data sets that form the basis for the dental appliances that are fabricated in the United States. A263-66. The ALJ also found certain patent claims of all but one of the asserted patents to be infringed and not invalid. A1057-58. For those claims, the ALJ recommended that the Commission

issue a cease and desist order to prevent ClearCorrect from importing the digital data sets that it uses to fabricate its dental appliances. A1047-51.

The parties petitioned for Commission review of the ALJ's determinations. After soliciting and receiving public comments, the Commission affirmed the ALJ's finding that Commission authority over "[u]nfair methods of competition and unfair acts in the importation of articles," 19 U.S.C. § 1337(a)(1)(A), includes the unfair acts and importations at issue here.[4] A199.37-.59. Specifically, ClearCorrect's unfair acts are patent infringement, and the articles are the digital models imported as part of ClearCorrect's process of manufacturing orthodontic appliances. A213-14.

The Commission found that the Group I patent claims are directly infringed by CCUS in the United States and that CCPK contributed to that infringement because the digital models it provides are "a material" for "use in" Align's patented processes, *see* 35 U.S.C. § 271(c). A199.84-.93.

The Commission also found a violation of section 337 for the Group II patent claims. These claims cover the creation of one or more data sets for making incremental orthodontic devices. A199.94. CCPK practiced these methods in Pakistan, *id.*, and the Commission found a violation of section 337 based on 19 U.S.C. § 1337(a)(1)(B)(ii), which is the

---

[4] Commissioner Johanson dissented on the statutory construction of "articles" and did not reach the other issues on review. A199.158, A199.173.

Commission's *sui generis* process-patent authority. A199.99-.104. In particular, the Commission found that the imported digital data sets are "processed" abroad by means of a process covered by Align's patents.[5] *Id.*

The Commission rejected ClearCorrect's invalidity arguments as to the three patent claims for which ClearCorrect advanced such arguments. A199.119-.147. The Commission found ClearCorrect's invalidity arguments to be waived for all other asserted patent claims. A119.119 & n.63.

The Commission affirmed and adopted the ALJ's finding that ClearCorrect had waived its right to rely upon a covenant not to sue, which relates to an unasserted Align patent. A199.140-.142. ClearCorrect failed to plead that defense in its answer to Align's complaint, as required by Commission rules. A199.142; A1071-72; A59830-31.

The Commission affirmed the ALJ's relevant findings concerning domestic industry, A199.143-147, which are not at issue on appeal.

Having found a violation of section 337, the Commission made findings on the statutory public interest factors of section 337. 19 U.S.C. § 1337(c), (d)(1), (f)(1). The Commission found that Align could service all dental professionals seeking to offer incremental orthodontic appliances for their patients. Comm'n Op. 151-52. Based on its analysis, the Commission

---

[5] The Commission found no infringement of the Group III patent claims, A199.106-.107, and as to the Group IV patent claims, A199.117-.119; they are at issue only in Align's companion appeal.

found that the "appropriate remedy in this case (and the only remedy requested) would be cease and desist orders directed to CCUS and CCPK." A199.155.  The cease and desist orders issued by the Commission exempted from its scope ClearCorrect's service of existing patients (as of the date of the cease and desist orders).  A199.155-.156; A218-19; A227-28.  As discussed earlier, the Commission stayed these orders pending resolution of this appeal.

# SUMMARY OF ARGUMENT

Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, makes unlawful the "importation into the United States, the sale for importation, or the sale within the United States after importation . . . of articles" that "infringe a valid and enforceable United States patent" or that "are made produced, processed or mined under . . . a process covered by the claims of a valid and enforceable United States patent." 19 U.S.C. § 1337(a)(1)(B). Acting under that authority, the Commission found that the digital dental models here are articles, that they infringe certain asserted patent claims, and that the proper remedy for that infringement is cease and desist orders directed to ClearCorrect.

The Commission's exercise of that authority was proper. The Commission found—and ClearCorrect does not dispute—that the digital models here precisely represent tooth alignment in the same manner as physical molds, and that the digital models are input into 3D printing systems in the United States to produce physical models, which then, in one final step, are used to make ClearCorrect's orthodontics.

The *amici* supporting ClearCorrect raise concerns about the Internet generally, but lose sight of the fact that this is a case about teeth. Specifically, it is a case in which ClearCorrect hoped to skirt U.S. patent law through 3D printing in the United States of the digital models it imported. The Commission simply ordered ClearCorrect to stop this activity. This is not a case that burdens Internet service providers and it is not a case that

threatens to bring down the Internet.  To the extent that cease and desist orders in future cases raise the *amicis*' concerns about Internet service providers, the Commission and the Court can confront those cases on a proper record then.

## ARGUMENT

## I.    STANDARD OF REVIEW

Rulings of the Commission are reviewed under the Administrative Procedure Act, 5 U.S.C. § 706(2)(E).  *See* 19 U.S.C. § 1337(c).  Findings of fact, such as the Commission's determinations of infringement, are reviewed for substantial evidence.  *See Finnigan Corp. v. ITC*, 180 F.3d 1354, 1361-62 (Fed. Cir. 1999); *Spansion, Inc. v. ITC*, 629 F.3d 1331, 1343-44 (Fed. Cir. 2010).  "Obviousness is a question of law based on underlying factual inquiries, and thus" the Court reviews "the Commission's ultimate determination de novo and factual determinations for substantial evidence." *Vizio, Inc. v. ITC*, 605 F.3d 1330, 1342 (Fed. Cir. 2010).

The Commission's findings of waiver, like other evidentiary determinations, are reviewed for abuse of discretion.  *Ajinimoto Co. v. ITC*, 597 F.3d 1267, 1277-78 (Fed. Cir. 2011); *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000).

Legal conclusions are reviewed *de novo*.  *GemStar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1360 (Fed. Cir. 2004).  If section 337, the Commission's organic statute, is ambiguous, the Court defers to the Commission's reasonable interpretation of the statute.  *See Corning Glass*

*Works v. USITC*, 799 F.2d 1559, 1565 (Fed. Cir. 1986); *see also United States v. Mead Corp.*, 533 U.S. 218, 229-32 (2001); *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).

## II.    SECTION 337 COVERS IMPORTATION OF THE DIGITAL MODELS AT ISSUE IN THIS INVESTIGATION

As discussed in detail in the Commission opinion on review, the Commission's decision that the digital models here are "articles" within the scope of section 337 was based on, *inter alia*, the plain meaning of the statute, its legislative history, and its remedial purpose.  *See generally Abbott Labs. v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 12 (1976) (explaining that because the Robinson-Patman Act "is remedial, it is to be construed broadly to effectuate its purposes").  Before turning to the discussion of the Commission's decision, historical background is provided on section 337 and the remedial purpose evidenced by that history.

### A.    The Legislative History Supports a Broad Interpretation of "Articles"

To interpret "articles," a full discussion of the pertinent legislative history is warranted.  In 1919, the Commission (under its then-name the Tariff Commission) issued an annual report that decried certain unfair competition (dumping) in the United States.  Second Annual Report of the Tariff Commission 24-25 (1919).  The House Ways & Means Committee, which then, like now, oversees the Commission, requested follow-up from the Commission, which is provided in U.S. Tariff Commission, Information

Concerning Dumping and Unfair Competition in the United States and
Canada's Anti-Dumping Law (1919). *Id.* at 7 (request to the Commission).
In that report, the Commission discussed "deceptive use of trade-marks,
deceptive imitation of goods, false labeling, exploitation of patents,
deceptive advertising, and commercial threats and bribery." *Id.* at 11; *see
also id.* at 16-17. Congress failed to act upon the Commission's
recommendations in connection with the next tariff legislation, the
Emergency Tariff Act of 1921, ch. 14, 42 Stat. 9, 11-12 (1921). Six months
after that act became law, the Commission reported its understanding that
the 1921 act had "been invoked only to an unimportant extent." Fifth
Annual Report of the U.S. Tariff Commission 96 (1921). Further legislation
was thus soon forthcoming in the House bill which became the Tariff Act of
1922.

  In 1922, the Senate Finance Committee, commenting on the House
bill (H.R. 7456), proposed broad authority to address unfair competition in
the import trade generally: "The provision relating to unfair methods of
competition in the importation of goods is broad enough to prevent every
type and form of unfair practice and is, therefore, a more adequate protection
to American industry than any antidumping statute the country has ever
had." S. Rep. No. 67-595 at 3 (1922); *see also* Conf. Rep. No. 67-1223 at
146 (1922). As part of the joint conference, and without any accompanying
explanation, the House agreed to the Senate proposal, but substituted the
word "articles" for "merchandise." Conf. Rep. No. 67-253 at 48 (1922).

The result of this was section 316 of the Tariff Act of 1922, Pub. L. No. 67-318, § 316, 42 Stat. 858, 943-44 (1922) ("1922 Act"), which, consistent with one of the Commission's proposals from 1919, invested the Commission with investigative authority to make recommendations to result in Presidential action.

Section 316, in relevant part, declared unlawful "unfair methods of competition and unfair acts in the importation of articles into the United States . . . the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States." *Id.* § 316(a). While the act provided the Commission with investigative authority, the Commission lacked remedial authority. *Id.* § 316(b). Instead, the Commission "assist[ed] the President," who, in turn could either impose an additional duty or an order that the articles be "excluded from entry." *Id.* § 316(e).

Shortly after the enactment of the 1922 Act, the Commission explained that section 316 "extends to import trade practically the same prohibition against unfair methods of competition which the Federal Trade Commission Act provides against unfair methods of competition in interstate trade." Sixth Annual Report of the United States Tariff Commission 4 (1922). In the Tariff Act of 1930, Pub. L. No. 71-361, ch. 497, § 337, 46 Stat. 590, 703-04 (1930) ("1930 Act"), section 316 became section 337, but it was only modified slightly. The most substantial amendment brought about by the 1930 act was providing for exclusion as the sole remedy, 1930

Act § 337(e); under the 1922 Act (§ 316(e)), the President previously had the additional authority to increase duties.[6]

Section 316, and then section 337, became a useful tool to combat patent infringement.  Thirteenth Annual Report of the United States Tariff Commission 28 (1929) ("Protection of domestic owners of patents from violation of their patent rights through the importation and sale of infringing articles is wholly inadequate under existing law apart from section 316. Such infringing articles may be and are imported in large quantities and distributed throughout the United States.").  Thus, Commission investigations increasingly became premised upon patent infringement.  But this in itself was potentially problematic because section 316 did not refer to patent infringement, nor was patent infringement within the ambit of what was classically considered to be unfair competition.  *Frischer & Co. v. Bakelite Corp.*, 39 F.2d 247, 260 (C.C.P.A. 1930) (explaining that unfair competition essentially meant "palming off").  Nonetheless, the Commission's reviewing court—one of this Court's predecessors—endorsed the Commission's extension of section 316 to patent infringement as a form of unfair competition.  *Id.* at 259-61.  In particular, the C.C.P.A. relied heavily on the remedial purpose of the statute and the Senate's expressed

---

[6] *See generally In re Orion Co.*, 71 F.2d 458, 463 (C.C.P.A. 1934) (noting the "only substantial differences being that the provisions for a writ of certiorari from the Supreme Court, and the provision giving the President a right to make increases of tariff duties, are omitted").

intent, from the 1922 Senate Report, "to prevent every type and form of unfair practice." *Id.* at 259. The C.C.P.A. reiterated this point shortly thereafter:

> We are of the opinion that when Congress used the phrase, in section 337(a) of the Tariff Act of 1930, 19 USCA 1337(a), "unfair methods of competition and unfair acts in the importation of articles into the United States," it did not intend that before such methods or acts could be stopped, the act had to fall within the technical definition of unfair methods of competition as it has been defined in some of the decisions, but we think that if unfair methods of competition or unfair acts in the importation of articles into the United States are being practiced or performed by any one, they are to be regarded as unlawful, and the section was intended to prevent them.

*In re Northern Pigment Co.*, 71 F.2d 447, 455 (C.C.P.A. 1934);[7] *see also In re von Clemm*, 229 F.2d 441, 443-44 (C.C.P.A. 1955); A199.49 (quoting *von Clemm*).

This history helps demonstrate the breadth of sections 316 and 337. The Commission's construction of "articles" is fully consistent with the foregoing legislative history, including the statute's remedial intent

---

[7] In *In re Amtorg*, 75 F.2d 826 (C.C.P.A. 1935), the C.C.P.A., while giving section 337 wide ambit, reversed the Commission determination of its authority over unpatented products made abroad using a patented process. *Id.* at 831-32. That had the effect of reversing *Frischer*, *Orion*, and *Northern Pigment* with respect to the process patents involved therein, but not the product patents. Congress subsequently reversed *Amtorg*. Act of July 2, 1940, ch. 515, 54 Stat. 724 (1940), codified at 19 U.S.C. § 1337a (1940) (presently codified as amended as 19 U.S.C. § 1337(a)(1)(B)(ii)). *See generally TianRui Grp. Co. v. ITC*, 661 F.3d 1322, 1333-34 (Fed. Cir. 2012).

discussed in *Northern Pigment*, 71 F.2d at 455, *Frischer*, 39 F.2d at 259, and *von Clemm*, 229 F.2d at 443-44. *See also TianRui*, 661 F.3d at 1335 (affirming the Commission because the appellants' arguments were "inconsistent with the congressional purpose of protecting domestic commerce from unfair methods of competition in importation such as trade secret misappropriation").

That is the extent of the pertinent legislative history. *Amici* Public Knowledge and Electronic Frontier Foundation presume a Congressional omniscience that because some telecommunications existed when section 337 was enacted, Congress expressed a "deliberate, intentional choice" for the digital models here not to be encompassed by section 337. PK/EFF Amicus Br. 10-12. These *amici* surmise legislative intent where there is none. That transatlantic telephone calls began shortly before the 1922 Act (PK/EFF Amicus Br. 10), for example, demonstrates little since it is unclear under what theory those telephone calls—as opposed to the digital models here—would be considered articles.[8] (Unlike the digital models produced and transacted here, the Commission is unaware of any use of the terms goods, products, or articles to describe the back-and-forth communications of a telephone call.)

---

[8] *Western Union Telegraph Co. v. Pendleton*, 122 U.S. 347, 356 (1887), which PK/EFF cites in its brief (PK/EFF Amicus Br. 6) is inapposite. In that case, Congress treated the telegraph signals exactly the same as tangible goods for purposes of the Interstate Commerce Clause. *Pendleton*, 122 U.S. at 356.

The Commission's reasonable determination that the digital models here are articles implements Congress's declared intention that section 316, and thereby section 337, "is broad enough to prevent every type and form of unfair practice." S. Rep. No. 67-595, at 3 (1922). To the extent that ClearCorrect and the *amici* who support it would limit "articles" to those specifically in Congress's mind in 1922 would be to limit "articles" not only as to the digital models at issue here, but also as to all of the future innovations that Congress did not, and could not, have appreciated.[9]

## B.   The Term "Articles" Includes the Digital Models Here

The Commission's determination properly began with the words of the statute. A199.41 (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979)). As discussed*, supra,* section 337 originated as section 316 of the Tariff Act of 1922. The Commission looked to contemporaneous and more recent dictionary definitions, which plainly encompass the digital models at issue here.[10] A199.43 & nn.20-21, A199.47 & n.22.

The Commission's interpretation of articles is consistent with contemporaneous interpretations of the Tariff Act after the 1922 and 1930

---

[9] *See generally, e.g.*, *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 157-58 (1975) (explaining that although "Congress did not revise the statutory language" from the 1909 Copyright Act to take account of commercial radio, "copyright law was quick to adapt to prevent the exploitation of protected works through the new electronic technology").

[10] The Commission does not rely on appeal on its reference in its opinion to articles as "a piece of writing." A199.43-.44.

legislation. In 1928, the Court of Customs and Patent Appeals defined "products," as used in the Tariff Act of 1922. *Bakelite v. United States*, 16 C.C.P.A. 378 (1928) was a tariff classification case, and the importer claimed that its "mixture" was not a "product." *Id.* at 380. The court rejected that argument:

> We are unable to perceive how any such claim may be maintained. The word "product" is thus defined:
>
> > Product: 1. Anything produced, as by generation, growth, labor, or thought, or by the operation of involuntary causes; as, the products of the season, or of the farm; the products of manufactures; the products of the brain. (Webster's New International Dictionary, 1925.)
>
> The word, as used in the statute, must be given its ordinary meaning, no commercial designation being attempted to be shown.

*Id.* at 381. Notably, the definition included "[a]nything produced." *Id.*

Similarly, shortly after the 1930 amendments, the C.C.P.A. addressed the meaning of "article"—though not in connection with section 337. *United States v. Eimer & Amend*, 28 C.C.P.A. 10, 12 (1940). In that decision, the court explained that the "word 'articles' is used hundreds of times in most tariff statutes, and obviously it is not always used in its broadest sense." *Id.* For that broadest sense, the court consulted a dictionary:

> 6. Something considered by itself and as apart from other things of the same kind or from the whole of which it forms a part; also, a thing of a particular class or kind, as distinct from a thing of

> another class or kind; as an *article* of merchandise; salt is a
> necessary *article.*

*Id.* at 12 (quoting the Webster's New International Dictionary).  The court

found that in the context of the appeal, "articles" was meant to be viewed

broadly, as "any provided-for substance, material or thing of whatever kind

or character that was imported into this country."  *Id.*  While the court may

not have had in mind distinctions between the tangible and intangible, its

own proffered definition is consistent with the Commission's interpretation

here.

The Commission correctly noted that, even in requests from Congress

to the Commission, it is now commonly understood that there are digital

goods.  A199.47-.48.  These items are transacted in the same manner as their

physical counterparts still are or used to be.  A199.48 & n.24.  Even the

Supreme Court has considered "the sale or release of certain information

into the interstate stream of business" to constitute "articles of commerce" as

required for Congressional authority under the Supreme Court's

interpretation of the Interstate Commerce Clause.[11]  *Reno v. Condon*, 528

U.S. 141, 148 (2000) ("Because drivers' information is, in this context, an

article of commerce, its sale or release into the interstate stream of business

is sufficient to support congressional regulation."); *Senne v. Village of*

---

[11] Even prior to the enactment of section 337, the Supreme Court found,
analogizing to goods, that the unauthorized transmission of news matter by
telegraph constituted unfair competition.  *International News Serv. v.
Associated Press*, 248 U.S. 215, 240-42 (1918).

*Palatine,* 695 F.3d 617, 620 (7th Cir. 2012) (explaining that *Reno* "identifies the information that the state possesses and 'release[s]' into interstate commerce as 'an article of commerce'"); *see* A199.44-.45. Thus, "articles" broadly includes the digital models at issue in this appeal.

In opposition to the Commission's decision, *amicus* Business Software Association argues that the Supreme Court decided the definition of "article" in *Junge v. Hedden*, 146 U.S. 233 (1892). BSA Amicus Br. 7. The Supreme Court noted that in "common usage, 'article' is applied to almost every separate substance or material," consistent with the arguments presented to the Court that purported to distinguish materials from articles. *Id.* at 238. The Supreme Court rejected the importer's argument that its India rubber was a "material" and not an "article" composed of rubber. *Id.* at 239. Nothing in *Junge* evinces an intention to define the outer boundaries of the term "article" some thirty years prior to the 1922 Act. BSA suggests that in view of *Junge*, "article" throughout all Tariff Acts, present and future, must subscribe to that definition of "article." BSA Amicus Br. at 7. But *Junge* did not set the meaning of "article" in all places for all times. Certainly, the C.C.P.A. did not think so when it acknowledged the hundreds of instances of "article" and noted that the term can mean different things in different places, as the context of each usage suggests. *Eimer & Amend*, 28 C.C.P.A. at 12.

ClearCorrect and the *amici* argue in favor of a narrower interpretation of "article" based upon supposed inconsistencies within section 337, and

with other uses of "article" in Title 19 of the U.S. Code.  That section 337 calls for exclusion orders—which would not cover the importation of these digital models—is of no moment.  In 1974, when Congress gave the Commission the authority to issue cease and desist orders, Congress explained that an exclusion order "is so extreme *or inappropriate* in some cases that it is often likely to result in the Commission not finding a violation of this section, thus reducing the effectiveness of section 337 for the purposes intended."  S. Rep. No. 93-1298, at 198 (1974) (emphasis added).  The present appeal presents such an inappropriate circumstance.

While the cease and desist order provision may have been viewed as a lesser remedy when it was first enacted, subsequent amendments have changed its character.  First, in 1979, Congress provided for civil penalties for violation of cease and desist orders, but not exclusion orders.  Trade Agreements Act of 1979, Pub. L. No. 96-39, § 1105(b), 93 Stat. 144, 311 (1979) (codified as 19 U.S.C. § 1337(f)(2)).  Then in 1988, Congress increased these penalties tenfold.  Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1342(a)(4)(B), 102 Stat. 1107, 1213 (1988) (revising 19 U.S.C. § 1337(f)(2)).[12]  One result of these changes is that violation of a cease and desist order can have dramatic consequences lacking

---

[12]  The 1988 act also amended section 337(f) to give the Commission authority to issue cease and desist orders "in addition to or in lieu of" exclusion orders, as opposed to "in lieu of" them.  Pub. L. 100-418 § 1342(a)(4)(A), 102 Stat. 1213 (revising 19 U.S.C. § 1337(f)(1)).

for exclusion orders.  *See, e.g.*, *Ninestar Tech. Co. v. ITC*, 667 F.3d 1373, 1380 (Fed. Cir. 2012) (affirming $11 million civil penalty).  Another result is that the Commission has two remedies at its disposal.[13]  *See* A199.56 n.29.

That other sections of the Tariff Act may regulate a narrower subset of "articles" in other contexts, such as tariff classifications, is irrelevant.  ClearCorrect Br. 14-16; BSA Amicus Br. 10-14; Internet Assoc. Amicus Br. 23-27.  The Tariff Act of 1930 as amended, 19 U.S.C. §§ 1202-1683g, occupies 338 pages of the U.S. Code.  19 U.S.C. §§ 1202-1683g, pp. 55-392 (2013).  The various provisions were enacted and amended at different times and to serve different statutory purposes.  Any presumption that a word should mean the same meaning in all contexts "readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent."[14]  *General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004) (quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)); *see also Robinson v. Shell Oil*, 519 U.S. 337, 343 (1997) (holding that the term "employees" carries a different meaning in different sections of Title VII).  The other, many,

---

[13] There will be circumstances in which a cease and desist order is more onerous than an exclusion order, including where a respondent's importations are already substantially complete.

[14] Indeed, even statutory definitions can yield to context.  *In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 158-60 (2d Cir. 2012).  The Tariff Act lacks any statutory definition of "article" for section 337.

sections of the Tariff Act, concerning classifications and the like, lack section 337's broad remedial purpose specifically evidenced by Congress in enacting section 316 in 1922 and section 337 in 1930, extensively discussed above.  A199.46-.52.

### C. The Commission's Authority Is Consonant with That of Other Agencies

The Business Software Alliance and PK/EFF argue that in the 1930s, Congress was aware of electronic transmissions and created the Federal Communications Commission for that purpose.  BSA Amicus Br. 3; PK/EFF Amicus Br. 6-9.  They offer no explanation for how the Communications Act of 1934 is *in pari materia* with the Tariff Act (either the 1922 or 1930 acts) to affect the Tariff Act's construction.  In any event, the FCC regulatory authority over certain aspects of telecommunications does not preempt other agencies from fulfilling their missions.[15]  Given the pervasiveness of electronic communications that have replaced either tangible communications or tangible things, it can be understood that

---

[15] PK/EFF's incredulity that "Congress would invest a trade commission with authority over data transmissions" and then invest the FCC with jurisdiction over "data transmissions," PK/EFF Amicus Br. 9, is misguided. The FTC (1914) and the FCC (1934) both regulate transmissions.  Further, the FTC (1914) and section 316 of the Tariff Act (1922) overlap.  *See generally* Nineteenth Annual Report of the United States Tariff Commission 14 (1935) ("the Federal Trade Commission and the Tariff Commission now have concurrent jurisdiction in all import cases other than those involving patents").

virtually every agency's mission extends to certain aspects of electronic communications.

By way of example, the Federal Trade Commission is deeply entrenched in regulating electronic transmissions, including, *e.g.*, robocalls and online privacy.[16]  The FTC's authority to do so arises under section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which reads in part, as it has for a hundred years:  "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."[17]  15 U.S.C. § 45(a)(1).  Notably, that section formed the basis for section 316 of the Tariff Act of 1922.  *See, e.g., In re Frischer & Co.*, 16 U.S. Cust. App. 191, 212 (1928) ("Section 316 of the Tariff Act of 1922 . . . in many respects is an absolute and precise copy of the Federal Trade Commission act.").

The Business Software Alliance argues that Congress intended such breadth for the FTC because "[w]hen Congress sought to extend an agency's authority beyond physical 'articles' to all commerce, it did so by using that term—'commerce'—on its own, authorizing the agency to regulate

---

[16] Bureau of Consumer Protection, *at* http://www.ftc.gov/about-ftc/bureaus-offices/bureau-consumer-protection (visited January 6, 2015). Additional examples are not far to seek, such as financial regulators and electronic trading.

[17] *See generally* Neil W. Averitt, *The Meaning of "Unfair Methods of Competition" in Section 5 of the Federal Trade Commission Act*, 21 B.C. L. Rev. 227 (1980).

'commerce' for specific purposes." BSA Amicus Br. 15. BSA's argument, however, is circular, presupposing a narrow definition of article and a broad definition of commerce. There is no evidence of Congressional intent for this in the Tariff Acts of 1922 or 1930 or in the FTC Act.

Moreover, even recognizing that "commerce" (as in the FTC Act) includes services, does not help in defining whether these digital models are articles—within the scope of ITC authority, *see* A199.45 ("items as are bought and sold in commerce")—or fall into the ambit of services or something else. Here, the Commission decided for the reasons set forth above and in its opinion that the digital models are "articles." The record shows that CCPK produces the digital models and sends them to CCUS. A199.24. In exchange CCUS pays CCPK. A78235 (Tr. 364-65).

The Supreme Court examined a similar agency analysis in *United States v. Eurodif S.A.*, 555 U.S. 305 (2009), involving the Commerce Department's delineation of goods from services. In that case, this Court twice did not defer to the Commerce Department's determination that transactions for uranium enrichment should be considered as the sale of goods rather than as the sale of services under section 371 of the Tariff Act of 1930 as amended, 19 U.S.C. § 1673. *Eurodif S.A. v. United States*, 411 F.3d 1355, 1365 (Fed. Cir. 2005), *aff'd on rehearing*, 423 F.3d 1275, 1277-78. The Supreme Court reversed, both as to deference and as to result, upholding Commerce's determination that certain transactions were for the sale of goods. *Eurodif*, 555 U.S. at 316-20. The Supreme Court explained:

"This is the very situation in which we look to an authoritative agency for a decision about the statute's scope, which is defined in cases at the statutory margin by the agency's application of it, and once the choice is made we ask only whether the Department's application was reasonable." *Id.* at 319.

### D. This Court's Decision in *Bayer v. Housey* Is Not to the Contrary

In support of their arguments limiting "articles," ClearCorrect and the *amici* who support it rely heavily upon *Bayer AG v. Housey Pharmaceuticals, Inc.*, 340 F.3d 1367 (Fed. Cir. 2003). ClearCorrect Br. 9-12; Internet Assoc. Amicus Br. 18-22. ClearCorrect's arguments fail for three reasons: (1) *Bayer* interprets the breadth of 35 U.S.C. § 271(g) and not section 337; (2) even as to section 271(g), *Bayer* interpreted "products *made*" (emphasis added) and not all "products"; and (3) even if *Bayer* were read (against its own reasoning and discussion) to concern "products" and "articles" generally, ClearCorrect overstates the effect of *Bayer* on section 271, much less section 337.

What was at issue in *Bayer* was what the Court called the "importation of information in the abstract." *Bayer*, 340 F.3d at 1376. Specifically, patent owner Housey asserted patent claims directed to "a method of screening for substances which specifically inhibit or activate a particular protein affecting the . . . characteristics of the cell expressing the protein." *Id.* at 1369 (quotation omitted). Based on this method, "a cell line is produced that is characterized by a higher production of the protein of

interest relative to an original cell line." *Id.* Housey alleged that Bayer infringed by, *inter alia*, importation of "the critical information, the identification and characterization of a drug, which is made by the patented process." *Id.* at 1370 (quotations, modifications, and emphases omitted).

With regard to "the information" at issue, the Court interpreted "a product which is made by a process patented in the United States" to mean "a product which is *manufactured*" by a process patented in the United States, and found that the information was not manufactured. *Id.* at 1372-73. In equating "made" with "manufactured," the Court first looked to dictionary definitions of "made," which it found nondispositive, because "made" does not necessarily mean "manufactured." *Id.* at 1372 (noting that under "these circumstances, the text is ambiguous, and we must look beyond the particular language being construed."). The Court then looked to section 271(g) as a whole, which suggested the narrower "manufactured" but which did not end the inquiry. *Id.* at 1372-73.

The Court then considered the legislative history, which, after extensive discussion, *id.* at 1373-76, the Court found silent beyond "manufactured" products, *id.* at 1376. It was in this context that the Court analogized section 271(g)'s "products made" with section 337(a)(1)(A)'s "articles that . . . are made." *Id.* at 1373. However, in assuming that "articles that . . . are made" required manufacture, the Court did not look to

any of the legislative history of section 337 (or section 316) itself.[18]  In any event, the Court's discussion was explicitly dicta, as the Court explained that "[e]ven if" this comparison with section 337 were put to the side, "we have been directed to nothing in the legislative history suggesting that Congress" intended the breadth for section 271(g) sought by Housey.  *Id.* at 1374. What then followed was nearly three full pages of legislative-history analysis of section 271(g) (as opposed to section 337), including that legislative history's focus on "manufacturers" and "manufacturing techniques."  *Id.* at 1374-76.

Far from dictating the result in the present appeal, *Bayer* is inapposite. In interpreting "product *made*"—and thereby "manufactured articles," *id.* at 1374, 1376—*Bayer* did not purport to interpret the breadth of "product" (*e.g.*, product of nature) or, for that matter, the breadth of section 337.  The Court was express that it was not limiting section 337:  "We recognize that section 1337 covers both articles that were 'made' and articles that were 'produced, processed, or mined.'  While this language in section 1337 perhaps suggests a broader scope for section 1337 than for section 271(g),

---

[18] Because the Commission was not a party in *Bayer*, the Commission did not have an opportunity to comment then on the Court's characterization of section 337.  To the extent *Bayer* interpreted section 337, it does not displace the Commission's construction here.  *See National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-84 (2005).

nothing in section 1337 suggests coverage of information, in addition to articles, *under section 271(g)*." *Id.* at 1374 n.9 (emphasis added).

To be clear, then, the threshold question in the present appeal about "articles" does not turn on what is meant by "articles made" or "articles manufactured." The question instead is what is meant by "articles." Similarly that question does not turn on the language in section 337(a)(1)(B)(ii) about articles "made, produced, processed, or mined." 19 U.S.C. § 1337(a)(1)(B)(ii). That language is only sometimes at issue in Commission investigations,[19] in view of the Commission's independent authority under 19 U.S.C. § 1337(a)(1)(B)(i).

To rely as heavily on *Bayer* as ClearCorrect and the *amici* do also is to lose sight of the facts of *Bayer*. *Bayer* dealt with the "importation of information in the abstract":

> Finally, reading the statute to cover processes other than manufacturing processes could lead to anomalous results. The importation of information in the abstract (here, the knowledge that a substance possesses a particular quality) cannot be easily controlled. As Bayer points out, a person possessing the allegedly infringing information could, under Housey's interpretation, possibly infringe by merely entering the country. . . . Such an illogical result cannot have been intended.

---

[19] The "made, produced, processed, or mined" language is relevant to the Commission's infringement determination as to the Group II (not Group I) patent claims, but has not been raised by ClearCorrect on appeal.

*Bayer*, 340 F.3d at 1376.  Similarly, *NTP, Inc. v. Research in Motion, Ltd.*
(another section 271(g) case) dealt with the transmission of all email—
millions or billions of messages—using Blackberry Enterprise Servers.  418
F.3d 1282, 1289, 1323 (Fed. Cir. 2005).

In contrast, each digital model in the present case is the tooth
alignment for a single patient, from which an orthodontic appliance is made
for that patient.  A199.21, .104.  ClearCorrect itself acknowledges that the
digital models are analogous to physical goods.  ClearCorrect Br. 41.  This is
a significant difference, because a number of district courts have found
similar compilations of information to be "products made" under section
271(g).  Should those district courts be correct in distinguishing *Bayer*,
ClearCorrect's reliance upon *Bayer* falls apart not just for analogy to section
337, but with respect to section 271(g) itself.

In *CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985 (N.D.
Cal. 2007), the district court discussed *Bayer* and *NTP* extensively.  At issue
in that case was an electronic "product catalog" that was "generated and
stored on a server located in Pakistan."  *Id.* at 991.  The district court noted
that "the relevant object for the court's analysis is the object made by the
patented process—the catalog," and that the "the catalog, *i.e.*, the data file, is
in fact an object that is present in the United States because the file is
downloaded onto the local hard drives of computers owned by customers in
the United States."  *Id.* at 994.  The district court distinguished *Bayer*
because the product catalog, "far from being abstract information or

- 38 -

knowledge, is a physical article no different from a product catalog manufactured and assembled on paper bound with stitching, glue or staples. The court holds that the catalog is a 'product' within the meaning of section 271(g) which is 'made by' [the asserted patented] processes and is 'imported' and 'used' in the United States." *Id.* at 994.

The district court also distinguished *NTP*: "To the extent that the [*NTP*] holding was based on the fact that the claims in *NTP* were directed to the transmission of email messages, *NTP* is distinguishable because the claims in this case are directed to the *creation and manufacture* of a catalog, not to its *transmission or delivery*." *Id.* at 995 (emphasis in original). The district court continued:

> To the extent that the [*NTP*] holding was based on the fact that the email messages in *NTP*, though tangible, were nevertheless not physical products, this case is still distinguishable. While email messages are not products that are bought and sold, a catalog—whether its physical form is etchings on a CD-ROM, magnetic fields in a server, or ink on paper—is a product that is bought and sold.

*Id.* So too the digital models here. *See* A199.24 (transfer of digital models from CCPK to CCUS); A78235 (Tr. 364-65) (payment).

Recently, a number of other district courts have followed *CNET*'s interpretation of *Bayer* and *NTP*. Of particular note is *Ormco Corp. v. Align Technology, Inc.*, 609 F. Supp. 2d 1057 (C.D. Cal. 2009). In that decision, the district court followed *CNET* for the same types of 3D digital dental models at issue in this appeal: "Like the catalog in *CNET Networks*, the 3D

digital model is not a mere package of information, but a 'creation' produced by 'practicing each step' of a patented process." *Id.* at 1076; *see id.* at 1076-77 & n.19. *See also McRO, Inc. v. Namco Bandai Games America, Inc.*, 23 F. Supp. 3d 1113, 1122-23 (C.D. Cal. 2013); *Yangaroo Inc. v. Destiny Media Techs. Inc.*, 720 F. Supp. 2d 1034, 1038 (E.D. Wis. 2010) ("Unlike the patents at issue in *CNET* and *Ormco*, however, the '712 patent does not claim a method of creating or manufacturing the digital content that is received in servers and then transmitted to authorized recipients."); *WesternGeco L.L.C. v. Ion Geophysical Corp.*, No. 4:09-cv-1827, 2011 WL 3608382, at *13-14 (S.D. Tex. Aug. 16, 2011); *Zond v. Toshiba Corp.*, No. 13-cv-11581-DJC, 2014 WL 4056024, at *4 (D. Mass. Aug. 14, 2014). Accordingly, beyond overextending *Bayer* to section 337, *Bayer*'s result may not apply to the facts of this case under section 271(g) itself.

### E. Questions About Section 101 Should Be Presented As Part of An Invalidity Defense, <u>and No Such Defense Was Presented Here</u>

The Internet Association also purports to argue that the asserted patents here are invalid under 35 U.S.C. § 101, because electronic transmissions are not patent eligible. Internet Assoc. Amicus Br. 6, 10-11. However, ClearCorrect did not present a section 101 challenge to the Commission, A199.57-.58 & n.30, it does not make one on appeal, and the asserted patents are presumed valid, 35 U.S.C. § 282. Accordingly, the issue is not before this Court. While a section 101 determination "bears some of

the hallmarks of a jurisdictional inquiry," *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring)—*i.e.*, the efficiency of deciding properly presented section 101 issues at the outset, *see id.* at 718-720—section 101 is not jurisdictional.  *See, e.g.*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161-62 (2010) (statutory limitations are presumed not to be jurisdictional).  Thus, a section 101 defense is now lost. *See Kontrick v. Ryan*, 540 U.S. 443, 459-60 (2004) (distinguishing "failure to state a claim upon which relief can be granted" from a court's subject-matter jurisdiction); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006) (same).

That the Internet Assocation attempts this challenge collaterally—in the guise of what "articles" are under section 337—is no more permissible than a now-foreclosed direct challenge.  Moreover, the Internet Association's attempt to squeeze the section 101 issue into section 337 makes little sense because patent infringements are only a subset of the unfair acts listed in section 337.[20]  *See* 19 U.S.C. § 1337(a)(1)(A)-(D).

## F.    The *Amicis'* Concerns Regarding Internet Service Providers Have Nothing to Do with This Case

The Internet Association's and PK/EFF's briefs also concern the burden imposed on Internet service providers.  Internet Assoc. Amicus Br. 2-6; PK/EFF Amicus Br. 13-17.  But apparently, the burden is strictly

---

[20] The Internet Association acknowledges as much in a footnote.  Internet Assoc. Amicus Br. 11-12 n.3.

hypothetical, because the *amici* point to nothing in the delivery of digital models from ClearCorrect Pakistan to ClearCorrect USA that somehow affects any non-party to this proceeding. Moreover, cease and desist orders, such as the one at issue here, are *personal* remedies. 19 U.S.C. § 1337(f); *see Gamut Trading Co. v. USITC*, 200 F.3d 775, 784 (Fed. Cir. 1999). The orders issued here extend to ClearCorrect's officers, employees, and agents. A217, A226. Such orders can extend only to the named respondent or those who command the respondent's infringement such as corporate officers. *Fuji Photo Film Co. v. ITC*, 474 F.3d 1281, 1291-92 (Fed. Cir. 2007). The Internet Association does not argue that there is an agency relationship between Internet service providers and their customers, such as ClearCorrect, and consequently, the Commission order does not extend as far as the Internet Association and PK/EFF intimate.

PK/EFF also argues that "[a]ction by this Court is necessary because the decision below, on its face, articulates no limiting principles on the scope of the Commission's authority." PK/EFF Amicus Br. 18. This solicitation of an advisory opinion from the Court puts the cart before the horse. To the extent that the Commission ever institutes an investigation that could give rise to the concerns actually identified by PK/EFF and the Internet Association, that case—with whatever facts it presents—is the appropriate forum, not here. Here, the Commission explained that these data sets are for fabricating dental appliances. A199.38, A199.57.

## III.   ALIGN'S PATENTS ARE INFRINGED

There is no factual dispute that ClearCorrect practices, or contributes to the practice, of all of the steps of each asserted patent claim that it was found to infringe. Instead, ClearCorrect makes certain legal arguments that, notwithstanding its practice of these claimed methods, its conduct is not actionable. To be clear, ClearCorrect argues that its conduct is not actionable *anywhere*—either at the Commission or in the district courts. While the arguments presented by the *amici* supporting ClearCorrect suggest merely that the Commission is the wrong forum, those arguments miss the mark by assuming that relief is available to Align in the district courts, but not at the Commission.

### A.   ClearCorrect Infringes the Group I Patent Claims

As set forth above, the Group I asserted claims are directed to a method of forming dental appliances starting with a digital data set. A199.73-.74. Direct infringement of these claims occurs in the United States,[21] so infringement is predicated on contributory infringement, specifically the importation of the digital models used in the United States to make the infringing dental appliances. In its opening brief, ClearCorrect challenges the Commission's finding of contributory infringement for five different reasons. None of ClearCorrect's arguments are persuasive.

---

[21] *See* A199.73-.74 & n.36 (discussing which ClearCorrect entity is the direct infringer for each of the three patent claims within Group I).

#### 1.    The Commission Properly Found That There Are No Substantial Noninfringing Uses for the Digital Models

To establish "contributory infringement liability, the patent owner must show, among other things, that there are no substantial noninfringing uses." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012). Noninfringing uses are substantial "when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental," and the factfinder may consider "the use's frequency, the use's practicality, the invention's intended purpose, and the intended market." *Id.* (quotations and modification omitted). As infringement is a question of fact, the question whether the digital models have substantial noninfringing uses is also a question of fact. *See Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1579 n.12 (Fed. Cir. 1987).

ClearCorrect's arguments are purely as to illusory uses, which are not cognizable. *Toshiba*, 681 F.3d at 1362. To the extent that ClearCorrect chooses to offer services other than for making incremental orthodontic appliances, then its digital models are beyond the scope of the asserted patents and beyond the scope of the cease and desist orders here. A216-18; A225-27.

It is undisputed that ClearCorrect's digital data sets "*have no separate commercial value*" apart from incremental dental appliances. A199.85; A794 (quoting A79764). That dentists can review the digital models before orthodontic devices are made does not establish a substantial noninfringing

use. There is no credible evidence that any dental professional would review *these* data sets—or that patients would pay for them—but for the production of orthodontic appliances. ClearCorrect's only citation in support of this dental-review "use" is A78235-36 (ClearCorrect Br. 28), which is testimony of a witness who opined on what digital models "could" be used for. ClearCorrect's models are not *actually* used for those purposes independent of orthodontics. A78236 (Tr. 366:1-22). To the extent that there were such a use, there is no evidence of substantiality.

Similarly, ClearCorrect hypothesizes that its digital models can be used for "planning and modeling of dental restorations." ClearCorrect Br. 28. But these models at issue are not so used. ClearCorrect cites an expert report—from an unrelated litigation to which ClearCorrect was not a party—concerning the history of tooth-related computer aided design. A80022-26. This is irrelevant. ClearCorrect offered no evidence of how its accused models are used for dental restoration, and there is no evidence in the record of any such uses. To the extent that ClearCorrect's business model broadens over time to include uses other than in connection with incremental orthodontic appliances, the Commission's cease and desist orders do not reach those activities. A216-18; A225-27.

Finally, ClearCorrect suggests that another use of its data would be to infringe others' patents, specifically, Ormco Corp.'s. ClearCorrect Br. 29. ClearCorrect confuses its activity (creation of digital models and orthodontic devices based on those models) with the result of its activity (infringement).

It is unclear how infringing multiple patent portfolios can or should exculpate ClearCorrect here.

### 2.    Contributory Infringement Does Not Require the Same *Mens Rea* as Inducement

ClearCorrect next argues that it did not contributorily infringe because it lacked the adequate *mens rea* to do so.  ClearCorrect Br. 30-33.  This Court has held that when there are no substantial noninfringing uses, an accused infringer aware of the asserted patents can be presumed to possess the requisite knowledge of contributory infringement.  *Spansion, Inc. v. ITC*, 629 F.3d 1331, 1355 (Fed. Cir. 2010).  Because ClearCorrect was aware of the asserted patents,[22] and because the Commission's finding of no substantial noninfringing uses is supported by substantial evidence, as discussed above, ClearCorrect's argument is not legally cognizable.

ClearCorrect argues that the Commission should have applied the same *mens rea* requirement for contributory infringement that is required for induced infringement.  ClearCorrect Br. 30-32.  But this Court has already rejected that proposition.  *See, e.g.*, *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1340 (Fed. Cir. 2008) ("Unlike contributory infringement,

---

[22] ClearCorrect argues that CCPK (as opposed to CCUS) lacked knowledge of the '325 patent, which is one of the two Group I patents. ClearCorrect Br. 33.  The ALJ properly concluded that there is "no question that CCUS and CCPK have knowledge of the '325 patent."  A1619. CCPK's CEO testified that he knew about Align's infringement action against CCUS which asserted this patent, and knew generally about Align's patents and infringement allegations.  A1619 (citing A78251 & A78254-55).

induced infringement liability under § 271(b) requires proof that 'the inducer [has] an affirmative intent to cause direct infringement.'") (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc as to *DSU* section III.B)). *See generally* Giles S. Rich, *Infringement Under Section 271 of the Patent Act of 1952*, 35 J. Pat. & Trademark Off. Soc'y 476, 492 (1953). Accordingly, as discussed in the Commission opinion, the Commission's contributory infringement findings are supported for all the asserted patents. A199.85; A1619.

### 3.    The Accused Digital Models Are "a Material" Used in the Patented Processes

Section 271(c) imposes contributory liability for "import[ing] into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process." 35 U.S.C. § 271(c). The Commission found that the digital models at issue are "a material" for use in practicing the asserted patents. The Commission opinion extensively discusses its reasoning in support of this legal conclusion. A199.86-.93. On appeal, ClearCorrect argues that "a material" in section 271(c) is limited to "tangible things and does not mean electronic transmission of data." ClearCorrect Br. 35. ClearCorrect's arguments are analogous to those ClearCorrect presents concerning "articles," but take aim here at the Patent Act rather than the Tariff Act.

In support of its tangibility requirement for "a material," ClearCorrect offers the definition of "material" from the 2009 edition of the Black's Law

Dictionary, which ClearCorrect submits means "[o]f or relating to matter; physical . . . ." ClearCorrect Br. 35 (quoting Black's Law Dictionary 1066 (9th ed. 2009)). ClearCorrect then looks to a different dictionary to redefine "matter." ClearCorrect Br. 36 n.5. ClearCorrect's reasoning is flawed. The Black's definition is expressly for the adjectival form of "material" and not the noun. Black's Law Dictionary 1066 (9th ed. 2009). The most recent version of Black's does include definitions of the noun. One of those definitions is: "Information, ideas, data, documents or other things that are used in reports, books, films, studies, etc." Black's Law Dictionary 1124 (10th ed. 2014). Another is the "things that are used for making or doing something." *Id.*

Such broader definitions are consistent with the Commission's analysis. In particular, the Commission looked to dictionaries contemporaneous with the Patent Act of 1952, from which section 271(c) originates. A199.86-.87. Even then, it was recognized, as the definition of the noun "material" from Black's presently states, that "a material" need not be tangible.[23] A199.86-.87 (collecting 1940s dictionary definitions).

---

[23] "Material" lacks a tangibility requirement under copyright law, *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 161 (1975) (copyrighted "material" cannot be broadcast without license), and unfair competition law*, International News Serv. v. Associated Press*, 248 U.S. 215, 239-42 (1918) (transmission of "material" for unfair competition).

Given that the digital models here are unquestionably the most important part of the patented processes—they represent the sequence of tooth alignments used in treatment—such interpretation is sensible and reasonable. ClearCorrect offers no legislative history from the Patent Act of 1952, nor is the Commission aware of any pertinent such history, limiting "a material" to that which is tangible.

Nor does the caselaw demand the tangibility requirement urged by ClearCorrect. ClearCorrect relies principally on the Supreme Court's decision in *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) involving section 271(f), not 271(c). In that case, Microsoft shipped disks containing its Windows operating system, or transmitted the code containing that operating system, abroad. *Id.* at 445. Foreign manufacturers generated copies, which were installed on their computers; those computers were in turn sold abroad. *Id.* at 445-46. AT&T owned a patent for speech compression, and infringement occurred "only when Windows is installed on a computer, thereby rendering it capable of performing as the patented speech processor." *Id.* at 446.

*Microsoft* does not support ClearCorrect. As the Court noted, "no one in this litigation argues that software can *never* rank as a 'component' under § 271(f)." *Id.* at 447. The Supreme Court treated the electronic transmissions from the United States exactly the same as it treated the mailing of physical discs. *See e.g., id.* at 445. Moreover, the Supreme Court never imposed a tangibility requirement for all components under section

271(f), but reserved the question for a future case. *Id.* at 452 n.13; *see Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1361-62 (Fed. Cir. 2009) (en banc) (noting the Supreme Court's reservation of the question). Unlike the facts of *Microsoft,* in which a computer was capable of performing the asserted patent claims only after installation of Windows, *id.* at 445-46, 452 n.13, the Group I patent claims here expressly call for the making, obtaining, or providing of the digital models themselves.

Moreover, in the present case, ClearCorrect transmits from Pakistan a digital model to the United States and it is *that* digital model—each for one patient—that is used to manufacture the orthodontia for that patient. A794; A78224 (Tr. 320); A78255 (Tr. 443). This difference is critical, as the Supreme Court explained:

> A machine for making sprockets might be used by a manufacturer to produce tens of thousands of sprockets an hour. That does not make the machine a "component" of the tens of thousands of devices in which the sprockets are incorporated, at least not under any ordinary understanding of the term "component."

*Microsoft*, 550 U.S. at 451.[24]

Thus, *Microsoft* is distinguishable even under section 271(f) because the present facts are not like Microsoft's supply of operating systems or like

---

[24] Microsoft contended that a disk shipped from the United States installed directly onto a computer abroad would avoid infringement, *i.e.*, absent the foundry steps present in the case. *Id.* at 453 n.14. The Supreme Court expressly reserved the question. *Compare id.* with *id.* at 460-62 (Alito, J., concurrence).

a sprocket-making machine.  Indeed, one district court so found with respect

to digital models for dental appliances, precisely the facts on appeal:

> [The data file containing the 3D digital model] is information that
> is incorporated into other steps of the patented claims, without
> which the patented claim cannot fully be completed.  It is the sole
> source of information about a patient's teeth, not a generalized set
> of steps.  Unlike a blueprint or "template," it is more like an
> "ingredient" in a recipe than the recipe card itself.

*Ormco Corp. v. Align Tech, Inc.*, 609 F. Supp. 2d 1057, 1071 (C.D. Cal.

2009) (footnotes omitted).  Accordingly, the district court found the digital

models to be "components" under section 271(f).[25]  *Id.*

The present appeal is not a subsection 271(f) case.  Instead, this

appeal involves subsection 271(c).[26]  Subsection 271(f) omits subsection

271(c)'s coverage for "a material or apparatus for use in practicing a

patented process."  35 U.S.C. § 271(c).  Unlike section 271(f), Congress

most certainly did provide coverage in section 271(c) for *Microsoft's*

sprocket-making machine—as a material or apparatus for performing a

patented method—so long as the other requirements, such as no substantial

---

[25] This Court subsequently ruled *en banc* that all method claims are
beyond the scope of section 271(f).  *Cardiac Pacemakers*, 576 F.3d at 1363-
64.

[26] In *Robocast, Inc. v. Microsoft Corp*, 21 F. Supp. 3d 320, 331-32 (D.
Del. 2014), the district court rejected reliance upon the Supreme Court's
section 271(f) analysis in connection with section 271(c).  *But see Veritas
Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141, 1275 (W.D.
Wash. 2008).

noninfringing uses, are met.  This Court compared subsections 271(c) and 271(f) in its *en banc* decision in *Cardiac Pacemakers*, explaining that "Congress clearly believed that a 'component' was separate and distinct from a 'material or apparatus for use in practicing a patented process.'"  576 F.3d at 1363-64.  Accordingly, *Microsoft* offers no pertinent guidance as to the interpretation of section 271(c).

The most pertinent case from this Court concerning section 271(c) is *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), which ClearCorrect does not discuss.  *See* A199.89-90.  At issue in *Lucent* was an asserted patent that covered entering information into fields on a screen without using a keyboard, such as with a pop-up calendar.  *Id.* at 1308, 1317.  The parties disputed what the relevant component was for purpose of establishing noninfringing uses.  The Court agreed with Lucent that the component was the date-picking tool, and not the accused Outlook software as a whole.  *Id.* at 1320.  The Court noted that "if, instead of selling Outlook with the date-picker, Microsoft had offered the date-picker for sale as a separate download to be used with Outlook, there would be little dispute that Microsoft was contributing to infringement of the" asserted patent.  *Id.* Plainly, then, digital files that are downloaded can contribute to infringement.  Moreover, the Court rejected Microsoft's reliance on *Microsoft v. AT&T*, explaining that "the Supreme Court in *Microsoft* did not address the meaning of 'material or apparatus' in § 271(c)."  *Lucent*, 580 F.3d at 1321.

ClearCorrect also argues that certain decisions of this Court impose a tangibility requirement upon "a material." ClearCorrect Br. 35, 37-38. Those decisions are inapposite. ClearCorrect asserts that in *Bayer*, "this Court construed section 271(c)." ClearCorrect Br. 35. That assertion is incorrect; *Bayer* is a section 271(g) case, and it never discusses section 271(c). ClearCorrect offers a dictionary from 2000 to argue that "especially adapted" can be defined as "to *make* suitable to or fit for a specific use or situation," ClearCorrect Br. 37 n.6, and thereby to argue that "adapted" be confined to section 271(g)'s limitation on a "product which is *made* by a process." ClearCorrect cannot demonstrate either in the ordinary meaning of "adapted" or in the legislative history of section 271(c), a relationship between "adapted" and *Bayer's* discussion of "manufactured." *Bayer*, 340 F.3d at 1368. Neither section 271(g) itself, nor *Bayer*'s interpretation of it, has the effect of narrowing the meaning of section 271(c), which preceded section 271(g) by nearly four decades.

ClearCorrect's other cases, ClearCorrect Br. 38-39, also fail to support it. *PharmaStem* involved patent claims covering the therapeutic use of neonatal or fetal blood cells. *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1348 (Fed. Cir. 2007). The patent owner, PharmaStem, sued blood banks that stored umbilical cord blood. *Id.* at 1347-48. PharmaStem's infringement theory was that the blood banks contributed to the infringement of one of the asserted patents. *Id.* at 1356. The Court found:

> The evidence showed that the cord blood the defendants collected and preserved was never their property; instead it remained the property of the families who engaged their services. The defendants were never the owners of the blood and thus never 'sold' the blood to the families when it was needed. The district court therefore properly held that the defendants could not be found liable for contributory infringement under section 271(c).

*Id.* at 1358; *id.* at 1357 (the "defendants were never owners of the blood, but instead were merely bailees").

*PharmaStem* does not stand for the proposition that intangibles cannot be materials, nor could it, since the case dealt with blood transfer. All that PharmaStem holds is that, as bailees, the blood banks cannot be liable as contributory infringers. No such special relationship exists here with CCPK.

ClearCorrect also cites *Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368 (Fed. Cir. 2011) for the proposition that a tangible product is required for contributory infringement. ClearCorrect Br. 38-39. *Arris* dealt with how to "hold a component supplier liable." *Arris*, 639 F.3d at 1376. The Commission did not rely upon component supply, but instead sale of "a material" for "use in practicing a patented process." This Court distinguished the two in *Cardiac Pacemakers*, 576 F.3d at 1363. Additionally, *Arris*, which deals with the supply of cable modem systems and terminal adapters, *Arris*, 639 F.3d at 1371, does not make tangibility distinctions.

### 4.    The Commission Acted Within Its Discretion to Find that ClearCorrect Had Waived Reliance on an Alleged License

ClearCorrect argues that had it been allowed to present a licensing defense, it could have shown that it lacked the intention to infringe Align's patents, defeating a finding of contributory infringement.  ClearCorrect Br. 33-34.  ClearCorrect's argument fails because, even if, *arguendo*, ClearCorrect's belief in a license could save it from a finding of contributory infringement, the evidence of the existence of a license was properly excluded.  *See infra* Part V; *see also* A1071-72; A44824-27; A199.85 n.40 (finding the licensing issues to have been waived).  Once the possible existence of the license was excluded so too was any effort to rely upon that license for purposes of defeating contributory infringement.  *Id.*  The Commission acted well within its discretion to conclude that ClearCorrect's reliance on the license was an improper attempt to circumvent the evidentiary order already entered.  *Id.*; *see* A1071-72.

### 5.    ClearCorrect's "Time of Importation" Arguments Depend on This Court's *En Banc* Decision in *Suprema*

ClearCorrect argues that—even if the digital models here are articles—that these articles do not infringe during their "importation, sale after importation, or sale for importation."  19 U.S.C. § 1337(b).  To be clear, ClearCorrect's arguments apply, if at all, only to the Group I patent claims and not the Group II claims.  ClearCorrect recognizes as much, stating:  "Thus, there could be no infringement of any method claim that

involves the fabrication of aligners (or any other acts of ClearCorrect that occur after its receipt of the digital data)." ClearCorrect Br. 60; *see also* Internet Assoc. Amicus Br. 12, 17. The Group II claims have no such limitations; the digital models are the *result* of the claimed processes, and do infringe at the time of importation. As discussed, *supra*, violation of section 337 was based upon the Commission's process-patent authority under 19 U.S.C. § 1337(a)(1)(b)(ii).

In support of its arguments (properly limited to the Group I claims), ClearCorrect relies upon the Commission's determination in *Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*, Inv. No. 337-TA-724, 2012 WL 3246515 (Dec. 21, 2011), from which no appeal was taken. In that investigation, the claimed method was performed only after importation of the accused personal computers. *Id.* at *8-9. The Commission found that the respondent did not import an article that meets all of the limitations of the claim, as required for direct infringement. *Id.* at *9 n.9. Neither inducement nor contributory infringement had been shown. *Id.* at *12. Notwithstanding the Commission's preservation of its authority for inducement and contributory infringement, *id.* at 18, ClearCorrect would apply *Electronic Devices* to strip the Commission of its authority in contributory infringement cases. So would the Internet Association, whose *amicus* brief here argues the same point in part by relying upon the Supreme Court's decision in *Limelight*

*Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111 (2014).
Internet Assoc. Amicus Br. 7-8, 14-15.

These issues are presently before the Court in two other cases. First, in *Suprema, Inc. v. ITC*, 742 F.3d 1350 (Fed. Cir. 2013), this Court found patent inducement generally to be beyond the scope of section 337. *Id.* at 1360-61. That decision has since been vacated by this Court's grant of rehearing *en banc* on May 13, 2014.[27] Although *Suprema* on its facts deals only with inducement, as discussed in the Statement of Related Cases, *supra*, *amici* in the *Suprema* have used the Court's rehearing to challenge Commission authority as to contributory infringement, making the same arguments there that ClearCorrect and the Internet Association make here. Second, *Motorola Mobility LLC v. ITC*, Appeal No. 2013-1518, deals expressly with contributory infringement, but on May 19, 2014, after briefing closed, the Court stayed that appeal pending the outcome of *Suprema*. To the extent the Court reaches any of these points, it should do so only after disposition of the *Suprema* rehearing and after affording parties here an opportunity for supplemental briefing in view of the Court's *en banc* opinion.

The Internet Association also makes the same point by arguing in favor of no relief as to method claims at the Commission under section

---

[27] The *Suprema* panel had upheld Commission authority as to contributory infringement. *Suprema*, 742 F.3d at 1361 n.4.

337(a)(1)(B)(i).  Internet Assoc. Amicus Br. 15-18.  Specifically, the Internet Association's position is that "an article cannot 'infringe' a method patent," even contributorily,  *id.* at 15-16, which is exactly what the rehearing in *Suprema* concerns.  The Internet Association also argues that exclusionary relief cannot lie for methods because it would not be clear to Customs whether the imported article infringes.  *See id.* at 18.  This would come as some news to Customs.  Customs and the Commission long ago resolved this problem with certification provisions that are regularly administered by Customs.[28]

In any event, should Congress have intended the uniquely narrow section 337 result sought by the Internet Association, Congress could have written uniquely narrow language for the Commission in section 337(a)(1)(B)(i), which it did not.  There is no support in the legislative history or as a matter of policy for the Internet Association's narrow reading of section 337(a)(1)(B)(i).

## B.    ClearCorrect Infringes the Group II Patent Claims

As will be recalled, the Group II patent claims, for which the Commission found a violation of section 337, all cover production of the digital models.  The models transmitted to the United States are the product

---

[28] *See generally, e..g.*, *Yingbin-Nature (Guangdong) Wood Indus. Co. v. ITC*, 535 F.3d 1322, 1331 (Fed. Cir. 2008); *Hyundai Elecs. Indus. Co. v. USITC*, 899 F.2d 1204, 1207, 1209-10 (Fed. Cir. 1990); *Allied Corp. v. USITC*, 850 F.2d 1573, 1577 & n.5 (Fed. Cir. 1988).

of Align's patented processes.  A199.94-.104.  The Commission's finding of
infringement of the Group II patent claims was not predicated on a finding
of contributory infringement under 35 U.S.C. § 271(c).  Instead, the
Commission relied upon 19 U.S.C. § 1337(a)(1)(B)(ii), which provides the
Commission authority over articles that "are made, produced, processed, or
mined under, or by means of, a process covered by" a U.S. patent.  Neither
ClearCorrect nor the *amici* who support it challenge the Commission's
interpretation of that language with regard to what is meant by
"processed."[29]  A199.100-.102.  Accordingly, interpretation of clause
(a)(1)(B)(ii) is beyond the scope of this appeal.[30]  Thus, ClearCorrect offers
neither a statutory argument nor a noninfringement argument for these
claims other than its overall argument concerning "articles," discussed
extensively above.

## IV.    CLEARCORRECT DID NOT PRESENT CLEAR AND CONVINCING EVIDENCE OF OBVIOUSNESS

Commission Rule 210.43 enables parties to petition the Commission
for review of an ALJ's initial determination.  19 C.F.R. § 210.43; *see* 5
U.S.C. § 557(b).  The rule provides, in part:  "Petitions for review may not
incorporate statements, issues, or arguments by reference.  Any issue not

---

[29] Section 337(a)(1)(B)(ii) is broader in this respect than section 271(g).
*See Bayer*, 340 F.3d at 1374 n.9.

[30] Section 337(a)(1)(B)(ii) is pertinent to Align's companion appeal, and
is discussed in the Commission's brief in that appeal.

raised in a petition for review will be deemed to have been abandoned . . . ." 19 C.F.R. § 210.43(b)(2). The rule is of the utmost importance to the Commission for the same reason that this Court requires issues to be presented in opening briefs. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). Once arguments are waived at the Commission, those arguments are lost on appeal. *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1362-63 (Fed. Cir. 1999).

Here, ClearCorrect's petition for review drew no comparisons between the specific claim language of each of the asserted claims and the prior art. A96199-96218. Instead, as the Commission found, ClearCorrect relied on asserted claims 1, 37, and 38 of the '325 patent as "exemplary claims to represent the entire ID." A199.119. The Commission's finding of waiver was not an abuse of discretion as to the more than forty other asserted patent claims not raised by ClearCorrect.[31]

On appeal, ClearCorrect offers nothing more than attorney argument as to three patent claims, including claim 1 of the '880 patent, which has now been waived. For those three patent claims ('325 claims 1 and 38 and '880 claim 1), that attorney argument is laid before the Court in the form of

---

[31] ClearCorrect neither used all of the space available to it—70-page petition, A96232-33; 100-page limit, 19 C.F.R. § 210.43(b)(2)—nor sought relief from the page limit to file a longer petition. It is unclear why ClearCorrect insinuates that the Commission would have "discourage[d] seeking additional pages by practice," ClearCorrect Br. 55, in this case in which the ALJ's opinion was more than 800 pages long.

claim charts that point to no supporting or corroborating evidence in the record. ClearCorrect Br. 48-50, 52-54, 56-58. Obviousness, of course, is a question of law based on underlying fact. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). These facts include "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and the level of skill in the art. *Id.* at 17. ClearCorrect's brief advances no factual evidence in support of the prior art it presents to the Court. The Commission is unaware of any case from this Court in which such a showing was adequate to invalidate patent claims. To the extent that ClearCorrect's showing has any probative force—and the Commission submits that it does not—its showing is far short of its burden to demonstrate invalidity clearly and convincingly.

## V. THE COMMISSION ACTED WITHIN ITS DISCRETION TO FIND CLEARCORRECT'S ESTOPPEL DEFENSE WAIVED

Commission rules have long required detailed pleadings in section 337 investigations, far more detailed than the notice pleading of federal courts. Commission rules require, *inter alia*: "Affirmative defenses shall be pleaded with as much specificity as possible in the response." 19 C.F.R. § 210.13(b).[32] Notwithstanding ClearCorrect's theory that Align's covenant not to sue ClearCorrect under U.S. Patent No. 6,554,611 was actually—despite the express terms of the covenant—a covenant as to all of Align's

---

[32] Rule 210.13 was amended in 2013 in manners not pertinent to this appeal; the pleading requirement did not change.

patents, ClearCorrect never pleaded that theory.  A199.140-41.  The Commission did not abuse its discretion in finding the matter waived.  To the extent that the Court finds that ClearCorrect's theory has not been waived, it must fail on the merits.  As discussed by the ALJ, ClearCorrect never demonstrated that all of the asserted patents are necessary to practice the one covenanted patent.  A44824-27.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that its final determination be affirmed.

Respectfully submitted,

/s/Sidney A. Rosenzweig
DOMINIC L. BIANCHI
General Counsel

WAYNE W. HERRINGTON
Assistant General Counsel

SIDNEY A. ROSENZWEIG
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, S.W.
Washington, DC  20436
(202) 708-2532

Dated:  February 18, 2015

## CERTIFICATE OF SERVICE

I certify that I served a copy of the attached **BRIEF OF APPELLEE**

**INTERNATIONAL TRADE COMMISSION** on counsel of record on

February 18, 2015 by the Court's CM/ECF system, which will send notice

of such filing to all registered CM/ECF users.


/s/ Sidney A. Rosenzweig
Sidney A. Rosenzweig
Attorney Advisor
U.S. International Trade Commission
500 E Street, SW,
Washington, DC  20436
tel. (202) 708-2532
fax (202) 205-3111
sidney.rosenzweig@usitc.gov

Dated: February 18, 2015

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief contains 13935 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ Sidney A. Rosenzweig
Sidney A. Rosenzweig

Dated: February 18, 2015