**2014-1527**

---

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**
_____

**CLEARCORRECT OPERATING, LLC and
CLEARCORRECT PAKISTAN (PRIVATE), LTD.,**

Appellants,

v.

**INTERNATIONAL TRADE COMMISSION,**

Appellee,

and

**ALIGN TECHNOLOGY, INC.,**

Intervenor.

_____

**Appeal from the United States International Trade Commission in
Investigation No. 337-TA-833.**

_____

**BRIEF OF INTERVENOR
ALIGN TECHNOLOGY, INC.**

_____

Stephen B. Kinnaird
Igor V. Timofeyev
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC  20005
Telephone:  (202) 551-1700
stephenkinnaird@paulhastings.com
igortimofeyev@paulhastings.com

Thomas A. Counts
PAUL HASTINGS LLP
55 Second Street, 24th Floor
San Francisco, CA  94105
Telephone:  (415) 856-7000
tomcounts@paulhastings.com

*Counsel for Intervenor
Align Technology, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Intervenor Align Technology, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:

Align Technology, Inc.

2. The name of the real party in interest represented by me is:

Align Technology, Inc.

3. Align Technology, Inc. has no parent corporations, and no publicly held company owns 10 percent or more of the stock of Align Technology, Inc.

4. The names of all law firms and the partners or associates that appeared for Align Technology, Inc. in proceedings before the United States International Trade Commission or are expected to appear in this Court are:

PAUL HASTINGS LLP
Stephen B. Kinnaird, Thomas A. Counts, Scott M. Flicker, Ned N. Isokawa*, Elizabeth L. Brann, Igor V. Timofeyev, Timothy P. Cremen, Bob Chen, Jeffrey D. Comeau, Elizabeth Dorsi, Ryan Fabre, Alyse L. Katz*, Lisa Leung, Ryan Nier, Ericka J. Schulz, Sophie Sung, Josh Weddle*, Jamie L. Williams*, Samuel C. Zun.*

*No longer with the firm.


Date: February 18, 2015        By:      /s/Igor V. Timofeyev
                                        Igor V. Timofeyev
                                        PAUL HASTINGS LLP
                                        875 15th Street, N.W.
                                        Washington, D.C. 20005
                                        (202) 551-1700

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................... i

TABLE OF AUTHORITIES ....................................................................... v

INTRODUCTION ...................................................................................... 1

STATEMENT OF RELATED CASES ........................................................ 2

STATEMENT OF ISSUES ......................................................................... 2

STATEMENT OF THE CASE AND THE FACTS .................................... 2

STANDARD OF REVIEW ........................................................................ 3

SUMMARY OF ARGUMENT .................................................................. 5

ARGUMENT ............................................................................................. 7

I.     THE COMMISSION CORRECTLY INTERPRETS THE TERM
"ARTICLES" IN SECTION 337 OF THE TARIFF ACT AS
ENCOMPASSING DIGITAL PRODUCTS. ................................... 7

     A.    The Text and the Purpose of Section 337 Demonstrate that the
Term "Articles" Extends to Digital Products. ....................... 8

          1.    The Ordinary and Accepted Meaning of "Articles" in the
Context of a Trade Statute Is Any Item Traded in Commerce ... 8

          2.    The Statutory Context Makes Plain that the Term Refers to Any
Item of Commercial Trade, Regardless of the Mode of
Importation. ........................................................................ 13

          3.    Congress's Use of the Broad and General Term "Articles"
Encompasses Articles of Commerce That Did Not Exist at the
Time the Statute Was Originally Enacted. .......................... 15

          4.    Other Agencies and Courts Recognize Trade in Digital
"Articles," Including Under Related Statutes. ..................... 18

          5.    The Commission's Interpretation of Articles Serves the Tariff
Act's Purpose of Combatting All Forms of Unfair Trade
Practices. ............................................................................ 21

     B.    The Counterarguments of ClearCorrect and Its *Amici* Lack
Force. ................................................................................... 22

# TABLE OF CONTENTS
(continued)

**Page**

1.    Nothing in the Commission's Ruling Asserts Jurisdiction over the Internet, International Telecommunications, or Global Network Operators. .................................................................22

2.    The Remedial Provisions of the Act Do Not Mandate a Narrow Interpretation of the Term "Articles." ......................................24

3.    *Bayer AG v. Housey Pharmaceuticals, Inc.* Does Not Contradict the Commission's Interpretation. ...........................27

    i.    *Bayer* Did Not Give a Definitive Construction of the Term "Articles" in Section 1337, Much Less One that Would Bind the Commission. .......................................27

    ii.   The Digital Data Sets Are "Products" Within the Meaning of 35 U.S.C. § 271(g). ....................................29

4.    This Court's Patentability Decision in *In re Nuijten* Is Irrelevant to the Interpretation of Section 337. .........................................33

  C.    At a Minimum, the Commission's Interpretation Is Reasonable. ........35

II.  CLEARCORRECT'S COVENANT-NOT-TO-SUE DEFENSE WAS WAIVED AND IS, IN ANY EVENT, MERITLESS. ..................................36

  A.    ClearCorrect Waived Any Estoppel Defense Based on Patent Exhaustion or Implied License. ...........................................................36

  B.    In Any Event, ClearCorrect's Estoppel Defense Is Meritless. .............37

III.  THE COMMISSION CORRECTLY FOUND CONTRIBUTORY INFRINGEMENT BY CCPK. .....................................................................39

  A.    The Accused Digital Data Sets Have No Substantial Non-Infringing Use. ....................................................................................39

  B.    The Commission Applied the Correct Legal Standard for Contributory Infringement Intent. .......................................................42

  C.    ClearCorrect Waived Its Exclusion-of-Evidence Argument. .............44

  D.    The Commission Correctly Concluded that the Accused Digital Data Sets Can Constitute a "Material" Under 35 U.S.C. § 271(c). ..............................................................................................45

# TABLE OF CONTENTS
### (continued)

                                                                        **Page**

    E.    CCPK's Provision of Digital Data Sets Constitutes a "Sale." ............48

    F.    Although Direct Infringement Occurs After Importation, that Does Not Undermine the Commission's Contributory Infringement Finding..........................................................................49

IV.    THE COMMISSION CORRECTLY REJECTED CLEARCORRECT'S INVALIDITY DEFENSES. ..........................................................................51

    A.    ClearCorrect Waived Its Obviousness Defense for the Majority of the Asserted Claims. .......................................................52

    B.    Align's Claims 1 and 38 of the '325 Patent, as Well as Other Asserted Claims, Are Not Obvious....................................54

    C.    ClearCorrect Mischaracterizes the Prior Art......................................55

        1.    Kesling Is Fundamentally Different from Align's Asserted Claims. ........................................................56

        2.    Lemchen Is Likewise Fundamentally Different from Align's Asserted Claims. ......................................57

    D.    Align's Claims Are Not Obvious in View of the Lemchen and Kesling References...........................................................58

CONCLUSION .....................................................................................60

CERTIFICATE OF SERVICE .............................................................61

CERTIFICATE OF COMPLIANCE.....................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abstrax, Inc. v. Dell, Inc.*,
  Civil Action No. 2:0-CV-221,
  2009 U.S. Dist. LEXIS 93603 (E.D. Tex. Oct. 7, 2009) ...................................30

*Akzo N.V. v. ITC*,
  808 F.2d 1471 (Fed. Cir. 1986) .........................................................................21

*Amkor Tech., Inc. v. ITC*,
  692 F.3d 1250 (Fed. Cir. 2012) ...........................................................................3

*Ardestani v. INS*,
  502 U.S. 129 (1991).............................................................................................18

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964).......................................................................................42, 43

*Arris Grp., Inc. v. British Telecomms. PLC*,
  639 F.3d 1368 (Fed. Cir. 2011) .........................................................................48

*Bayer AG v. Housey Pharms., Inc.*,
  340 F.3d 1367 (Fed. Cir. 2003) ...............................................................*passim*

*Becton Dickinson & Co. v. C.R. Bard, Inc.*,
  922 F.2d 792 (Fed. Cir. 1990) ...........................................................................53

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
  661 F.3d 629 (Fed. Cir. 2011) ...........................................................................13

*Cain v. Bowlby*,
  114 F.2d 519 (10th Cir. 1940) ...........................................................................16

*Canton R.R. Co. v. Rogan*,
  340 U.S. 511 (1951).............................................................................................13

*Carcieri v. Salazar*,
  555 U.S. 379 (2009)...............................................................................................9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)................................................................4, 8, 28

*City of Arlington v. FCC*,
133 S. Ct. 1863 (2013).......................................................................5

*City of Philadelphia v. New Jersey*,
437 U.S. 617 (1978).........................................................................10

*ClearCorrect, Inc. v. Align Tech., Inc.*,
No. 09-470 (S.D. Tex. Feb. 17, 2009) ...............................................44

*CNET Networks, Inc. v. Etilize, Inc.*,
528 F. Supp. 2d 985 (N.D. Cal. 2007)....................................31, 32, 46

*Cooper Techs. Co. v. Dudas*,
536 F.3d 1330 (Fed. Cir. 2008) ..........................................................5

*Corning Glass Works v. ITC*,
799 F.2d 1559 (Fed. Cir. 1986) .....................................................5, 36

*Cunard S.S. Co. v. Mellon*,
262 U.S. 100 (1923).........................................................................13

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980).........................................................................16

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ........................................................42

*Endo Pharms., Inc. v. Actavis, Inc.*,
746 F.3d 1371 (Fed. Cir. 2014) ........................................................38

*Enercon GmbH v. ITC*,
151 F.3d 1376 (Fed. Cir. 1998) ........................................................35

*Eolas Techs., Inc. v. Microsoft Corp.*,
399 F.3d 1325 (Fed. Cir. 2005) ........................................................14

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ....................................................................... 9

*Finnigan Corp. v. ITC*,
  180 F.3d 1354 (Fed. Cir. 1999) ................................................. 4, 39

*Former Emps. v. Sec'y of Labor*,
  408 F. Supp. 2d 1338 (Ct. Int'l Trade 2005) .......................... 19

*Former Emps. v. Sec'y of Labor*,
  414 F. Supp. 2d 1334 (Ct. Int'l Trade 2006) .......................... 20

*Former Emps. v. Sec'y of Labor*,
  483 F. Supp. 2d 1256 (Ct. Int'l Trade 2007) .......................... 20

*Fortnightly Corp. v. United Artists Television, Inc.*,
  392 U.S. 390 (1968) ..................................................................... 17

*Fujitsu Ltd. v. Netgear Inc.*,
  620 F.3d 1321 (Fed. Cir. 2010) ................................................ 42, 43

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................ 51, 52, 54

*General Protecht Grp., Inc. v. Leviton Mfg. Co.*,
  651 F.3d 1355 (Fed. Cir. 2011) ............................................... 37

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
  438 F.3d 1354 (Fed. Cir. 2006) ................................................ 41

*Guy v. Baltimore*,
  100 U.S. 434 (1880) ..................................................................... 10

*H.P. Hood & Sons, Inc. v. DuMond*,
  336 U.S. 525 (1949) ..................................................................... 10

*IBP, Inc. v. Alvarez*,
  546 U.S. 21 (2005) ....................................................................... 33

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Intel Corp. v. ITC,*
  946 F.2d 821 (Fed. Cir. 1991) ...........................................................52

*InterDigital Commc'ns, LLC v. ITC,*
  690 F.3d 1318 (Fed. Cir. 2012) ...........................................................8

*Junge v. Hedden,*
  146 U.S. 233 (1892) ...........................................................................12

*Keurig, Inc. v. Sturm Foods, Inc.,*
  732 F.3d 1370 (Fed. Cir. 2013) .........................................................36

*KSR Int'l Co. v. Teleflex Inc.,*
  550 U.S. 398 (2007) ...........................................................................53

*In re Lovin,*
  652 F.3d 1349 (Fed. Cir. 2011) .........................................................29

*Lucent Techs., Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009) ...........................................7, 47, 48

*Matsushita Elec. Indus. Co. v. United States,*
  750 F.2d 927 (Fed. Cir. 1984) .....................................................4, 42

*McRO, Inc. v. Namco Bandai Games Am., Inc.,*
  23 F. Supp. 3d 1113 (C.D. Cal. 2013) ...............................................32

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.,*
  244 F.3d 1365 (Fed. Cir. 2001) .........................................................41

*MGM Studios, Inc. v. Grokster, Ltd.,*
  545 U.S. 913 (2005) ....................................................................40, 43

*Microsoft Corp. v. AT&T Corp.,*
  550 U.S. 437 (2007) ...........................................................................47

*Microsoft Corp. v. DataTern, Inc.,*
  755 F.3d 899 (Fed. Cir. 2014) ...........................................................52

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*,
545 U.S. 967 (2005)..................................................................................29

*NEC Corp. v. United States*,
151 F.3d 1361 (Fed. Cir. 1998) ............................................4, 36, 52

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ..........................................................4

*NTP, Inc. v. Research in Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) ......................................30, 31, 32, 34

*In re Nuijten*,
500 F.3d 1346 (Fed. Cir. 2007) ..............................................*passim*

*OKI Am., Inc. v. Advanced Micro Devices, Inc.*,
No. C 04-03171, 2006 U.S. Dist. LEXIS 73144 (N.D. Cal.
Sept. 21, 2006) ................................................................................30

*Oracle Corp. v. Parallel Networks, LLC*,
778 F. Supp. 2d 527 (D. Del. 2011)...............................................48

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*,
511 U.S. 93 (1994).........................................................................10

*Ormco Corp. v. Align Tech., Inc.*,
609 F. Supp. 2d 1057 (C.D. Cal. 2009) ..........................................41

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ......................................................55

*Paul v. Virginia*,
75 U.S. (7 Wall.) 168, 183 (1869), *overruled on other grounds by*
*United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944)......................10

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
494 F.3d 788 (9th Cir. 2007) ..........................................................11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
  587 F.3d 1324 (Fed. Cir. 2009) ..........................................................54

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
  491 F.3d 1342 (Fed. Cir. 2007) ....................................................48, 49

*Pickhardt v. Merritt*,
  132 U.S. 252 (1889) ...........................................................................16

*Reese v. United States*,
  24 F.3d 228 (Fed. Cir. 1994) .............................................................14

*Reno v. Condon*,
  528 U.S. 141 (2000) ...........................................................................11

*Research Corp. Techs. v. Microsoft Corp.*,
  627 F.3d 859 (Fed. Cir. 2010) ...........................................................35

*Robocast, Inc. v. Microsoft Corp.*,
  21 F. Supp. 3d 320 (D. Del. 2014) ...............................................46, 47

*Rothe Dev. Corp. v. DOD*,
  413 F.3d 1327 (Fed. Cir. 2005) ..........................................................52

*Senne v. Vill. of Palatine*,
  695 F.3d 617 (7th Cir. 2012) ..............................................................11

*SKF USA, Inc. v. United States*,
  537 F.3d 1373 (Fed. Cir. 2008) ............................................................5

*Source Search Techs., LLC v. LendingTree, LLC*,
  588 F.3d 1063 (Fed. Cir. 2009) ..........................................................54

*Spansion, Inc. v. ITC*,
  629 F.3d 1331 (Fed. Cir. 2010) ...............................................6, 42, 43

*Sporhase v. Nebraska, ex rel. Douglas*,
  458 U.S. 941 (1982) ...........................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Suprema, Inc. v. ITC*,
    742 F.3d 1350(Fed. Cir. 2013), *pending en banc*, No. 2013-1170,
    2014 WL 3036241 (Fed. Cir. May 13, 2014) .........................................49, 50, 51

*T5 Labs (Del.) LLC v. Gaikai Inc.*,
    No. 12-1281, 2013 U.S. Dist. LEXIS 49710 (D. Del. Apr. 5, 2013) ................48

*Tcherepnin v. Knight*,
    389 U.S. 332 (1967) .........................................................................................22

*Tel. Co. v. Texas*,
    105 U.S. 460 (1881) .........................................................................................11

*Texas Instruments Inc. v. ITC*,
    988 F.2d 1165 (Fed. Cir. 1993) .......................................................................22

*TianRui Group Co. v. ITC*,
    661 F.3d 1322 (Fed. Cir. 2011) .......................................................................35

*TransCore, LP v. Electronic Transaction Consultants Corp.*,
    563 F.3d 1271 (Fed. Cir. 2009) .......................................................................37

*United States v. Gowadia*,
    No. CRIm 05-00486 HGKSC,
    2006 WL 2520599 (D. Haw. Aug. 28, 2006) ..................................................21

*United States v. Sheridan*,
    329 U.S. 379 (1946) .........................................................................................13

*United States v. Simpson*,
    252 U.S. 465 (1920) .........................................................................................13

*United States v. Sw. Cable Co.*,
    392 U.S. 157 (1968) .........................................................................................16

*uPI Semiconductor Corp. v. ITC*,
    767 F.3d 1372 (Fed. Cir. 2014) .......................................................................58

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Versata Software, Inc. v. Callidus Software, Inc.*,
  944 F. Supp. 2d 357 (D. Del. 2013).....................................................48

*Voda v. Cordis Corp.*,
  536 F.3d 1311 (Fed. Cir. 2008) .........................................................45

*Voggenthaler v. Maryland Square LLC*,
  724 F.3d 1050 (9th Cir. 2013) ...........................................................10

*W. Union Co. v. MoneyGram Payment Systems*,
  626 F.3d 1361 (Fed. Cir. 2010) .........................................................55

*W. Union Tel. Co. v. Lenroot*,
  323 U.S. 490 (1945)...........................................................................11

*W. Union Tel. Co. v. Pendleton*,
  122 U.S. 347 (1887)...........................................................................11

*Walker Digital, LLC v. Facebook, Inc.*,
  852 F. Supp. 2d 559 (D. Del. 2012)....................................................48

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*,
  103 F.3d 1571 (Fed. Cir. 1997) .........................................................37

*West v. Gibson*,
  527 U.S. 212 (1999)...........................................................................16

*Zond v. Toshiba Corp.*,
  No. 13-cv-11581-DJC,
  2014 WL 4056024 (D. Mass. Aug. 14, 2014) ....................................30

**Constitutional Provisions and Statutes**

U.S. Const.
  amend. I..............................................................................................17
  art. I, § 8, cl. 8 ...................................................................................12

17 U.S.C. § 512 .........................................................................................11

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

19 U.S.C.

§ 1337 ................................................................................*passim*

§ 1337(a) .........................................................................................25

§ 1337(a)(1)(A) .....................................................................8, 22, 26

§ 1337(a)(1)(A)-(C) .........................................................................13

§ 1337(a)(1)(A)-(E) .........................................................................33

§ 1337(a)(1)(B) .................................................................................23

§ 1337(a)(1)(B)(i) ...................................................................*passim*

§ 1337(a)(1)(B)(ii) .....................................................................26, 34

§ 1337(a)(1)(B)-(C) .........................................................................14

§ 1337(a)(1)(B)-(E) ...........................................................................8

§ 1337(a)(1)(E) ..........................................................................13, 14

§ 1337(f) ...........................................................................................24

§ 1337(f)(1) .......................................................................................25

§ 1337(f)(1)-(2) .................................................................................24

§ 1337(f)(2) .......................................................................................27

§ 1401(c) .....................................................................................18, 19

§ 2272 ...............................................................................................19

22 U.S.C. § 2278(a)(1) .............................................................20, 21

35 U.S.C.

§ 101 ...........................................................................33, 34, 35

§ 271(a) .....................................................................................50, 51

§ 271(b) .....................................................................................44, 50

§ 271(c) .................................................................................*passim*

§ 271(f) .............................................................................................47

§ 271(g) ...............................................................................*passim*

47 U.S.C. § 152(a) .............................................................................23

Omnibus Trade and Competitiveness Act of 1988,
    Pub. L. No. 100-418, § 1341(b) ...................................................22

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Regulations and Rules**

19 C.F.R.
  § 210.13(b) ...................................................................................36
  § 210.43(b)(1) ..............................................................................53
  § 210.43(b)(2) .........................................................................48, 52
  § 210.47 .......................................................................................52

22 C.F.R. § 120.17 .........................................................................21

71 Fed. Reg. 18,355 (Apr. 11, 2006) ............................................20

Fed. R. App. P. 28 .........................................................................53

**Other Authorities**

Harmonized Tariff Schedule of the United States § 2716.00.00 .............................19

HQ114459, 1998 U.S. CUSTOM HQ LEXIS 640 (Sept. 17, 1998) ................18, 19

Office of the United States Trade Representative,
  E-Commerce and Telecommunications,
  https://ustr.gov/trade-agreements/free-trade-agreements/trans-
  pacific-partnership/tpp-chapter-chapter-negotiating-6 .......................................18

S. Rep. No. 67-595 (1922) .............................................................22

S. Rep. No. 93-1298 (1974) ...........................................................25

S. Rep. No. 105-190 (1998) ...........................................................11

United States-Australia Free Trade Agreement, Chapter 16,
  https://ustr.gov/archive/assets/Trade_Agreements/Bilateral/Austral
  ia_FTA/Final_Text/asset_upload_file508_5156.pdf .........................................18

U.S. Customs, *Requirements for Pipeline Operators*,
  http://www.cbp.gov/trade/entry-summary/pipeline-monthly-entry-
  processing/pipeline-directors ..............................................................26

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

U.S. Government Accountability Office, GAO-15-78,
  *Intellectual Property: U.S. Customs and Border Patrol Could
  Better Manage Its Process To Enforce Exclusion Orders*
  (Nov. 2014) ......................................................................................................27

*Webster's New International Dictionary* (1924) ......................................................9

# INTRODUCTION

After lengthy proceedings, the United States International Trade Commission ("the Commission") found that ClearCorrect Operating, Inc. ("CCUS") and ClearCorrect Pakistan (Private), Ltd. ("CCPK") (together, "ClearCorrect") violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, by importing into the United States "articles that infringe" valid and enforceable patents held by Align Technology, Inc. ("Align"). The Commission concluded, after a thorough analysis of its governing statute and extensive public comments, that section 337's prohibition on "importation … of articles" encompasses ClearCorrect's electronic transmission into the United States of the accused digital data products. This construction faithfully interprets the statutory text and furthers section 337's purpose of preventing unfair import trade and protecting U.S.-held intellectual property. At the very least, this interpretation is reasonable, and therefore is entitled to deference.

The Commission correctly rejected ClearCorrect's invalidity and estoppel contentions, and found a violation of section 337 with respect to many of Align's asserted patent claims. These findings are amply supported by substantial evidence, and, indeed, ClearCorrect has waived many of its contentions.

## STATEMENT OF RELATED CASES

This appeal is related to Align's pending companion appeal No. 2014-1533.

Align hereby incorporates by reference its statement of related cases in that appeal.

## STATEMENT OF ISSUES

The issues presented are:

1. Whether the Commission correctly, or at least reasonably, interpreted the term "articles" in section 337 to encompass digital products.

2. Whether the Commission acted within its discretion in finding that ClearCorrect waived its estoppel defense and whether the defense, in any event, lacks merit.

3. Whether the Commission correctly found that CCPK contributorily infringed Align's patents-in-suit.

4. Whether the Commission correctly rejected ClearCorrect's obviousness contentions.

## STATEMENT OF THE CASE AND THE FACTS[1]

On April 5, 2012, the Commission instituted the investigation against ClearCorrect based on a complaint filed by Align. JA199.5. The ALJ issued an Initial Determination ("ID"), finding a violation of section 337. JA199.6.

On review, the Commission held that the accused products are "articles"

---

[1] Align incorporates by reference its statement of the case and the facts in the companion appeal No. 14-1533.

within the meaning of section 337 and that their electronic transmission into the United States constitutes importation under that statute. JA214; JA199.25-199.59.[2] The Commission then found that CCPK contributorily infringes claims 21 and 30 of U.S. Patent No. 6,217,325 ("the '325 patent") and claim 1 of U.S. Patent No. 6,722,880 ("the '880 patent") by transmitting the digital data sets to CCUS. JA199.84-199.93. The Commission also found a violation with respect to claims 31 and 32 of the '325 patent, claims 1 and 4-8 of U.S. Patent No. 6,705,863 ("the '863 patent"), claims 1, 3, 7, and 9 of U.S. Patent No. 6,626,666 ("the '666 patent"), and claims 1, 3, and 5 of U.S. Patent No. 8,070,487 ("the '487 patent") because ClearCorrect imports digital data sets made abroad by the patented method. JA199.99-199.104.[3] The Commission issued cease-and-desist orders. JA214-32.

## STANDARD OF REVIEW

This Court reviews the Commission's legal determinations *de novo* and factual determinations for substantial evidence. *Amkor Tech., Inc. v. ITC*, 692 F.3d 1250, 1254 (Fed. Cir. 2012). "Substantial evidence" is "more than a mere scintilla," but "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an

---

[2] Commissioner Johanson dissented from the Commission's interpretation of section 337. JA199.158-199.173.

[3] The Commission also found that ClearCorrect had waived its estoppel defense based on implied license or patent exhaustion. JA199.142.

administrative agency's finding from being supported by substantial evidence."

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Under this "limited standard of review," the Court "will not disturb the

Commission's factual findings if they are supported by such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion," *Finnigan*

*Corp. v. ITC*, 180 F.3d 1354, 1362 (Fed. Cir. 1999), and "must affirm a

Commission determination if it is reasonable and supported by the record as a

whole, even if some evidence detracts from the Commission's conclusion," *Nippon*

*Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).  The

Commission's evidentiary determinations, including findings of waiver, are

reviewed for an abuse of discretion.  *NEC Corp. v. United States*, 151 F.3d 1361,

1375 (Fed. Cir. 1998).

In determining whether the Commission properly interpreted the Tariff Act

of 1930, this Court conducts a two-step inquiry.  First, it must determine "whether

Congress has directly spoken to the precise question at issue," and if so, this Court

"must give effect to the unambiguously expressed intent of Congress."  *Chevron*

*U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  But

"if the statute is silent or ambiguous with respect to the specific issue, the question

for the court is whether the agency's answer is based on a permissible construction

of the statute."  *Id.* at 843.  Thus, if this Court were to "conclude that Congress

either had no intent on the matter, or that Congress's purpose and intent is unclear," this Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute."  *Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1338, 1341 (Fed. Cir. 2008) (internal quotation marks omitted).  Accordingly, this Court "must defer to an agency's reasonable interpretation of a statute even if [it] might have preferred another."  *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) (internal quotation marks and citation omitted).  "[N]o exception exists to the normal deferential standard of review for jurisdictional or legal questions concerning the coverage of an Act."  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1871 (2013) (internal quotation marks and citation omitted).  "[T]he court is not free simply to substitute its view for that of the Commission," and its "function then becomes to decide whether the Commission's definitions or standards are reasonable in light of the language, policies and legislative history of the statute." *Corning Glass Works v. ITC*, 799 F.2d 1559, 1565 (Fed. Cir. 1986) (citing cases) (emphasis removed).

## SUMMARY OF ARGUMENT

1.  The Commission correctly concluded that the term "articles" in section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, encompasses digital data

products. This interpretation is mandated by the statute' plain language, supported by the Supreme Court precedent, faithful to the legislative objective of affording U.S.-holders of intellectual property rights broad protection against unfair acts of import trade, and aligned with the interpretation of other federal courts and agencies responsible for international trade. This Court's precedent does not foreclose the Commission's interpretation, nor does the Commission's ruling assert jurisdiction over the Internet or international telecommunications. At a minimum, the Commission's interpretation of section 337 is a reasonable construction of the statute, and therefore is entitled to deference.

2. The Commission acted within its discretion in finding that ClearCorrect waived any estoppel defense by failing to plead it. In any event, Align's limited covenant-not-to-sue (given with respect to a patent not asserted here) conveyed no implied license and did not extend to the patents-in-suit.

3. The Commission correctly found contributory infringement by ClearCorrect. ClearCorrect's digital data sets are specially adapted for infringement of Align's patents, and have no substantial non-infringing use. The Commission's finding of intent comports with *Spansion, Inc. v. ITC*, 629 F.3d 1331, 1353 (Fed. Cir. 2010). The issue of ClearCorrect's purported exculpatory evidence regarding its intent is waived. The Commission's conclusion that the accused digital data sets are "a material" under 35 U.S.C. § 271(c) is supported by

the plain language of section 271(c) and by *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009). The accused data sets are imported and sold. Finally, although direct infringement of Align's patents occurs after importation, section 337 prohibits conduct tied to "articles that … infringe," which can be "a material or apparatus" especially designed for infringement under 35 U.S.C. § 271(c).

4. The Commission correctly rejected ClearCorrect's obviousness defenses. ClearCorrect waived most of its invalidity contentions, and the Commission properly rejected the rest as "conclusory and unsupported."

## ARGUMENT

## I. THE COMMISSION CORRECTLY INTERPRETS THE TERM "ARTICLES" IN SECTION 337 OF THE TARIFF ACT AS ENCOMPASSING DIGITAL PRODUCTS.

After a careful review, the Commission correctly concluded that the term "articles" in section 337 of the Tariff Act, 19 U.S.C. § 1337, extends to "digital merchandise [that] are articles of international commerce," encompassing digital data products. JA199.25-199.59. This construction faithfully interprets the statutory text and furthers the statute's purpose of preventing every type of unfair act in import trade. But even if the term "articles" — which is not expressly defined — is ambiguous, the Commission has reasonably construed that statutory term. Because the Commission is entrusted with the administration of section 337,

its interpretation is "entitled to deference under the principles of *Chevron*."

*InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1330 (Fed. Cir. 2012) (citation

omitted).

    **A.**    **The Text and the Purpose of Section 337 Demonstrate that the Term "Articles" Extends to Digital Products.**

        **1.**    **The Ordinary and Accepted Meaning of "Articles" in the Context of a Trade Statute Is Any Item Traded in Commerce.**

Section 337 grants the Commission jurisdiction to redress "[u]nfair methods

of competition and unfair acts in the importation of *articles*" that have certain

adverse effects on domestic industry.  19 U.S.C. § 1337(a)(1)(A) (emphasis

added).  It also grants the Commission jurisdiction to remedy the unlawful acts of

"importation into the United States, the sale for importation, or the sale within the

United States after importation by the owner, importer, or consignee, of *articles*

that infringe a valid and enforceable United States patent" or "are made, produced,

processed, or mined under, or by means of, a process covered by the claims of"

such a patent; infringe registered copyrights, trademarks, and mask works; or

infringe exclusive design rights protected by statute.  19 U.S.C. § 1337(a)(1)(B)-

(E) (emphasis added).  ClearCorrect asserts (with no elaboration) that "[t]he plain

language of th[e] statute … construe[s] 'articles' as tangible items," CCBr. 5, but

the statute's broad language forbids that interpretation.

As the Commission observed, the term "articles" is not expressly defined in

the statute.  JA199.41.  "In the absence of such a definition, [a court] construe[s] a statutory term in accordance with its ordinary or natural meaning," *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (citation omitted), as informed by contemporary dictionaries, *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009).  The Commission correctly looked to the dictionaries contemporaneous with section 337's enactment, which define "article" as

> "Something considered by itself and as apart from other things of the same kind or from the whole of which it forms a part; also, a thing of a particular class or kind; as, an article of merchandise …."

JA199.43 (quoting *Webster's New International Dictionary* 131 (1924)).[4]  These definitions instruct that "the term 'article' was understood at the time of the enactment of the Tariff Act to carry the meaning of an identifiable unit, item, or thing, with examples indicating that such articles may be traded in commerce or used by consumers."  JA199.43.[5]  Thus, the term "articles" in section 337 is broad enough to encompass data of commercial value to the user.

Moreover, the Supreme Court prior to the Tariff Act of 1930 had defined the

---

[4] The term "articles" first appeared in section 337's predecessor, section 316 of the Tariff Act of 1922; this provision was re-enacted with some modifications in the Tariff Act of 1930.  JA199.41.

[5] *Amicus* BSA contends that this dictionary definition turns section 337 "into nonsense."  BSABr. 16-17.  But it is perfectly reasonable to read section 337 as vesting the Commission with jurisdiction over importation of "a thing of a particular class or kind" — for example, an imported "thing of a class or kind" that infringes a patent or a copyright.

term "articles of commerce" with an equally broad brush as "subjects of trade and barter offered in the market as something having an existence and value independent of the parties to them." *Paul v. Virginia*, 75 U.S. (7 Wall.) 168, 183 (1869), *overruled on other grounds by United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944). The Supreme Court and other courts to this day have consistently understood "articles of commerce" to refer to any discrete items sold or moved in commerce, and thus subject to Congress's interstate or foreign Commerce Clause power. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 622-23 (1978) ("All objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset."); *Voggenthaler v. Maryland Square LLC*, 724 F.3d 1050, 1059 (9th Cir. 2013) ("any item that may be bought or sold, indeed all objects of trade, are articles of commerce" subject to congressional regulation); *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 953–54 (1982) (groundwater is an "article of commerce"). The same conception of "articles of commerce" defines the scope of the Dormant Commerce Clause, which "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994); *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 535 (1949) (states cannot "advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state"); *Guy v. Baltimore*, 100 U.S.

-10-

434, 443 (1880) (states cannot discriminate against "articles" produced or manufactured in other states).  There is no doubt that Congress' power to regulate all articles in interstate or foreign commerce encompasses electronic articles.  *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 n. 2 (9th Cir. 2007) ("Congress … enacted the Digital Millennium Copyright Act …, 17 U.S.C. § 512, … to 'facilitate the robust development and worldwide expansion of electronic commerce, communications, research, development, and education in the digital age.'") (quoting S. Rep. No. 105-190, at 1-2 (1998)).

While mere telephonic or telegraphic messages that convey information across state or international borders are not articles of commerce (even though regulable as "subjects of interstate commerce"), *see W. Union Tel. Co. v. Lenroot*, 323 U.S. 490, 502-03 (1945); *W. Union Tel. Co. v. Pendleton,* 122 U.S. 347, 356 (1887); *Tel. Co. v. Texas*, 105 U.S. 460, 462 (1881), information products that are traded in commerce do qualify as articles of commerce (regardless of the mode of transmission).  The Supreme Court so held in ruling that Congress has the power to regulate drivers' personal information that states sell in interstate commerce (whether by electronic delivery or otherwise):  "Because drivers' information is, in this context, an article of commerce, its sale or release into the interstate stream of business is sufficient to support congressional regulation."  *Reno v. Condon*, 528 U.S. 141, 148 (2000); *see also Senne v. Vill. of Palatine*, 695 F.3d 617, 620 (7th

Cir. 2012) (Ripple, J., in chambers).[6]

The Tariff Act is an exercise of Congress's power to regulate "Commerce with Foreign Nations." U.S. Const. art. I, § 8, cl. 8. When Congress in section 337 outlawed certain unfair trade practices with regard to the importation of "articles" without qualification, it necessarily intended the Commission to regulate those practices with regard to all articles subject to regulation under the Foreign Commerce Clause (*i.e.*, all items traded in foreign commerce). The Commission properly refused to adopt a crabbed interpretation of the articles subject to its jurisdiction, and correctly found that "Congress intended the statute expansively to embrace 'articles' that may be traded in commerce, regardless of form or type." JA199.44.

In this vein, the Commission observed that section 337 contains "no statutory words of limitation used in conjunction with 'articles,' and that the

---

[6] *Amicus* BSA falters in its attempt (at 7) to limit the reach of the term "articles" by reliance upon *Junge v. Hedden*, 146 U.S. 233 (1892). There, the Supreme Court interpreted the phrase "'[a]rticles composed of India rubber'" in a tariff statute, and upheld the determination that term "articles" "was used in this paragraph in a broad sense, and covered equally things manufactured, things unmanufactured, and things partially manufactured." *Id.* at 238-39. The Court reasoned that "[i]n common usage, 'article' is applied to almost every separate substance or material, whether as a member of a class, or as a particular substance or commodity." *Id.* at 238. In so holding, the *Junge* Court did not purport to limit the longstanding doctrine that articles of commerce are any item of trade or barter, much less address clairvoyantly whether digital products are articles. Regardless, the *Junge* discussion of articles encompasses the digital material (and digitally altered material) at issue here. *Supra* at 9-12.

-12-

statutory language "does not encompass some infringing importations while excluding others." JA199.41-42 (citing *United States v. Simpson*, 252 U.S. 465, 466-67 (1920)). Where the statute does not contain a limiting distinction, "[t]here is no room for implying such a distinction." *United States v. Sheridan*, 329 U.S. 379, 391 (1946). Section 337 "broadly cover[s] infringing imports, without express limitation as to form or type of said articles." JA199.42. ClearCorrect and its *amici* cannot rewrite the statute to limit the term "articles" to "tangible articles."

**2.    The Statutory Context Makes Plain that the Term Refers to Any Item of Commercial Trade, Regardless of the Mode of Importation.**

A statutory term "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 644 (Fed. Cir. 2011). Here, the statutory context supports the Commission's interpretation. First, in several provisions of section 337, the term "articles" appears in conjunction with the terms "importation" and "sale," thereby "indicating that articles subject to the statute are imported items that are bought and sold in commerce," without restriction. JA199.44. (citing 19 U.S.C. § 1337(a)(1)(A)-(C), (E)). The Supreme Court has recognized that the term "importation" has an expansive meaning, denoting "an actual bringing" into the United States of an article "regardless of the mode by which it is effected." *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923); *see also Canton R.R. Co. v. Rogan*, 340 U.S. 511, 515

(1951) ("to import means to bring into the country").  Because the statute broadly

outlaws unfair trade practices with regard to the "importation" of "articles" without

qualification, there is no warrant to limit section 337 only to certain modes of

importation (non-electronic) and certain kinds of articles (tangible articles).  *See*

JA199.45.  Section 337's title, "Unfair Practices in Import Trade," confirms that

the statute is meant to apply to all articles of import commerce.  *See Reese v.*

*United States*, 24 F.3d 228, 231 (Fed. Cir. 1994) (statutory titles may aid

interpretation); JA199.41.

Second, the term "articles" appears in the phrase "articles that infringe" a

patent, a copyright, a trademark, or a protected hull design.  19 U.S.C.

§ 1337(a)(1)(B)-(C), (E), *cited in* JA199.45-46.  Since digital data qualifies for

copyright and trademark protection, *see* JA199.45-46 (citing cases); *see also Eolas*

*Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1339 (Fed. Cir. 2005) ("Without

question, software code alone qualifies as an invention eligible for patenting … at

least as processes.") (citations omitted), the Commission concluded that the term

"articles" encompasses imported items of commerce that may cause infringement.

JA199.46.  *Amicus* BSA contends that this conclusion "reads the word 'article'

completely out of the statute" because now "*everything* that can infringe a patent,

trademark, or copyright is an 'article.'"  BSABr. 18-19.  BSA overstates the reach

of the Commission's holding, as it would not, for instance, transform a method

(which can infringe a patent) into an "article."  Rather, given the absence of any

language restricting the term "articles," the Commission construed section 337

consistently with its structure and its overall intent of preventing unfair commercial

trade practices, including infringement of various kinds of intellectual property

rights.

### 3. Congress's Use of the Broad and General Term "Articles" Encompasses Articles of Commerce That Did Not Exist at the Time the Statute Was Originally Enacted.

ClearCorrect and its *amici* battle against the plain meaning by arguing that

the schedules of dutiable items in the original Tariff Act of 1930 only included

tangible items, BSABr. 12, and by scouring the legislative history for references

they deem to be directed to tangible goods, CCBr. 13-14; BSABr. 19-20.  As an

initial matter, Congress's determination of which particular articles in 1930 were

dutiable and at what rate hardly defines the scope of the term "articles," especially

when that term is also used to define the Commission's and its predecessors' broad

authority to redress unfair trade acts.  But the central flaw in their argument is that

no commercial trade in electronically transmitted articles existed in 1930, decades

before the development of computers and the Internet, and one would not expect

Congress to provide for duties on articles that were not crossing the border.

That does not place these later developing items of trade beyond section 337.

"It is a general rule in the construction of statutes that legislative enactments in

general and comprehensive terms, and prospective in operation, apply to persons, subjects and businesses within their general purview and scope, though coming into existence after their passage, where the language fairly includes them." *Cain v. Bowlby*, 114 F.2d 519, 522 (10th Cir. 1940) (holding that "public conveyances" in an 1882 statute encompassed trucks, even though not invented at the time) (citing cases); *see also Diamond v. Chakrabarty*, 447 U.S. 303, 316-17 (1980) ("Congress employed broad general language in drafting § 101 precisely because … inventions are often unforeseeable.") (footnote omitted); *Pickhardt v. Merritt*, 132 U.S. 252, 257 (1889) (the term "aniline dyes" is not limited to articles in existence at the time of the enactment of the customs statute because "the law was made for the future"); JA199.47 n.22 (citing cases).  Giving effect to this broad statutory language would not usurp Congress's prerogative or represent an impermissible judicial amendment of the statute.  *See* CCBr. 13-14, 16-17; BSABr. 22-23; PK/EFFBr. 12.  As the Supreme Court instructed, "[w]ords in statutes can enlarge or contract their scope as other changes, in law or in the world, require their application to new instances or make old applications anachronistic." *West v. Gibson*, 527 U.S. 212, 218 (1999) (citing cases).  Congress plausibly intended Section 337 to cover items traded by new technologies as they appear, rather than freeze the statute in time and require constant congressional amendments.  *See, e.g.*, *United States v. Sw. Cable Co.*, 392 U.S. 157 (1968) (FCC authority over

"communications" in the Communications Act of 1934 included cable television because Congress wanted the FCC to exercise "broad authority" in a rapidly changing field). ClearCorrect's and its *amici*'s atavistic focus on the articles that were imported in 1930 is akin to claiming that the First Amendment does not protect electronic speech that did not exist in the 18th century. Although trade in electronic articles had not emerged in 1930, they are amply within the broad authority granted by section 337. *See Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 395-96 (1968) ("[w]e must read the statutory language of 60 years ago in the light of drastic technological change").

ClearCorrect's attempted recourse to section 337's legislative history fares no better. CCBr 13-14; *see also* BSABr. 19-20. The legislative history of the original enactment "that was drafted long before the development of the electronic phenomena with which we deal" sheds no light on the application of a statute's general terms to the new technology. *Fortnightly*, 392 U.S. at 395. Regardless, as the Commission points out, references to "goods" and "merchandise" in the congressional debates do not limit the statute's scope to tangible products; the definitions of those terms more broadly "encompass within their meaning various types and forms of products that are bought and sold in commerce," and "have retained their expansive meanings even as the fundamental nature of international commerce has evolved in the many decades since section 337 was originally

enacted." JA199.47-48. In all events, even if the legislative history were remotely

favorable to ClearCorrect (which it is not), it "cannot overcome the strong

presumption that the legislative purpose is expressed by the ordinary meaning of

the words used." *Ardestani v. INS*, 502 U.S. 129, 136 (1991) (internal quotation

marks and citations omitted).

### 4. Other Agencies and Courts Recognize Trade in Digital "Articles," Including Under Related Statutes.

Contemporary understandings that digital products are articles of commerce

buttress the Commission's statutory interpretation. As the Commission notes, both

Congress and scholars recognize trade in digital products. JA199.47-48. And the

United States Trade Representative actively pursues protections for "digital

products" in various trade agreements and partnerships.[7]

In keeping with the Commission's approach, U.S. Customs and Border

Protection ("Customs") has interpreted electronically transmitted software to be

"merchandise" under the customs laws, which is defined to include "goods, wares,

and chattels of every description," 19 U.S.C. § 1401(c). *See* HQ114459, 1998 U.S.

CUSTOM HQ LEXIS 640 (Sept. 17, 1998). Applying the Supreme Court's broad

---

[7] *See, e.g.*, United States-Australia Free Trade Agreement, Chapter 16, https://ustr.gov/archive/assets/Trade_Agreements/Bilateral/Australia_FTA/Final_Text/asset_upload_file508_5156.pdf; E-Commerce and Telecommunications, https://ustr.gov/trade-agreements/free-trade-agreements/trans-pacific-partnership/tpp-chapter-chapter-negotiating-6 (describing agenda to protect "digital products" from customs duties and discriminatory treatment).

definition of "importation," Customs found "that the transmission of software modules and products to the United States from a foreign country via the Internet is an importation of merchandise into the customs territory of the United States." *Id.*[8] There is no reason to construe the term "articles" in section 337 more narrowly than the term "goods" in section 1401(c). Moreover, the Harmonized Tariff Schedule designates "electrical energy" measured in kilowatt hours as an "article" and subjects it to special entry requirements — belying the claim of ClearCorrect and its *amici* that, as a matter of the plain meaning, articles in the customs context can only refer to tangible goods. HTSUS § 2716.00.00 & Subheading Note 6 (excluding transmissions as a medium of communication).

Similarly, both the Department of Labor ("DOL") and the U.S. Court of International Trade ("CIT") have refused to read "a tangibility requirement" into the term "articles" in section 222 of the Trade Adjustment Assistance Act of 1974 ("TAA"), 19 U.S.C. § 2272 — a statute that was "an outgrowth" of the Tariff Act of 1930. *See Former Emps. v. Sec'y of Labor*, 408 F. Supp. 2d 1338, 1341 n.4 (Ct. Int'l Trade 2005). Section 2272 authorizes trade adjustment assistance when a significant proportion of a firm's workers have been injured by "imports of articles" of various kinds. 19 U.S.C. § 2272. DOL, which administers the TAA,

---

[8] Those digital goods are currently exempted from entry and duty requirements — along with certain tangible articles such as business records, and certain previously exported articles and aircraft parts returned by foreign customs services. *See id.*; Harmonized Tariff Schedule of the United States ("HTSUS"), General Note 16.

has determined that "[s]oftware and similar intangible goods that would have been considered articles … if embodied in a physical medium will now be considered to be articles regardless of their method of transfer."  71 Fed. Reg. 18,355, 18,357 (Apr. 11, 2006).  And the CIT has held that because the TAA used the general term "articles," without "a tangibility requirement," assistance does not turn on "[t]he mode of importation, via tangible compact discs versus the Internet," of the articles in question.  *Former Emps. v. Sec'y of Labor*, 414 F. Supp. 2d 1334, 1340-41 (Ct. Int'l Trade 2006); *see also Former Emps. v. Sec'y of Labor*, 483 F. Supp. 2d 1256, 1267-68 (Ct. Int'l Trade 2007) (drawing a "distinction between tangible and intangible articles" would contravene the statutory mandate and "frustrate congressional policy").  There is a consensus among U.S. federal agencies and courts responsible for international trade that "digital merchandise are articles of international commerce."  JA199.55 & n.28.

The argument that the term statutory "articles" necessarily excludes digital data is likewise refuted by the usage of that term in the Arms Export Control Act ("AECA").  The AECA authorizes the President "to control the import and the export of defense articles and defense services," and specifically "to designate those items which shall be considered as defense articles and defense services" in the form of "the United States Munitions List."  22 U.S.C. § 2278(a)(1).  The State Department has defined the term "Defense article" to "mean[] any item *or*

*technical data* designated in § 121.1 of this subchapter [the U.S. Munitions List],"

and defined "export" as (among other things) "[s]ending or taking a defense article

out of the United States *in any manner*, except by mere travel outside of the United

States by a person whose personal knowledge includes technical data," including

by "transferring technical data to a foreign person."  22 C.F.R. § 120.17 (emphasis

added).  Thus, electronic transmission of controlled data abroad to a foreign person

constitutes unlawful exportation of a "defense article" under the AECA.  *See*

*United States v. Gowadia*,  No. CRIm 05-00486 HGKSC, 2006 WL 2520599, at

*6-*8 (D. Haw. Aug. 28, 2006) (allegations of faxed and e-mailed presentations

containing classified defense information suffice to charge unlawful export of

controlled technical data).  By the same token, electronic transmission of digital

data constitutes an "importation" of "articles" within the meaning of section 337.

### 5.     The Commission's Interpretation of Articles Serves the Tariff Act's Purpose of Combatting All Forms of Unfair Trade Practices.

Finally, the Commission's interpretation furthers the legislative intent of

section 337.  As this Court observed, section 337 was designed to "provid[e] an

adequate remedy for domestic industries against unfair practices beginning abroad

and culminating in importation."  *Akzo N.V. v. ITC*, 808 F.2d 1471, 1488 (Fed. Cir.

1986).  From its inception, section 337 has afforded U.S. holders of intellectual

property rights broad protection against unfair trade practices, including

importation that infringes U.S. patents and copyrights. *See, e.g.*, S. Rep. No. 67-595, at 3 (1922) ("[t]he provision relating to unfair methods of competition is broad enough to prevent every type and form of unfair practice"). Moreover, Congress anticipated that "innovation would yield many new types and forms of articles that would be traded in commerce in the future." JA199.50-199.51 (discussing legislative history).[9]

In summary, as a matter of plain language, context, history, and policy, the Commission properly interpreted the term "articles" in section 337 to encompass electronically transmitted articles of commerce.

## B. The Counterarguments of ClearCorrect and Its *Amici* Lack Force.

### 1. Nothing in the Commission's Ruling Asserts Jurisdiction over the Internet, International Telecommunications, or Global Network Operators.

The *amici* briefs supporting ClearCorrect brim with hyperbole. They claim

---

[9] BSA contends that this legislative history refers solely to subsection 337(a)(1)(A), and not to the statute as a whole. BSABr. 21 n.6. But subsection 337(a)(1)(A) uses the same term "importation of articles," and Congress did not intend to give broad reading to that phrase in one subsection of the statute but not in the neighboring one. In any event, as a remedial statute, section 337 "should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). The fact that section 337 is part of the trade laws and not the intellectual property laws, *see* BSABr. 22, is immaterial. Irrespective of its codification, Congress intended for section 337 to serve as "'effective remedy for the protection of United States intellectual property rights.'" *Texas Instruments Inc. v. ITC*, 988 F.2d 1165, 1181 (Fed. Cir. 1993) (quoting Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1341(b) (codified at 19 U.S.C. § 1337 note)).

that the Commission's ruling portends "[r]adical transformations of global communications and commerce" because the Commission is purportedly engaging in "regulation of the Internet" and exercising jurisdiction over "all signals transmitted into the United States" (IABr. 27, 1) and "general telecommunications data transmissions" (PK/EFFBr. 4, BSABr. 3).  *Amici* worry that the ruling below jeopardizes the future of cloud computing.  IABr. 3-4.

These assertions misconceive the Commission's ruling.  The Commission only asserts jurisdiction over the "articles" that are electronically transmitted, not over all acts of transmission.  The Commission no more regulates electronic carriage of articles into the U.S. than it regulates traditional carriage of goods into the U.S. by ship, railroad, or truck.  Moreover, it is the "owner, importer, or consignee" of the offending articles that violates section 337, 19 U.S.C. § 1337(a)(1)(B), not the carrier.  Thus, *amici*'s professed concern that Commission has assumed the power to issue cease-and-desist orders "against Internet service providers and other telecommunications providers for data transmission *activities*," PK/EFFBr. 15-17 (emphasis added), is baseless.

Equally groundless is the claim that the Commission's interpretation of its jurisdiction cannot be reconciled with Congress's grant to the Federal Communications Commission ("FCC") of jurisdiction over "all interstate and foreign communication by wire or radio."  47 U.S.C. § 152(a).  *See* PK/EFFBr. 8-

9; BSABr. 14-15.  The Commission has no jurisdiction over interstate or foreign communications or communications carriers; it has jurisdiction over unfair trade practices with regard to imported "articles," and its jurisdiction is unaffected by the mode of importation, as the statute commands.  The Commission's jurisdiction does not trench upon the FCC's, given the distinction drawn in longstanding Supreme Court jurisprudence between articles of commerce and interstate wire communications.  *Supra* at 11-12.

> **2.    The Remedial Provisions of the Act Do Not Mandate a Narrow Interpretation of the Term "Articles."**

ClearCorrect and its *amici* argue that reading of the term "articles" to encompass digital transmission would make section 337 "internally inconsistent" because, they assert, the Commission's primary remedy — an exclusion order — cannot be applied to a digital article.  CCBr. 14-15; IABr. 21; BSABr. 11-14.  This argument founders upon the plain statutory terms — as the Commission noted, section 337(f) provides that "cease and desist orders may be issued '[i]n addition to, or in lieu of,' an exclusion order."  JA199.56 (quoting 19 U.S.C. § 1337(f)).  This remedy is fully enforceable by the Commission, including through court proceedings, and carries harsh penalties, such as bond forfeiture and heavy monetary fines.  JA199.56; 19 U.S.C. § 1337(f)(1)-(2).

Indeed, as *amici* Internet Association and BSA concede (IABr. 25; BSABr. 13-14), Congress authorized the Commission to impose cease-and-desist orders out

of concern that the exclusion order was too blunt a remedy, and wished to strengthen "the effectiveness of section 337." S. Rep. No. 93-1298 (1974), 1974 U.S.C.C.A.N. 7331. Congress did not condition the cease-and-desist orders on a finding that the exclusion order is inappropriate, nor were cease-and-desist orders merely a "step on the road to the exclusion-order remedy." *See* IABr. 24. Rather, Congress simply added the cease-and-desist order to the Commission's arsenal of remedies, and directed that it could be applied either together with an exclusion order or *instead* of it.

Although the Commission has discretion to revoke the cease-and-desist order and to impose an exclusion order in its place, *see* 19 U.S.C. § 1337(f)(1); IABr. 25, that does not make the cease-and-desist order dependent on the availability of an exclusion remedy. As the Commission explained, it is not uncommon "for a set of remedy provisions to include some subsections that apply only in some settings," and "agencies are given deference on their choices about which statutory remedy to apply." JA199-56 n.29.[10]

ClearCorrect's and its *amici*'s claim that an exclusion order cannot be enforced against digital articles is premised on the false notion that exclusion

---

[10] *Amicus* BSA takes out of context the observation in the legislative history that Congress did not mean to change "'the jurisdiction conferred under section 337(a).'" BSABr. 13 (quoting S. Rep. No. 93-1298, 1974 U.S.C.C.A.N. at 7327). That comment relates to an amendment of a different provision, section 337(a), authorizing the Commission, rather than the President, to find violations of section 337. 1974 U.S.C.C.A.N. at 7327.

necessarily requires interception of communications.  *See* CCBr. 15; BSABr. 13; IABr. 23-24.  Customs has not traditionally enforced the customs laws against digital goods because of the HTSUS exemption, *see supra* at 18-19 & n.8, and neither the Commission nor Customs has found it necessary to explore the application of exclusion orders in this context, given the efficacy of cease-and-desist orders.  But that does not mean that exclusion orders against digital articles are unenforceable; if called to do so, Customs could devise different methods.  For example, Customs cannot inspect and intercept at the border certain other imported articles, like natural gas transported by pipeline; it therefore regulates entry of those articles by requiring monthly entry submissions.  *See* Customs, *Requirements for Pipeline Operators*, http://www.cbp.gov/trade/entry-summary/pipeline-monthly-entry-processing/pipeline-directors.[11]  Customs similarly could (for example) require the respondent subject to an exclusion order to provide electronic copies of digital articles intended for importation for advance inspection.  While an importer could conceivably disobey a Customs order (just as importers can avoid

---

[11] Natural gas (like electrical energy) is subject to section 337 if a foreign producer engages in unfair trade practices, or if it were "made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent."  19 U.S.C. § 1337(a)(1)(A) & (B)(ii).  The effort of ClearCorrect and its *amici* to tether the Commission's jurisdiction to the availability of an interception-only exclusion remedy would thus mean that the undefined term "articles" refers at best only to a subset of tangible articles, which is absurd.

imperfectly enforceable exclusion orders against tangible articles[12]), Customs

enforcement of such an exclusion order would augment an accompanying cease-

and-desist order that is punishable by severe penalties. *See* 19 U.S.C.

§ 1337(f)(2).[13]

### 3. *Bayer AG v. Housey Pharmaceuticals, Inc.* Does Not Contradict the Commission's Interpretation.

ClearCorrect contends that this Court in *Bayer AG v. Housey*

*Pharmaceuticals, Inc.*, 340 F.3d 1367 (Fed. Cir. 2003), has already disposed of the

issue here. That argument wholly misconstrues the holding and effect of *Bayer*.

### i. *Bayer* Did Not Give a Definitive Construction of the Term "Articles" in Section 1337, Much Less One that Would Bind the Commission.

*Bayer* involved a claim of infringement under section 271(g) of the Patent

Act, which declares unlawful the unauthorized importation, sale, offer for sale, or

use of "a *product* which is *made by* a process patented in the United States."

35 U.S.C. 271(g) (emphasis added). The alleged infringer claimed that section

---

[12] *See* U.S. Government Accountability Office, GAO-15-78, *Intellectual Property: U.S. Customs and Border Patrol Could Better Manage Its Process To Enforce Exclusion Orders*, at 9-15 (Nov. 2014) (discussing need for targeting strategies).

[13] Similarly unavailing is the claim that the term "articles" cannot include digital articles because the authority to use cease-and-desist orders was not added to section 337 until 1974. BSABr. 13. There was no import trade in digital articles in 1974 that required any such remedy. Because the term "articles" encompasses later-emerging products, and because there has always been cease-and-desist authority at all relevant times, the Commission may properly exercise jurisdiction over imported digital articles.

271(g) encompassed only manufactured physical products. *Bayer*, 340 F.3d at 1371-72. "In order to resolve the ambiguity in the statutory language," this Court looked "first to other provisions of the statute," and then to the legislative history of the Process Patent Amendments Act ("PPAA") that contained section 271(g). *Id.* at 1372-74. That legislative history revealed that section 271(g) was intended to augment the protections for process patents beyond those given by section 337, and this Court stated that "*the legislative history suggests* that section 271(g) was intended to address the same 'articles' as were addressed by section 1337, but to add additional rights against importers of such 'articles.'" *Id.* (emphasis added).

A statement, in the course of resolving the ambiguity of a different statute, of what the legislative history of that statute "suggests" is hardly a definitive construction of the term "articles" in section 337. To the contrary, rather than offer any such construction, this Court instead observed in the accompanying footnote that because "section 337 covers both articles that were 'made' and articles that were 'produced, processed, or mined,'" the language of section 337 "suggests *a broader scope* for section 337 than for section 271(g)." *Bayer*, 340 F.3d at 1374 n.9 (emphasis added). Nothing in *Bayer* holds that section 271(g) "products" exhaust the scope of "articles" within the Commission's section 337 jurisdiction.

Even if *Bayer* did so hold, its construction would not bind the Commission. A "court's prior judicial construction of a statute trumps an agency construction

otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute." *Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005); *see also In re Lovin*, 652 F.3d 1349, 1354-55 (Fed. Cir. 2011). Because "*Chevron's* premise is that it is for agencies, not courts, to fill statutory gaps, … [o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Brand X*, 545 U.S. at 983-84.

In *Bayer*, this Court did not even endeavor to construe section 337, since only the interpretation of section 271(g) was before it. But even if *Bayer*'s fleeting reference to suggestions from the PPAA's legislative history about the relationship of section 271(g) "products" to section 337 "articles" could somehow be deemed a construction of section 337, this Court did not make the requisite "hold[ing]" that section 337 "unambiguously requires the court's construction." *Brand X*, 545 U.S. at 984. Therefore, the Commission is free to depart from any construction of section 337 derived from *Bayer*.

### ii.    The Digital Data Sets Are "Products" Within the Meaning of 35 U.S.C. § 271(g).

Even if the term "products" in Section 271(g) were equivalent to the term "articles" in Section 337, *Bayer* would not aid ClearCorrect. Under the *Bayer* standard, the digital data sets imported by ClearCorrect are "product[s] which [are]

made *by* a process patented in the United States."  35 U.S.C. § 271(g) (emphasis added).

Unlike Align's patents, the patent at issue in *Bayer* claimed "a method of determining whether a substance is an inhibitor or activator," 340 F.3d at 1369, not a method of *making something*.  The result of following the steps of this claim would be a determination of "yes" or "no," which is "information in the abstract" or "*knowledge* that a [drug] substance possesses a particular quality."  *Bayer,* 340 F.3d at 1371-72, 1376 (emphasis added).  This Court held that "information" is not a *product*, digital or otherwise, of a manufacturing process, and therefore not within the scope of § 271(g).  *Id.* at 1377; *see also NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) (relying on *Bayer* to hold that section 271(g) did not cover a claimed method for "the transmission of information in the form of email messages" because it did "not entail the manufacturing of a physical product").[14]

---

[14] *See Zond v. Toshiba Corp.*, No. 13-cv-11581-DJC, 2014 WL 4056024 (D. Mass. Aug. 14, 2014) ("*Bayer*'s drug was identified as useful using [the] patented process, but it was not made by that process."); *OKI Am., Inc. v. Advanced Micro Devices, Inc.*, No. C 04-03171, 2006 U.S. Dist. LEXIS 73144 , at *43(N.D. Cal. Sept. 21, 2006) (while the process in *Bayer* "generated data useful as a means to identify the product to be manufactured, it was not in any way part of the manufacturing process itself"); *see also Abstrax, Inc. v. Dell, Inc.*, Civil Action No. 2:0-CV-221, 2009 U.S. Dist. LEXIS 93603, at *11-12 (E.D. Tex. Oct. 7, 2009) (distinguishing the "claimed process of generating assembly instructions" at issue from *Bayer* because it did "not produce 'information,' but a tangible result" and "explicitly contemplates that it will be used as part of an overall process to create

*Bayer*'s rationale, however, does not exclude digital data sets from the ambit of section 271(g). Digital data sets, although intangible, are "physical" products[15]; are not mere "abstract information" (like a "yes" or "no" answer); and can be "made" according to claim steps. *See, e.g.*, JA80342 (col. R2:27-50) ('325 patent). These data sets are the direct result of practicing Align's patented methods and are three-dimensional representations of tangible molds that are specifically formatted to be rendered into those molds by 3D printing.

Indeed, since *Bayer*, when courts have considered the situation where a digital article is *made* according to the steps of a claim directed to *making something*, they have found that the resultant digital product may infringe under section 271(g). For example, *CNET* distinguished between claims directed to a method of *making something* (there, a product catalog) and methods of "determining" (*Bayer*) or "transmitting information" (*NTP*). 528 F. Supp. 2d at 993. Although section 271(g) did not cover the latter, it did apply to the former. *Id.* Accordingly, *CNET* found that an electronic version of a catalogue is, indeed, a "product" under § 271(g):

> [T]he electronic catalog in this case, far from being
> abstract information or knowledge, is a physical article

an end product").

[15] *See CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, 994-95 (N.D. Cal. 2007); *cf. In re Nuijten*, 500 F.3d 1346, 1353 (Fed. Cir. 2007) (electronic signals are physical objects).

> no different from a product catalog manufactured and
> assembled on paper bound with stitching, glue or staples.

*Id.* at 994.  Like the electronic catalogue of *CNET*, the digital data sets here are more than "abstract information," because they are "physical article[s] no different from" the tangible aligner molds 3D-printed according to the data sets.

Following *CNET*, the district court in *McRO, Inc. v. Namco Bandai Games Am., Inc.*, 23 F. Supp. 3d 1113 (C.D. Cal. 2013), addressed claims directed to methods of making video game scenes.  Rejecting the argument that *Bayer* precluded section 271(g) infringement of such scenes because they are "information," the *McRO* court found:

> The asserted methods for automatically animating lip
> synchronization and facial expressions of animated
> characters are allegedly used to make the accused games,
> not to decide which games to make.  The non-
> manufacturing "information" in *Bayer* was of the sort
> that "a person possessing the allegedly infringing
> information could … possibly infringe by merely
> entering the country."  Nothing of the sort is at issue
> here, where the "information" — the animated scenes —
> are integrated into the game.

23 F. Supp. 3d at 1122 (quoting *Bayer*, 340 F.3d at 1376).  The digital data sets here are akin to the animations of *McRO*; they cannot simply be possessed in the mind.  Rather, in any of their as-transmitted or as-stored physical forms, the digital data sets are detailed, virtual, three-dimensional models of patients' teeth that are

used to print tangible molds.[16]  Align's digital data sets are "products" within the

meaning of section 271(g), and are therefore (even by ClearCorrect's lights)

"articles" within the meaning of section 337.

### 4. This Court's Patentability Decision in *In re Nuijten* Is Irrelevant to the Interpretation of Section 337.

*Amicus* Internet Association (but not ClearCorrect) invokes *In re Nuijten*,

500 F.3d 1346 (Fed. Cir. 2007), a patentability decision under 35 U.S.C. § 101.

*See* IABr. 10-11.  *Nuijten* is a red herring.  As the Commission observed, the

question in this appeal "goes to the importation requirement, not patent eligibility

*per se*."  JA199.54.  Notwithstanding the *amici*'s attempt to pose the interpretive

question as the meaning of the statutory phrase "articles … that infringe a valid

and enforceable United States patent," 19 U.S.C. § 1337(a)(1)(B)(i), the

Commission properly rejected this approach because the term "articles" appears

throughout section 337.  It applies to infringement of other forms of intellectual

property (trademarks, copyright, mask works, designs), and also to "other unfair

acts and methods of competition in connection with importation and sale of

articles."  JA199.54; *see* 19 U.S.C. § 1337(a)(1)(A)-(E).  "[I]dentical words used in

different parts of the same statute are generally presumed to have the same

---

[16] *McRO* also distinguishes its animations from *NTP*:  "Here, the alleged infringement is not merely the transmission of information, but rather, [the accused infringer's] use of the method to manufacture a 'physical product.'"  *McRO*, 23 F. Supp. 3d at 1122.

meaning," *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005), and a construction of

"articles" that varies across section 337's provisions is implausible.  Indeed,

section 337(a)(1)(B)(i) addresses "articles that … infringe a valid and enforceable

United States patent *or* a valid and enforceable United States copyright" in the

same sentence, 19 U.S.C. § 1337(a)(1)(B)(i) (emphasis added); thus, articles

cannot mean only "patentable" articles even in that subparagraph.

Finally, even in the patent context, the patentability of an apparatus claim

covering an article could only possible be relevant when the respondent challenges

its validity under 35 U.S.C. § 101; a patentee need not show the inherent

patentability of an "article" that *contributorily* infringes a patent, or that is a

product made or produced by a patented process, the import of which is prohibited

by 19 U.S.C. § 1337(a)(1)(B)(ii) — a requirement that would be equally

nonsensical in the patent laws and in section 337.  And there is "no doubt that a

process producing … data is patentable under section 101." *NTP*, 418 F.3d at 1324

(citation omitted).  As the Commission noted, ClearCorrect never raised any

section 101 patentability challenge to any claim asserted by Align, and the

patentability doctrine of *Nuijten* is irrelevant.  JA199.54 & n.30.

Even if ClearCorrect had raised a patentability challenge, *Nuijten* would not

aid its cause.  *Nuijten* addressed the very different case of patentability of "a

transient electric or electromagnetic transmission" in an apparatus claim where the

claimed signal "is fleeting and is devoid of any semblance of permanence during transmission," and held only that such signals "standing alone" did not meet the patentability standard of section 101." 500 F.3d at 1359. By contrast, ClearCorrect's digital data sets are three-dimensional representations of tangible molds that are not only transmitted electronically, but are also stored in a physical form on a server; they are radically different from a "fleeting" and "transient" signal at issue in *Nuijten*. *Id.* Furthermore, as the Commission observed, the patentability requirements of section 101 are satisfied where, as here, the digital data sets lend a concrete and useful result. JA199.54 & n.30 (citing cases); *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010) (methods for rendering a digital image are patentable because "[t]he invention presents functional and palpable applications in the field of computer technology").

### C.    At a Minimum, the Commission's Interpretation Is Reasonable.

Although the plain language compels the Commission's interpretation, the Commission's ruling should be upheld even if there were any ambiguity as to the scope of the term "articles." *TianRui Group Co. v. ITC*, 661 F.3d 1322, 1331-32 (Fed. Cir. 2011). The Commission's interpretation — rooted in longstanding conceptions of articles of commerce as any traded items; consonant with the structure and history of the Act; and in furtherance of the Act's purpose to protect domestic industry from unfair competition abroad, especially infringement of

-35-

intellectual property rights — "is reasonable in light of the language, policies and legislative history of the statute." *Enercon GmbH v. ITC*, 151 F.3d 1376, 1381 (Fed. Cir. 1998). Because "it is particularly within the province and expertise of the Commission to define" key statutory phrases like "articles," the Commission's reasonable interpretation is entitled to deference and should be upheld. *Corning*, 799 F.2d at 1565.

## II. CLEARCORRECT'S COVENANT-NOT-TO-SUE DEFENSE WAS WAIVED AND IS, IN ANY EVENT, MERITLESS.

ClearCorrect claims an estoppel defense based on a patent that Align has never asserted against ClearCorrect, U.S. Patent No. 6,554,611 ("the '611 Patent"). CCBr. 17-26. The Commission did not abuse its discretion in finding that ClearCorrect waived any such defense by failing to plead it. JA199.142; *NEC Corp.*, 151 F.3d at 1375. In any event, ClearCorrect's argument lacks merit. JA199.142.

### A. ClearCorrect Waived Any Estoppel Defense Based on Patent Exhaustion or Implied License.

Under the Commission's rules, an affirmative defense must "be pleaded with as much specificity as possible." 19 C.F.R. § 210.13(b); JA199.142. An estoppel defense based on patent exhaustion or implied license is an affirmative defense. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013). The Commission did not abuse its discretion in finding that the Fourth Affirmative

Defense on which ClearCorrect relies (*see* CCBr. 25), a *prosecution history*
estoppel defense, does not suffice to give notice of any implied license or patent
exhaustion defense. JA199.142. The pleading does not mention either implied
license or patent exhaustion, and "does not even reference the '611 patent." *Id.*;
*see also* JA2470; JA25040-41.[17]

### B.    In Any Event, ClearCorrect's Estoppel Defense Is Meritless.

The Commission correctly found that, even aside from waiver,
ClearCorrect's estoppel defense fails on its merits. JA199.142. The implied
license defense applies in "a narrow[] category of conduct … where a patentee has
licensed or assigned a right, received consideration, and then sought to derogate
from the right granted." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d
1571, 1580-81 (Fed. Cir. 1997). ClearCorrect relies (at 17-19, 22-24) on
*TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed.
Cir. 2009), and *General Protecht Group, Inc. v. Leviton Manufacturing Co.*, 651
F.3d 1355 (Fed. Cir. 2011), but these cases are entirely inapposite. Align's
assurances were not provided in the context of a settlement agreement, and Align
received no consideration for any license. JA59832. Align only represented that it
would not assert the '611 Patent against ClearCorrect's products sold at that time

---

[17] ClearCorrect's subsequent self-serving responses in its supplemental responses
to interrogatories, *see* CCBr. 25 (citing JA96195-98), cannot overcome the waiver.

because they did not infringe that patent.  JA59073-74.[18]  Indeed, Align

simultaneously maintained its assertions of the '325, '511, '863, '880, and '874

patents against ClearCorrect.  JA59832.

The implied license defense also does not extend beyond continuations of

expressly licensed patents.  *Endo Pharms., Inc. v. Actavis, Inc.*, 746 F.3d 1371,

1378 (Fed. Cir. 2014).  None of the asserted patents is a continuation of the '611

patent.  JA59831-32.  Indeed, most of the patents at issue have different

inventorship from the '611 patent.  *Compare* JA58793 ('611 patent), *with* JA80398

('874 patent), JA80450 ('487 patent), JA80282 ('880 patent), JA80364 ('863

patent), *and* JA80265 ('511 patent).

The implied license defense is also "expressly limited … to the scope of the

licensed claims."  *Endo*, 746 F.3d at 1377.  None of the claims asserted here is

necessary to practice the claims of the '611 patent; indeed, ClearCorrect avoids

discussing the language or the scope of the '611 patent claims, *see* CCBr. 19-22.

The Commission's conclusion that the asserted claims were not licensed because

Align granted a limited covenant-not-to-sue regarding the '611 patent is correct

and substantial evidence supports the underlying factual findings.  JA199.142.

---

[18] ClearCorrect tries to make much of the Commission's statement that "Align
withdrew its complaint," CCBr. 22-23, but this is simply an imprecise description
of Align's assurances, and is harmless at most.

## III.  THE COMMISSION CORRECTLY FOUND CONTRIBUTORY INFRINGEMENT BY CCPK.

The Commission correctly found that CCPK contributorily infringed claim 1 of the '880 Patent and claims 21 and 30 of the '325 Patent in violation of section 337.  JA199.84-199.93.  ClearCorrect raises a host of challenges to the Commission's finding, but none has merit.

### A.  The Accused Digital Data Sets Have No Substantial Non-Infringing Use.

The Commission correctly concluded, relying on ClearCorrect's own admission, that the accused digital data sets have no substantial non-infringing use, as required by 35 U.S.C. § 271(c).  JA199.85 (citing JA1618).  ClearCorrect's contention that the Commission "disregarded the record evidence," CCBr. 27, is refuted by the record.  CCUS's and CCPK's CEOs testified that CCUS uses the data sets received from CCPK solely to make dental aligners by practicing (and infringing) Align's patented methods.  JA1618 (citing JA78224 (320:20-321-2); JA78255 (443:3-6)).[19]  Tellingly, ClearCorrect admitted in its post-hearing brief that the data sets "have no separate commercial value" aside from "making physical aligners."  JA79764-65, *quoted in* JA199.85; JA1618.  This evidence is more than adequate to support the Commission's conclusion, *Finnigan*, 180 F.3d at

---

[19] Indeed, the digital data sets are unsuited for any other use because, as the CEOs acknowledged (and the Commission found), the digital data sets are specifically tailored to each individual patient.  JA1618 (citing JA78224 (320:20-321-2); JA78255 (443:3-6)).

1362, which is further buttressed by additional evidence.  *See* JA94895 (646:1-4); JA78255 (442:24-443:10); JA94895 (645:15-646:4).

ClearCorrect next argues that the Commission "improperly" limited its analysis to "economic aspects of the accused digital data," ignoring its "substantial non-infringing uses in the dental and orthodontic field."  CCBr. 28-29.  The only "non-infringing use" ClearCorrect identifies is that, after CCPK creates the proposed "treatment setup" for the patient, that setup is sent to the treating dentists for review and approval.  CCBr. 28 (citing JA199.23).

Section 271(c) provides a safe harbor only for "*a staple article or commodity of commerce* suitable for substantial noninfringing use."  35 U.S.C. § 271(c) (emphasis added).  This doctrine absolves only "the equivocal conduct of selling an item with substantial lawful *as well as* unlawful uses," and provides no defense "where an article is 'good for nothing else' but infringement."  *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932-33 (2005) (citation omitted) (emphasis added).  ClearCorrect's digital data sets are not staple products that are sold in commerce for any noninfringing purpose; they are created solely for the infringement practiced here.  The dentist's review of ClearCorrect's "treatment setup" is a necessary element of ClearCorrect's infringing process of producing the accused data sets, since the "treatment setup" (which reflects the desired final teeth positioning) is a prerequisite for generating the three-dimensional digital models of

-40-

the intermediate tooth positions, which form the data sets. *See* JA199.23-24; JA719; JA1759-60.[20]

ClearCorrect's argument that digital data models of teeth in general — such as those at issue in a prior litigation between Align and Ormco Corporation — can hypothetically be used in a number of non-infringing ways, *see* CCBr. 28-29, also fails. The digital files in the Align-Ormco litigation are *not* ClearCorrect's data sets, and the question of whether such different data files (or data files of patients' teeth in general) have substantial non-infringing use is irrelevant.[21]

The "substantial non-infringing use" safe harbor requires both that "the device at issue, in theory, could be used in a way so as not to infringe the asserted method claim" *and* "that the device was *actually used* in the non-infringing way." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006) (emphasis added); *see also Ormco*, 609 F. Supp. 2d at 1075. Here, the Commission found that ClearCorrect "offered nothing to substantiate" its assertions of non-infringing use, and that "hypothetical uses cannot qualify as a substantial non-infringing use." JA1618; *see also Golden Blount*, 438 F.3d at

---

[20] The fact that the dentist can take notes of the proposed "treatment plan" in the patient's records, CCBr. 28, is similarly immaterial.

[21] Indeed, the *Ormco* court rejected precisely the argument ClearCorrect advances here, refusing to accept Align's expert testimony on which ClearCorrect now relies, *see* CCBr. 28 (citing JA80023-26; JA80200-210), because it addressed digital teeth data scans in general, without showing any actual non-infringing use of the accused products. *Ormco Corp. v. Align Tech., Inc.*, 609 F. Supp. 2d 1057, 1075 (C.D. Cal. 2009).

1364; *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1379 (Fed. Cir. 2001) (reversing a JMOL of non-infringement on contributory infringement where "the record does not indicate any actual uses of the device other than [the infringing use]").  In any event, given evidence that that the data sets were *only* used to manufacture the infringing aligners, JA199.85; JA1618; *supra* at 39, the Commission's finding is supported by substantial evidence.  *Matsushita*, 750 F.2d at 933.

### B.    The Commission Applied the Correct Legal Standard for Contributory Infringement Intent.

ClearCorrect's contention that the Commission applied an incorrect intent standard for contributory infringement, *see* CCBr. 30-32, fares no better.  The Commission correctly observed that section 271(c) "requires that the infringer knows that the patented component is specially adapted for infringement and that there are no substantial noninfringing uses."  JA199.85 (citing 35 U.S.C. § 271(c)).  Under this Court's precedent, where evidence demonstrates that the accused infringers

> were aware of the … patent, and [the patentee]
> successfully showed that the accused devices did not
> have any substantial noninfringing uses, the Commission
> presume[s] the requisite knowledge for contributory
> infringement.

*Spansion*, 629 F.3d at 1355.  This is the standard that the Commission applied

-42-

here.  JA199.85.[22]

ClearCorrect (at 30-32) invokes in vain *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964), and *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010).  For starters, both cases predate this Court's holding in *Spansion*.  Moreover, while they require knowledge that the component is specially adapted for use in an infringing product, *Aro*, 377 U.S. at 488-90 & n.8; *Fujitsu*, 620 F.3d at 1326, under *Spansion* such knowledge is presumed where, as here, the accused material has no substantial non-infringing use.  *Spansion*, 629 F.3d at 1355 (citing *Grokster*, 545 U.S. at 932).  ClearCorrect presented no evidence to rebut this presumption.  *Supra* at 39-40; *cf. Spansion*, 629 F.3d at 1353-54.

The Commission also found that there was "no question that CCUS and CCPK had knowledge of the [patents-in-suit]."  JA1619 & n.47.  ClearCorrect does not challenge this finding with respect to CCUS, or with respect to the majority of the asserted patents, but argues that *CCPK* lacked knowledge of a single patent — the '325 patent.  CCBr. 32-33.

This argument is refuted by the evidence.  As the Commission found (and as ClearCorrect concedes, CCBr. 33), CCPK's CEO testified that he knew about

---

[22] The Commission correctly rejected, JA199.108 n.54, ClearCorrect's argument that the standard for contributory infringement is "the same" as for induced infringement.  *Compare Spansion*, 629 F.3d at 1353, *with DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304-05 (Fed. Cir. 2006) (*en banc* in relevant part).

Align's district court complaint filed against CCUS, which asserted the '325 patent; knew about Align's patents directed to clear aligners and their manufacturing process, as well as Align's infringement theories based on these patents; and had entered into a consent order with respect to two patents-in-suit (the '880 and the '511 patents).  JA1619 (citing JA78251 (427:6-11); JA78254-55 (441:9-442:4)).  Moreover, in February 2009, CCPK and CCUS discussed legal strategy vis-à-vis Align, JA1649; JA93547-48, and CCUS then sought a declaratory judgment of invalidity and non-infringement as to all of Align's patents directed to the manufacture of clear aligners, *ClearCorrect, Inc. v. Align Tech., Inc.*, No. 09-470 (S.D. Tex. Feb. 17, 2009).  The Commission's conclusion that CCPK knew about the '325 patent more than meets the substantial evidence standard.

### C.    ClearCorrect Waived Its Exclusion-of-Evidence Argument.

ClearCorrect next argues that the Commission erroneously excluded the evidence of ClearCorrect's purported good-faith belief in having an implied license.  CCBr. 33-34.  After the ALJ correctly rejected ClearCorrect's implied-license defense, *supra* at 36-38, ClearCorrect sought to submit that evidence on the question of an intent to infringe.  JA78234-35 (361:13-362:9).  The ALJ excluded that evidence, JA78132-33 (32:5-33:3), and the Commission affirmed, JA199.85 n.40.  The Commission properly exercised its discretion in excluding this evidence

given that ClearCorrect failed to plead any reliance on the implied-license defense. *Supra* at 36-37.

In any event, the issue is waived. The ALJ expressly stated that he was excluding the evidence only with respect to an intent to *induce* infringement under 35 U.S.C. § 271(b), not with respect to the requisite knowledge for *contributory* infringement. JA78234-35 (361:6-363:7) ("[Y]ou keep saying induce infringement and that's correct. I did not touch on contributory infringement. … I didn't put anything out on contributory."). ClearCorrect then failed to seek admission of this evidence on the question of contributory infringement intent. This Court does not review arguments waived below. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1325 n.6 (Fed. Cir. 2008).

### D. The Commission Correctly Concluded that the Accused Digital Data Sets Can Constitute a "Material" Under 35 U.S.C. § 271(c).

ClearCorrect contends that the Commission erred by holding that the accused digital data sets constitute a "material" under 35 U.S.C. § 271(c) because (ClearCorrect argues) the term "material" does not cover "intangible things such as information." CCBr. 34-39. This argument misconstrues section 271(c)'s text, ignores this Court's precedent, and mischaracterizes the nature of the products at issue.

As the Commission explained, the term "material" in section 271(c) (which is not expressly defined) has "a widely accepted definition as an input into a more

finished work," and does not require tangibility.  JA199.86 & nn.44-45.  In

response, ClearCorrect offers only a single dictionary definition (which post-dates

the enactment of the Patent Act by over five decades) that describes "material" as

"relating to matter" or "physical."  CCBr. 35 & n.4.  But the Commission has

already acknowledged that some definitions of material "do relate to physical

matter," and explained that such definitions do not preclude the more expansive

common meaning of the term, found "in a plurality of dictionary definitions."

JA199.86, 199.88-89.

Moreover, even if "material" in section 271(c) requires a physical

embodiment, that would not help ClearCorrect.  The digital data sets at issue are

physical and so qualify as a "material" under 35 U.S.C. § 271(c).  When CCPK

transmits the data sets to the United States, it places them on CCUS's server in

Texas.  JA199.24; JA1601-06.  These digital data sets are physical, discrete, and

identifiable; they do not differ in any meaningful way from data sets residing on a

CD-ROM and shipped into the U.S. by conventional means.  *See Robocast, Inc. v.*

*Microsoft Corp.*, 21 F. Supp. 3d 320, 332 (D. Del. 2014) ("To differentiate

between copying between two computers and physically sending a disk, which is

itself a copy, is not persuasive.").  A digital product has "a physical, tangible

embodiment one it is expressed and stored on a computer readable media" and

becomes "an actual, physical" material.  *CNET*, 528 F. Supp. 2d at 994; *supra*

at 31-32.[23]

ClearCorrect seeks to bootstrap its argument by relying again on *Bayer*. *See* CCBr. 36-37. But the fact that *Bayer*, in construing the term "made" in 35 U.S.C. § 271(g) mentioned a dictionary definition that referred to "a material thing," *Bayer*, 340 F.3d at 1372, does not inform the meaning of a different term in a different section of the Patent Act. Nor did this Court in *Bayer* purport to construe the term "especially adapted" in section 271(c).

ClearCorrect's reliance (at 37-28) on *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007), similarly misses its mark. *Microsoft* interpreted a different term "component" in a different provision of the Patent Act, section 271(f). *See* 550 U.S. at 447-49. As this Court explained, "the Supreme Court in *Microsoft* did not address the "meaning of 'material or apparatus' in § 271(c)," *Lucent*, 580 F.3d at 1321; *see also Robocast*, 21 F. Supp. 3d at 332 (same).[24]

In fact, *Lucent* (which ClearCorrect ignores) is fatal to its argument. In *Lucent*, the patent holder accused a feature of Microsoft's software (a date picker tool sold as part of Microsoft Outlook and other software packages) of contributorily infringing a method patent. 580 F.3d at 1320-21. Microsoft

---

[23] Indeed, even "an electromagnetic wave" carrying data is "a physical carrier." *Nuijten*, 500 F.3d at 1353.

[24] Moreover, the digital data sets are issue here are not mere "information," *supra* at 30-33, and *Microsoft* left open the question of whether "software in the abstract, or any other intangible" can be "a component" under § 271(f). 550 U.S. at 452 n.13.

countered that its date-picker tool was "not a 'material or apparatus' as the statute requires," invoking *Microsoft* in support. *Id.* at 1321. This Court rejected this argument, holding that the date-picker tool was an infringing material or apparatus, and noting that "there would be little dispute that Microsoft was contributing to infringement" if Microsoft "had offered the date-picker for sale as a separate download to be used with Outlook." *Id.* at 1320-21; *see also* JA199.89-199.91.[25]

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007), and *Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368 (Fed. Cir. 2011), *see* CCBr. 38-39, are inapposite. Neither case dealt with the definition of the term "material." *PharmaStem* concerned the term "sale" in section 271(c), 491 F.3d at 1356-57, and *Arris* simply recited the general contributory infringement standard, 639 F.3d at 1376.

### E.    CCPK's Provision of Digital Data Sets Constitutes a "Sale."

ClearCorrect argues that, by producing and selling the digital data sets to CCUS, CCPK is merely providing a "service," not selling a product. CCBr. 39-40.

---

[25] District courts have regularly found that data can contributorily infringe. *See T5 Labs (Del.) LLC v. Gaikai Inc.*, No. 12-1281, 2013 U.S. Dist. LEXIS 49710 (D. Del. Apr. 5, 2013) (finding sufficient allegations that a "cloud"-based gaming applications and service contributorily infringes); *Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 566 (D. Del. 2012) (permitting allegations that software contributorily infringed); *Oracle Corp. v. Parallel Networks, LLC*, 778 F. Supp. 2d 527, 544 (D. Del. 2011) (same); *Versata Software, Inc. v. Callidus Software, Inc.*, 944 F. Supp. 2d 357, 363 (D. Del. 2013) (allowing contributory infringement claims for accused software).

ClearCorrect failed to raise this issue in its petition for review to the Commission, thereby waiving it. 19 C.F.R. § 210.43(b)(2). In any event, this argument is meritless.

This case is unlike *PharmaStem*. There, the alleged infringers obtained umbilical cord blood, converted it into a therapeutically useful blood product, and provided it to physicians at the behest of the client family. 491 F.3d at 1357. This Court held that "[w]hile cord blood *is certainly a product*, the transaction between the defendants and their clients is plainly not the sale of 'a material or apparatus'" because "the cord blood remained the property of the families throughout the period in which the defendants stored it." *Id.* (emphasis added).

Here, by contrast, CCPK produces the digital data sets and sends them to CCUS in exchange for payment. JA199.24; JA1091; JA78224 (320:2-9); JA78235 (364:20-365:5); *Id.* (365:13-20). So long as commercial articles are imported into the United States in exchange for payment, there is a "product" sold. Irrespective of whether CCPK provides any "service" to CCUS, the fact is that CCPK sells the digital data sets, and CCUS imports them into the U.S. and then uses them to infringe Align's patents.

> ### F.   Although Direct Infringement Occurs After Importation, that Does Not Undermine the Commission's Contributory Infringement Finding.

As a last resort, ClearCorrect and its *amicus* Internet Association argue that

the Commission erred in finding a violation under 19 U.S.C. § 1337(a)(1)(B)(i),
based on ClearCorrect's contributory infringement, because direct infringement did
not occur until after importation.  CCBr. 59-60; IABr. 12-15.[26]  This argument
seeks to extend the holding of the vacated panel opinion in *Suprema, Inc. v. ITC*,
742 F.3d 1350 (Fed. Cir. 2013), which is currently pending *en banc*, *see* No. 2013-
1170, 2014 WL 3036241 (Fed. Cir. May 13, 2014).

In *Suprema*, a divided panel of this Court held that the Commission's
jurisdiction does not extend to instances of *induced* infringement under 35 U.S.C.
§ 271(b) "where the acts of underlying direct infringement occur post-
importation."  742 F.3d at 1360.  The panel majority observed that both direct
infringement under 35 U.S.C. § 271(a) and contributory infringement under
35 U.S.C. § 271(c) prohibit "conduct tied to an article" — a "'patented invention'"
for section 271(a) or a "'component'" or "'a material or apparatus[]'" for section
271(c).  *Id.* (quoting 35 U.S.C. § 271(a), (c)).  The panel then reasoned that "[p]rior
to the commission of any direct infringement, for purposes of inducement of
infringement, there are no 'articles that … infringe' — a prerequisite to the
Commission's exercise of authority based on § 337(a)(1)(B)(i)."  *Id.* at 1361.

Even if upheld *en banc*, this reasoning only applies to induced infringement
under 35 U.S.C. § 271(b).  In fact, the *Suprema* panel expressly reaffirmed that the

---

[26] ClearCorrect challenges only the Commission's ruling with respect to claim 1 of
the '880 patent and claims 21 and 30 of the '325 patent.  CCBr. 60.

Commission has statutory authority to address importation of products that

*contributorily infringe*:

> Section 271(c) defines contributory patent infringement,
> which again prohibits conduct *tied to an article*, but *here*,
> "*a component* of a patented machine, manufacture,
> combination or composition, *or a material or
> apparatus[]* for use in practicing a patented process,
> constituting a material part of the invention."

*Id*. at 1360 (quoting 35 U.S.C. § 271(c)) (emphasis added); *see also id.* at 1361 n.4

(the Commission has authority to address instances of method patent infringement

"via resort to § 271(a) or § 271(c)").[27]  The Commission's finding of violation is

fully in accord with Section 337(a)(1)(B)(i).

## IV.   THE COMMISSION CORRECTLY REJECTED CLEARCORRECT'S INVALIDITY DEFENSES.

Align's asserted patent claims have been held valid and nonobvious by the

PTO over the prior art during examination and reexamination.  ClearCorrect

waived its invalidity arguments with respect to most claims.  JA199.119.  In any

event, ClearCorrect's entire invalidity case rested on a cursory statement of its

expert, which the Commission found to be "conclusory and unsupported."

JA99.135; *see also* JA1252.  Finding that ClearCorrect failed to present "any

substantive evidence of record to support the defense that the asserted claims are

---

[27] Thus, *amici*'s argument that an article "cannot infringe a method claim," IABr.
15-18, similarly fails.  At base, the *amici* simply seek to limit section 337's reach
to tangible products that directly infringe an apparatus claim.  There is no support
for such limitation in this Court's precedent.

an obvious application of digital technology," the Commission correctly upheld Align's asserted claims as nonobvious. JA199.135. Because the Commission's factual findings as to obviousness are supported by substantial evidence, this Court should affirm. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

## A. ClearCorrect Waived Its Obviousness Defense for the Majority of the Asserted Claims.

As an initial matter, when petitioning the Commission to review the ID, ClearCorrect "failed to make a specific case for any of the … claims" other than claims 1 and 38 of the '325 Patent. JA199.119. The Commission did not abuse its discretion in finding waiver as to the other claims. *Id.*; *see also* 19 C.F.R. § 210.43(b)(2) ("Any issue not raised in a petition for review will be deemed to have been abandoned … ."); *NEC Corp.*, 151 F.3d at 1375.

ClearCorrect challenges the waiver finding as improper, claiming that it preserved the invalidity arguments by reference. CCBr. 54-55.[28] But, as this Court has recognized, incorporation of arguments by reference is disfavored, and can result in waiver. *See Rothe Dev. Corp. v. DOD*, 413 F.3d 1327, 1339 (Fed. Cir. 2005); *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 910 (Fed. Cir. 2014).[29]

---

[28] ClearCorrect does not challenge the Commission's separate finding of a waiver with respect to the '511 patent. *See* JA199.138-199.140.

[29] ClearCorrect argues that its reference (at JA96918) to claim 37 of the '325 patent (rather than claim 31) was a typographical error. CCBr. 58. But ClearCorrect did not seek reconsideration, *see* 19 C.F.R. § 210.47; in any event, the Commission rejected that argument on its merits, JA199.135 n.69; *infra* at 53.

The Commission did not abuse its discretion in refusing to consider ClearCorrect's undifferentiated invalidity contentions.  JA199.119 & n.63.[30]

ClearCorrect's argument (at 55) that it was stymied by the Commission's page limit is downright disingenuous.  ClearCorrect never requested an enlargement of the page limit, and its petition for review was only 69 pages long — well short of the 100-page limit.  *See* 19 C.F.R. § 210.43(b)(1).

Moreover, ClearCorrect has not presented anything for this Court to review regarding its waived contentions.  ClearCorrect has neither identified the relevant claims, nor showed where each claim element is allegedly disclosed in the prior art.  ClearCorrect's arguments are therefore also waived here.  *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990); *see also* Fed. R. App. P. 28.

In any event, the Commission did review these other claims and rejected ClearCorrect's obviousness defense.  JA199.135 n.69.  For reasons stated below, this Court should affirm.

---

[30] ClearCorrect's reliance (at 40-59) on *Intel Corp. v. ITC*, 946 F.2d 821 (Fed. Cir. 1991), is misplaced.  *See* Appeal Br. at 40-59.  In *Intel*, the appellant incorporated its arguments by reference to specific patents, and the Commission "considered and decided the issues."  946 F.2d at 828 n.12.  ClearCorrect here did nothing of the kind.  ClearCorrect only complained about the exclusion of a "claim chart" that was properly disallowed for lack of the requisite notice, JA96924-25; *see also* JA79603; JA1250; JA199.119; JA199.135.

**B.    Align's Claims 1 and 38 of the '325 Patent, as Well as Other Asserted Claims, Are Not Obvious.**

The ultimate judgment of obviousness is a legal determination with underlying factual determinations. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). The Commission's factual findings here are supported by substantial evidence, and its overall conclusion of nonobviousness is correct.

ClearCorrect's obviousness defense is based entirely on the flawed premise that Align's asserted claims merely "apply[] digital technology to replace older analog technology." CCBr. 40, 47. ClearCorrect is incorrect. The asserted patents claim orthodontic treatment methods that are fundamentally different from any disclosed in the prior art, as the Commission correctly recognized.[31] Align's asserted claims do not merely recite old prior art methods performed on a computer; rather, this is a case where "[s]imply computerizing the [prior art] systems would not yield the invention." *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1072 (Fed. Cir. 2009).

ClearCorrect suggests (at 40) that "common sense" be used in addition to evidence in determining obviousness, relying on *Perfect Web Technologies, Inc. v.*

---

[31] ClearCorrect distorts (at 41) the Commission's statement that "the art of processing of the digital data is analogous to the art of processing of plaster casts of teeth." JA199.104. The Commission was addressing the statutory interpretation of the term "processed," not ClearCorrect's invalidity arguments. In fact, the Commission expressly noted that the prior art was different from ClearCorrect's infringing process. JA199.104.

*InfoUSA, Inc.*, 587 F.3d 1324 (Fed. Cir. 2009).  But this Court in *Perfect Web*

emphasized that "'common sense'" is not a substitute for evidentiary findings.  587

F.3d at 1330.  Here, the Commission flatly rejected ClearCorrect's evidence.  This

Court does not second-guess the Commission's factual findings underlying

nonobviousness, as long as they are supported by substantial evidence.  *Gartside*,

203 F.3d at 1316.

ClearCorrect invokes in vain (at 40-41, 47) *Western Union Co. v.*

*MoneyGram Payment Systems*, 626 F.3d 1361 (Fed. Cir. 2010).  Unlike here, the

evidence in *Western Union* showed that the invention taught nothing more than

"routine modifications that are a part of adapting a new technology to an existing

system."  626 F.3d at 1370.  *Ormco Corp. v. Align Technology, Inc.*, 463 F.3d

1299 (Fed. Cir. 2006), is similarly inapplicable.  *Ormco* addressed different

patents, different claims, different claim limitations, and different prior art.  *See*,

*e.g.*, 463 F.3d at 1302.

Therefore, Align's asserted claims are not an obvious application of

computer technology to prior art methods.

## C.    ClearCorrect Mischaracterizes the Prior Art.

ClearCorrect's obviousness case is an unsupported mischaracterization of

two prior art references: U.S. Patent No. 2,467,432 ("Kesling") and U.S. Patent

No. RE 35,169 ("Lemchen").  The PTO considered these references extensively in

approving the asserted claims during examination and reexamination, including during reexamination of the two claims at issue here. *See* JA80265-466, JA89838-90252. As the Commission correctly held, "Kesling and Lemchen do not teach the interpolation of digital data sets, and [ClearCorrect] ha[s] not cited any substantive evidence of record to support the defense that the asserted claims are an obvious application of digital technology." JA199.135-199.136.

### 1. Kesling Is Fundamentally Different from Align's Asserted Claims.

Substantial evidence supported the Commission's findings regarding Kesling. Kesling (JA86987-91) generally discloses tooth positioning appliances made manually using tools and equipment available in the 1940s (*e.g*., plaster and wax). JA95704-05; JA95860-61 ¶ 63. Align's inventive concept of determining intermediate states based on the initial and final states is absent from Kesling. JA95705-06; JA95862 ¶ 65. Rather, Kesling only disclosed a *reactive* process, done *one step at a time*, where subsequent appliances are created by repeating the process for making the first. JA95705-06; JA95862 ¶ 65; JA78770-71 (790:9-791:20). Kesling makes one appliance at a time. Kesling does not disclose a *proactive* method of determining intermediate tooth positions at the outset based on both the initial and final positions. JA95705-06; JA95862 ¶ 65.

Kesling does not disclose, *inter alia*: (i) digital data sets or models of a dentition; (ii) intermediate or successive tooth arrangements based on initial and

-56-

final positions; (iii) fabricating a dental appliance, or controlling a fabrication machine, based on a digital data set; or (iv) numerous other elements. JA95703-10; JA95860-64 ¶¶ 62-63, 65, 67; JA78771-73 (791:21-793:5); JA92431-37. The Commission's findings regarding Kesling are amply supported by a plain reading of the reference, as well as the credible testimony of Align's expert. JA199.120-21; JA199.127-30; JA199.134-35.

### 2. Lemchen Is Likewise Fundamentally Different from Align's Asserted Claims.

Substantial evidence similarly supported the Commission's findings regarding Lemchen. Lemchen (JA86992-87000) discloses a method for determining orthodontic bracket placement. JA86993 (col. 1:55-2:8). Lemchen is directed to a single *fixed appliance* used for the duration of a patient's treatment, not a removable appliance. JA86993 (col. 1:55-2:8); JA95717-18; JA95871-72 ¶¶ 90-91; JA92544. Lemchen's disclosure is limited to treating a patient with the single set of brackets. JA95717-18; JA95871-72 ¶¶ 90-91. The concept of intermediate digital data sets or tooth arrangements is, therefore, absent from, and irrelevant to, Lemchen. JA95714-15; JA95868 ¶ 82. In fact, Lemchen teaches *away* from using intermediate arrangements. JA95726-27; JA95873-74 ¶ 97.

Lemchen does not disclose, *inter alia*: (i) intermediate or successive digital data sets or tooth arrangements; (ii) polymeric shell appliances; (iii) positive models of modified tooth arrangements based on digital data sets; (iv) multiple

removable appliances or fabricating intermediate or successive appliances based on digital data sets; (v) interpolation; or (vii) numerous other elements of the asserted claims. JA95714-18, JA95721-23; JA95728-31; JA95739-40; JA95868-72 ¶¶ 82, 85-86, 87, 90-91; JA95878-81 ¶¶ 105, 106, 108-109; JA92544; JA92438-44. The Commission correctly adopted these findings regarding Lemchen, which were supported by a plain reading of the reference, as well as the testimony of Align's expert. JA199.119-20; JA199.125-31; JA199.134-35. Because the Commission's factual findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," this Court should affirm. *uPI Semiconductor Corp. v. ITC*, 767 F.3d 1372, 1379 (Fed. Cir. 2014) (internal quotation marks omitted).

### D. Align's Claims Are Not Obvious in View of the Lemchen and Kesling References.

ClearCorrect's argument (at 48-54) that claims 1 and 38 of the '325 patent are obvious mischaracterizes the prior art.[32] Setting aside ClearCorrect's abject failure to adduce credible evidence in support of its claims, JA199.135-136, a fundamental flaw in ClearCorrect's invalidity argument is that ClearCorrect erroneously assumes that Lemchen discloses "a digital method that replicated the physical models of Kesling's method." CCBr. 45. ClearCorrect ignores the

---

[32] As stated above, ClearCorrect waived its arguments regarding any other claims. Irrespective, same conclusion applies to those claims.

express finding by the Commission that Lemchen does not incorporate Kesling's method.  *See* JA199.126-199.127; JA1212-18.  Indeed, ClearCorrect's reading of Lemchen is nonsensical because Lemchen uses a completely different type of orthodontic appliance than Kesling.  JA86993; JA95704-05; JA95717-18; JA95860-61 ¶ 63; JA95871-72 ¶¶ 90-91.

One aspect consistently absent from both Lemchen and Kesling is Align's inventive concept of determining intermediate tooth arrangements and digital data sets based on both the initial *and* final tooth arrangements.  The PTO has repeatedly recognized this in approving Align's claims over Lemchen and Kesling.  *See* JA80262-466; JA87789-87796; JA89842-43; JA90258-90266.  The Commission likewise recognized this distinction, which it referred to as "the interpolation of digital data sets."  JA199.135.[33]  Accordingly, the Commission correctly found that the combination of Lemchen and Kesling does not render obvious *any* of the asserted claims.  *See, e.g.*, JA199.134-35 & n.69; JA1217.[34]

---

[33] ClearCorrect incorrectly suggests that the Commission found that only the claim limitation of "interpolation" was missing from the prior art.  CCBr. 42.  The Commission expressly recognized that the prior art, even in combination, fails to disclose numerous elements of Align's claims.  JA199.135-199.136; *see also* JA1250-52; JA1273-76.

[34] Align also introduced substantial evidence that one of ordinary skill in the art would not have been motivated to combine prior art directed to removable appliances (Kesling) with prior art directed to fixed appliances (Lemchen) because the knowledge and understanding of the capabilities of these different types of appliances was vastly different.  JA95710-11; JA95740-41; JA95750-51; JA95759-60; JA95775-JA95781; JA95824; JA95866-67 ¶ 77; JA95886 ¶ 121.

## CONCLUSION

This Court should affirm the Commission's finding of a violation under section 337.

Respectfully submitted,

Dated:  February 18, 2015         By:___/s/Igor V. Timofeyev

Stephen B. Kinnaird
Igor V. Timofeyev
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC  20005
Telephone:  (202) 551-1700
stephenkinnaird@paulhastings.com
igortimofeyev@paulhastings.com

Thomas A. Counts
PAUL HASTINGS LLP
55 Second Street, 24th Floor
San Francisco, CA  94105
Telephone:  (415) 856-7000
tomcounts@paulhastings.com

*Counsel for Intervenor*
*Align Technology, Inc.*

# CERTIFICATE OF SERVICE

I, Igor V. Timofeyev, hereby certify that, on February 18, 2015, the foregoing document was filed using the CM/ECF system and served on the parties of record via ECF.

***Counsel for Appellee***
***U.S. International Trade Commission:***

Sidney A. Rosenzweig
Wayne W. Herrington
**U.S. INTERNATIONAL TRADE COMMISSION**
500 E Street, S.W., Room 707
Washington, D.C. 20436
sidney.rosenzweig@usitc.gov
wayne.herrington@usitc.gov

***Counsel for Appellants ClearCorrect Operating, LLC and***
***CCPK (Private), Ltd.:***

Michael D. Myers
Robert H. Espey, II
**MCCLANAHAN MYERS**
  **ESPEY, LLP**
3355 West Alabama, Suite 210
Houston, TX 77098
mike@mmellp.com
bob@mmellp.com
clearcorrect@mmellp.com

Gary M. Hnath
Paul Hughes
**MAYER BROWN LLP**
1999 K Street, NW
Washington, DC 20006
ghnath@mayerbrown.com
phughes@mayerbrown.com

Dated:  February 18, 2015

BY:   /s/Igor V. Timofeyev

Igor V. Timofeyev

**PAUL HASTINGS LLP**

875 15th Street, N.W.

Washington, D.C.  20005

Tel.:  (202) 551-1700

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and this

Court's Rule 28(a)(14), I certify the following:

1.      The attached Brief of Intervenor Align Technology, Inc. complies

with the type-volume limitation of Federal Rule of Appellate Procedure

32(a)(7(B).  The brief contains 13,993 words (according to the Microsoft Word

2010 count function), excluding the parts of the brief exempted by Federal Rule of

Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      The attached Brief of Intervenor Align Technology, Inc. complies

with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)

and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally space typeface using Microsoft

Word 2010 in 14-point Times New Roman type style.

DATED:  February 18, 2015          By:

_____
/s/Igor V. Timofeyev
Igor V. Timofeyev
PAUL HASTINGS LLP
875 15th Street N.W.
Washington, DC 20005
Telephone:  (202) 551-1700
igortimofeyev@paulhastings.com