No. 2014-1527

In the

# United States Court of Appeals
# for the Federal Circuit

CLEARCORRECT OPERATING, LLC, and
CLEARCORRECT PAKISTAN (PRIVATE), LTD.,

*Appellants,*

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

ALIGN TECHNOLOGY, INC.,

*Intervenor.*

Appeal from the United States International Trade Commission,
Inv. No. 337-TA-833

**Brief of *Amici Curiae* Public Knowledge
and the Electronic Frontier Foundation
in Support of Appellants**

Charles Duan
Public Knowledge
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
cduan@publicknowledge.org

*Counsel for amici curiae*

## CERTIFICATE OF INTEREST

Pursuant to Rules 29(a) and 47.4 of the Federal Circuit Rules of Practice, counsel of record certifies as follows:

(1) The full name of every party or amicus represented by counsel to this brief is **Public Knowledge** and the **Electronic Frontier Foundation**.

(2) The above-identified parties are the real parties in interest.

(3) The corporate disclosure statement of Rule 26.1 of the Federal Rules of Appellate Procedure is as follows: There is no parent corporation to or any corporation that owns 10% or more of stock in Public Knowledge or the Electronic Frontier Foundation.

(4) The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this court are: **Charles Duan, Public Knowledge, Washington, DC**.


Dated: October 16, 2014        */s/ Charles Duan*
                               Charles Duan
                               *Counsel for amici curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . .   i

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . .   iii

INTEREST OF AMICI CURIAE  . . . . . . . . . . . . . . . . . . . . . .   1

SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . .   3

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

I.   The Commission's Broad Construction of "Articles" Cannot Be Correct Because the Commission Does Not Have Jurisdiction over Telecommunications . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

    A.   At the Time of the Enactment of the Tariff Act of 1930, Data Transmissions Were Clearly Distinguished from Articles of Commerce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    B.   Contrary to the Commission's Assumptions, Congress Was Fully Apprised of the Nature of Data Transmissions . . . . . . . . . . .   9

II.   Strong, Well-Established Policy Considerations Disfavor ITC Jurisdiction over Telecommunications Data   . . . . . . . . . . . . . . . . . .   12

    A.   Internet Service Providers Should Not Be Burdened with Mandates to Inspect Data Transmissions . . . . . . . . . . . . . . . . .   13

    B.   Existing Legal Policy Warns Against Inhibiting an Open Internet, and Similar Principles Should Be Followed Here . . . . . . . . . . .   15

III.   This Court Should Reject the Commission's Overbroad Construction of "Articles" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

CERTIFICATE OF COMPLIANCE  . . . . . . . . . . . . . . . . . . .   22

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . .   23

# TABLE OF AUTHORITIES

### CASES

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) . . . . . . . . . . 1

*CLS Bank Int'l v. Alice Corp.*, 685 F.3d 1341 (Fed. Cir. 2012) (panel decision), *vacated and reh'g en banc granted*, 484 Fed. Appx. 559 (Fed. Cir. 2012) . . . . . 15

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) . . . . . . . . . . . . . . . 16

*I4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Certain Digital Models, Digital Data, & Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, & Methods of Making the Same*, Inv. No. 337-TA-833 (U.S. Int'l Trade Comm'n Apr. 9, 2014) . . . . . . . . . . . . . . . . . 3, 5, 7, 9, 18−20

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340 (Fed. Cir. 2008) . . 3

*Leloup v. Port of Mobile*, 127 U.S. 640 (1888) . . . . . . . . . . . . . . . . . . 11

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) . . . . . . . 13

*Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011) . . . . . . . . . . . . 13

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014) . . . . . . . . . 1

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014) . . . . 1

*Paul v. Virginia*, 75 U.S. (7 Wall.) 168 (1869), *overruled by United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944) . . . . . . . . . . . . . . . . . . . . 7

*Pensacola Tel. Co. v. W. Union Tel. Co.*, 96 U.S. 1 (1878) . . . . . . . . . . . 7, 10

*Preserving the Open Internet*, 25 F.C.C.R. 17905 (2010) (report & order), *available at* https://apps.fcc.gov/edocs_public/attachmatch/FCC-10-201A1_Rcd.

pdf, *vacated in part sub nom. Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) . . . 16

*Ratterman v. W. Union Tel. Co.*, 127 U.S. 411 (1888) . . . . . . . . . . . . . . . 10

*Ratzlaf v. United States*, 510 U.S. 135 (1994) . . . . . . . . . . . . . . . . 8

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Reno v. Condon*, 528 U.S. 141 (2000) . . . . . . . . . . . . . . . . . . . . 7

*Superguide Corp. v. DirecTV Enters., Inc.*, 358 F. 3d 870 (Fed. Cir. 2004) . . . . . 20

*Tel. Co. v. Texas*, 105 U.S. 460 (1882) . . . . . . . . . . . . . . . . . . 6, 10

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . 16

*W. Union Tel. Co. v. Lenroot*, 323 U.S. 490 (1945) . . . . . . . . . . . . . . 7, 10

*W. Union Tel. Co. v. Pendleton*, 122 U.S. 347 (1887) . . . . . . . . . . . . . 6

## Constitutional Provisions

U.S. Const. art. 1, § 8, cl. 8 . . . . . . . . . . . . . . . . . . . . . . . 17

## Statutes

35 U.S.C. § 271 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 (codified as amended at 47 U.S.C. §§ 151–621 (2012)) . . . . . . . . . . . . . . . . . . 8

Communications Decency Act of 1996, 47 U.S.C. § 230 (2012) . . . . . . . . 17

Copyright Act of 1909, Pub. L. No. 60-349, 35 Stat. 1075 . . . . . . . . . . . 11

Digital Millennium Copyright Act, 17 U.S.C. § 512 (2012) . . . . . . . . . . 14, 17

Electronic Communications Privacy Act, 18 U.S.C. § 2511 (2012) . . . . . . . 14

Mann-Elkins Act, Pub. L. No. 61-218, 36 Stat. 539 (1910) . . . . . . . . . . . 11

Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590 . . . . . . . . . . . . . . 7–8

Tariff Act of 1930 § 337, 19 U.S.C. § 1337 (2012) . . . . . . . . . 3–6, 8–10, 12

Townsend Amendment, Pub. L. No. 62-303, 37 Stat. 488 (1912) . . . . . . . . 11

**OTHER SOURCES**

Janet Abbate, *Inventing the Internet* (1999) . . . . . . . . . . . . . . . . . . 16

*Arlington Speaks with Paris Again*, N.Y. Times, Oct. 24, 1915, at 8 . . . . . . . 10

Bruce E. Boyden, *Can a Computer Intercept Your Email?*, 34 Cardozo L. Rev. 669 (2012), *available at* http://www.cardozolawreview.com/content/34-2/BOYDEN.34.2.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

H.R. Rep. No. 105-551 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Timothy R. Holbrook & Lucas S. Osborn, *Digital Patent Infringement in an Era of 3D Printing*, 48 U.C. Davis L. Rev. (forthcoming 2014), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2483550 . . . . . . . . . . . . . . . 13

J. Scott Holliday et al., *Policy Brief No. 10, Internet Benefits: Consumer Surplus and Net Neutrality* (2011), http://policyintegrity.org/files/publications/Internet_Benefits.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Mehan Jayasuriya et al., *Forcing the Net Through a Sieve: Why Copyright Filtering is Not a Viable Solution for U.S. ISPs* (2009), https://www.publicknowledge.org/pdf/pk-filtering-whitepaper-200907.pdf . . . . . . . . 14

Al Kohn & Bob Kohn, *Kohn on Music Licensing* (4th ed. 2010) . . . . . . . . 11

*Marconi Tells of His Latest Success*, N.Y. Times, Jan. 25, 1903, at 10 . . . . . . 10

William F. Patry, *Patry on Copyright* (2012) . . . . . . . . . . . . . . . . . . . 11

S. Rep. No. 73-781 (1934), *reprinted in A Legislative History of the Communications Act of 1934*, at 711 (Max D. Paglin ed., 1989) . . . . . . . . . . . . . . 9

*Song Pluggers by Subtle Art Purvey Wares*, N.Y. Times, Feb. 15, 1925, at 18 . . . 11

Christopher H. Sterling & George Shiers, *History of Telecommunications Technology* (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Telecomm. Standardization Sector, Int'l Telecomm. Union, *Rec. ITU-T H.323, Packet-Based Multimedia Communications Systems* (2009), *available at* http://www.itu.int/rec/T-REC-H.323-200912-I/en . . . . . . . . . . . . . . 20

*The Atlantic Telegraph*, N.Y. Times, Aug. 7, 1858, at 1 . . . . . . . . . . . . . . 10

## INTEREST OF AMICI CURIAE

*Amicus curiae* Public Knowledge is a non-profit organization that is dedicated to preserving the openness of the Internet and the public's access to knowledge; promoting creativity through balanced intellectual property rights; and upholding and protecting the rights of consumers to use innovative technology lawfully. As part of this mission, Public Knowledge advocates on behalf of the public interest for a balanced patent system, particularly with respect to new and emerging technologies.

*Amicus curiae* the Electronic Frontier Foundation is a nonprofit civil liberties organization that has worked for more than 20 years to protect consumer interests, innovation, and free expression in the digital world. EFF and its more than 24,000 dues-paying members have a strong interest in helping the courts and policy-makers in striking the appropriate balance between intellectual property and the public interest.

Public Knowledge and the Electronic Frontier Foundation have previously served as *amici* in key patent cases. *E.g., Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014); *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014).

Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief. Pursuant to Rule 29(c)(5), no counsel for a party

authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of the brief.  No person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

In the sweeping and unprecedented decision below, the International Trade Commission found that its authority to regulate trade extends to pure "electronic transmission of digital data" untied to any physical medium. *In re Certain Digital Models, Digital Data, & Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, & Methods of Making the Same*, Inv. No. 337-TA-833, slip op. at 55 (U.S. Int'l Trade Comm'n Apr. 9, 2014).  Generally, by statute, the Commission's jurisdiction is limited to oversight of "importation . . . of articles." Tariff Act of 1930 § 337(a)(1)(B), 19 U.S.C. § 1337 (2012).  However, the Commission expansively construed the term "articles" to potentially include anything "bought and sold in commerce," thereby leading to its conclusion that digital data was an article of importation. *E.g., Certain Digital Models*, slip op. at 41.  This broadly sketched statutory construction fails to indicate clearly any limiting principles on the Commission's power.

Among other things, the Commission's decision leaves open the question of whether all transmissions of telecommunications data are within the scope of its authority.

The Commission, being a "creature of statute," is most certainly limited in its power. *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1355 (Fed. Cir. 2008).  In particular, as explained in detail below, the Commission does not

have jurisdiction over general telecommunications data transmissions, such as telephone calls, telegraph messages, and television and radio broadcasts. The historical context of the Tariff Act of 1930 evinces absolutely no legislative contemplation of ITC authority over telecommunications, and strong policy considerations favor openness of communications channels such as the Internet and thus disfavor the Commission's manufacturing of new powers over data transmissions.

Accordingly, for the reasons set forth in detail below, this Court should reject the Commission's overzealous construction of the statutory term "importation . . . of articles." The Court should articulate those limiting principles, ignored by the decision below, that circumscribe the Commission's authority, at least to ensure that the agency cannot assert power over all international telecommunications data transmissions.

# ARGUMENT

## I. THE COMMISSION'S BROAD CONSTRUCTION OF "ARTICLES" CANNOT BE CORRECT BECAUSE THE COMMISSION DOES NOT HAVE JURISDICTION OVER TELECOMMUNICATIONS

The Commission construed the term "articles" in section 337 as, and thus effectively handed itself jurisdiction over, essentially all "items as are bought and sold in commerce." *E.g., Certain Digital Models*, slip op. at 41; *cf. id.* at 16 (Johanson, Comm'r, dissenting) (criticizing this construction as "overly broad").  It arrived at this broad construction in large part based on historical evidence from the time of the enactment of the Tariff Act of 1930. *See, e.g., id.* at 39–40, 43 (citing pre-1930 dictionary definitions of "article").

However, the historical evidence in fact suggests otherwise.  Evidence from the early 1900s indicates that Congress and others would have cleanly distinguished importation and telecommunication, vesting authority over each in distinct agencies.  Treating the Commission as having authority over telecommunications data, then, conflicts with this distinction.  To the extent that the Commission's interpretation of "digital data" as an imported article encompasses such telecommunications data, this Court should reject that erroneous interpretation of the Commission's purview.[1]

---

[1] Whether the Commission's interpretation reaches so far is treated in this brief in Section III *infra* p. 18.

## A. AT THE TIME OF THE ENACTMENT OF THE TARIFF ACT OF 1930, DATA TRANSMISSIONS WERE CLEARLY DISTINGUISHED FROM ARTICLES OF COMMERCE

There is substantial evidence that, around 1930, data transmissions were generally understood to be distinct from articles of commerce and international trade. This understanding influenced Congress, as reflected in its creation of separate and distinct agencies to oversee trade and telecommunications.

The distinction was highlighted by the Supreme Court as early as 1887, in considering one specific type of telecommunications data, namely telegrams:

> Other commerce deals only with persons, or with visible and tangible things. But the telegraph transports nothing visible and tangible; it carries only ideas, wishes, orders, and intelligence. Other commerce requires the constant attention and supervision of the carrier for the safety of the persons and property carried. The message of the telegraph passes at once beyond the control of the sender, and reaches the office to which it is sent instantaneously. *It is plain, from these essentially different characteristics, that the regulations suitable for one of these kinds of commerce would be entirely inapplicable to the other.*

*W. Union Tel. Co. v. Pendleton*, 122 U.S. 347, 356 (1887) (emphasis added). Based on this distinction, the Supreme Court went on to hold that state statutes regulating the transmission of telegrams were unconstitutional. *See id.* at 359.

That telecommunications were seen as distinct from other commerce is evident from other contemporaneous case law. Although telegraph services were frequently described as "commerce" by the Supreme Court, individual telegrams have never been described as "articles of commerce." *See, e.g., Tel. Co. v. Texas*, 105

U.S. 460, 464 (1882) (citing *Pensacola Tel. Co. v. W. Union Tel. Co.*, 96 U.S. 1 (1878)).[2] In fact, every single opinion of the Supreme Court prior to 1930 used the phrase "article of commerce" in connection with a physical good, except for a string of cases holding that insurance contracts, being intangible, were *not* articles of commerce. *See, e.g., Paul v. Virginia*, 75 U.S. (7 Wall.) 168, 183 (1869), *overruled by United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944).[3] Of note, in 1945, the Supreme Court construed the statutory text "articles or subjects of commerce," and held that telegraph messages were "subjects," but not articles. *See W. Union Tel. Co. v. Lenroot*, 323 U.S. 490, 502 (1945).

Statutory language also confirms the view that telecommunication differs from trade. Although the Tariff Act of 1930 imposed tariffs on all manner of goods from acid anhydrides to Zante currants, its schedules do not once include telegraph messages, radio broadcasts, telephone calls, or other transmissions. *See* Tariff Act of 1930, Pub. L. No. 71-361, § 1, ¶¶ 1, 742, 46 Stat. 590. Duties are imposed by the Act on telegraph, radio, telephone *equipment* such as devices, wires,

---

[2] The Commission's citation to *Reno v. Condon*, 528 U.S. 141, 148 (2000), for the proposition that "digital files are 'articles of commerce,'" *Certain Digital Models*, slip op. at 40, is thus inapposite. *Condon* is better understood as holding that data is commerce within the meaning of the commerce clause, not that data constitutes an article for purposes of importation. *See* 528 U.S. at 148 ("[D]rivers' information is, *in this context*, an article of commerce . . . ." (emphasis added)).

[3] The negative conclusions of this paragraph were confirmed by conducting date-limited searches for the term "article(s) of commerce" in Supreme Court opinions.

and telephone poles, *see id.* § 1, ¶¶ 316, 353, but not on the data sent by that equipment. Telecommunications data is simply not contemplated in the text of the Act.

Use of term "article" in the Tariff Act is also revealing. In describing the items being tariffed, the Act uses the word "article" 268 times. Every single use of the term, though, is within a context that makes clear that the word "article" refers only to tangible goods. *See, e.g., id.* § 1, ¶ 385 ("articles made wholly or in chief value of tinsel wire, metal thread, lame or lahn"). Thus, the statutory text belies the Commission's broad construction. *Cf. Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.").

Any remaining suggestion that the Tariff Act of 1930 was intended to invest the International Trade Commission with jurisdiction over data transmissions is laid to rest by the passage of the Communications Act of 1934. Pub. L. No. 73-416, 48 Stat. 1064 (codified as amended at 47 U.S.C. §§ 151–621 (2012)). That act created the Federal Communications Commission, "centralizing authority" in that body "with respect to interstate and foreign commerce in wire and radio communication." *Id.* sec. 1. The Senate report explained that the FCC was to have "regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio," and that the prior patchwork of authority indicated "a

vital need for one commission with unified jurisdiction over all these methods of communication." S. Rep. No. 73-781, at 1 (1934), *reprinted in A Legislative History of the Communications Act of 1934*, at 711 (Max D. Paglin ed., 1989). It is hard to believe that Congress would invest a trade commission with authority over data transmissions and then only three years later create a "commission with unified jurisdiction" over those same data transmissions. The logical conclusion is that Congress did not intend for the ITC to have authority over data transmissions.

Accordingly, there is no historical precedent for the Commission's authority extending to telecommunications data transmissions. Insofar as the decision below read the term "articles . . . of importation" to reach so far, the Commission erred.

## B. Contrary to the Commission's Assumptions, Congress Was Fully Apprised of the Nature of Data Transmissions

The Commission was willing to broadly construe the term "articles" in large part because, as it said, the Tariff Act of 1930 was drafted "at a time when internet downloads were not in existence." *Certain Digital Models*, slip op. at 36. So the Commission found that the statute, originally understood only to cover tangible articles, should be reinterpreted to cover digital goods, in view of how "the fundamental nature of international commerce has evolved" since 1930. *Id.* at 43–44.

Thus, the Commission's reasoning reflects an assumption that, in 1930,

Congress (1) was unfamiliar with data transmissions, (2) did not know that data transmissions were regulable commerce, or (3) did not recognize that infringement of intellectual property could occur through data transmissions. All three of these assumptions are incorrect, for the following reasons.

*First*: although Internet downloads did not exist in 1930, plenty of other transmissions of telecommunications data, including cross-border transmissions, did exist and were certainly known to Congress at that time. Trans-Atlantic telegraph cables were laid and sending messages as early as 1858. *See The Atlantic Telegraph*, N.Y. Times, Aug. 7, 1858, at 1. Guglielmo Marconi sent the first radio transmission from the United States to the United Kingdom in 1903. *See Marconi Tells of His Latest Success*, N.Y. Times, Jan. 25, 1903, at 10. A telephone call between Arlington, Virginia and Paris, France was completed in 1915. *See Arlington Speaks with Paris Again*, N.Y. Times, Oct. 24, 1915, at 8. Thus, if the term "articles" in section 337 so certainly encompassed intangible data, as the Commission believed, then Congress would have been well apprised of this when drafting the Tariff Act of 1930.

*Second*: these developments in technology were certainly recognized as within the scope of commerce when section 337 was enacted. Numerous cases in the Supreme Court recognized telegraphy as a form of commerce.[4] Between

---

[4]*See, e.g., Tel. Co.*, 105 U.S. at 464; *Pensacola Tel. Co. v. W. Union Tel. Co.*, 96 U.S. 1, 10 (1878); *Lenroot*, 323 U.S. at 502–03; *Ratterman v. W. Union Tel. Co.*, 127 U.S.

1910 and 1933, telephone, telegraph, and cable companies were within the ju-
risdiction of the Interstate Commerce Commission—a commission with the very
word "commerce" in its name. *See* Mann-Elkins Act, Pub. L. No. 61-218, sec. 7, § 1,
36 Stat. 539, 544–45 (1910). So Congress would have known that telecommunica-
tions data could be the subject of legislation at the time of drafting the Tariff Act.

*Third*: concern for intellectual property rights in the face of electronic trans-
missions is no new problem, contrary to the Commission's view. Radio broad-
casts posed the same problems to intellectual property owners in the early 1900s
as digital files pose today. Said one representative of a music publishing business:
"The public will not buy songs that it can hear almost at will by a brief manipula-
tion of the radio dials." *Song Pluggers by Subtle Art Purvey Wares*, N.Y. Times, Feb.
15, 1925, at 18; *see also* Al Kohn & Bob Kohn, *Kohn on Music Licensing* 10 (4th ed.
2010) (describing E.C. Mills, chair of the Music Publisher's Protective Association,
as "sensing that the radio broadcasting could threaten the very foundations of the
music publishing industry"). And Congress has contemplated intellectual prop-
erty issues in new technologies in legislation from time to time.[5] So Congress

---

411, 425 (1888); *Leloup v. Port of Mobile*, 127 U.S. 640, 645 (1888).

[5]*See, e.g.,* Copyright Act of 1909, Pub. L. No. 60-349, § 1(e), 35 Stat. 1075 (creat-
ing statutory licensing system for mechanical reproductions of music); Townsend
Amendment, Pub. L. No. 62-303, 37 Stat. 488 (1912) (providing copyright protec-
tion for motion pictures). *See generally* 1 William F. Patry, *Patry on Copyright*
§ 1:46 (2012) (between the 1909 and 1976 Copyright Acts, "there was a series of
amendments designed principally to take into account new technologies . . . .").

would have known that data transmission was a potential avenue of intellectual property infringement. Thus, omission of data transmissions from section 337 should be seen as a deliberate, intentional choice.

The Commission found it appropriate that "the term 'articles' should be construed flexibly to fit new technologies" such as the digital data transmissions at issue. But that finding is in error, because Congress has had numerous opportunities to contemplate analogous data transmissions, and each time has declined to extend the Commission's authority to reach them. This Court should not allow the Commission to unilaterally take that step where Congress has never ventured.

## II. STRONG, WELL-ESTABLISHED POLICY CONSIDERATIONS DISFAVOR ITC JURISDICTION OVER TELECOMMUNICATIONS DATA

Aside from the evidence presented above that section 337, properly interpreted, does not cover telecommunications, there are important reasons why section 337 *ought not* cover telecommunications. Among those reasons, explained in detail below, are (1) that treatment of data transmissions as articles of importation could give rise to conflicting legal burdens for those carrying the data, and (2) that such treatment would thwart the open Internet and its widely accepted benefits to innovation.

## A. Internet Service Providers Should Not Be Burdened with Mandates to Inspect Data Transmissions

Unlike imported physical goods, which arrive at defined ports of entry and are subject to inspection by customs, Internet data transmissions enter the United States through private communications carriers known as Internet service providers. Thus, the ITC's decision to treat data transmissions as imported articles raises real and unanswered questions about the enforcement role that such service providers will play. For example, if the Commission were to exercise its powers against Internet service providers and other telecommunications providers for data transmission activities, those service providers could be required to actively block transmission of certain content.[6]

As unsettled as the implications of the decision below may be, it is well settled that, as a matter of policy, Internet service providers should not be re-

---

[6]What theory of infringement could be brought to bear against a third party data carrier is a separate and unsettled problem. None of the exclusive rights (making, using, selling, or offering to sell) would seem to apply to a mere carrier. A number of commentators have theorized that data transmission alone can constitute contributory patent infringement under 35 U.S.C. § 271(c). *See, e.g.,* Timothy R. Holbrook & Lucas S. Osborn, *Digital Patent Infringement in an Era of 3D Printing*, 48 U.C. Davis L. Rev. (forthcoming 2014) (manuscript at 27 & note 96), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2483550. But the cases cited for that proposition do not clearly take that position. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010) ("The parties' infringement arguments did not turn on whether Word's custom XML editor was a 'component' . . . ."), *aff'd,* 131 S. Ct. 2238 (2011); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321 (Fed. Cir. 2009) ("We need only respond that the Supreme Court . . . did not address the meaning of 'material or apparatus' in § 271(c).").

quired to actively inspect or block data transmissions.  At least two laws suggest this: § 2511 of the Electronic Communications Privacy Act and § 512 of the Digital Millennium Copyright Act.  *See generally* Mehan Jayasuriya et al., *Forcing the Net Through a Sieve:  Why Copyright Filtering is Not a Viable Solution for U.S. ISPs* 49–54 (2009),  https://www.publicknowledge.org/pdf/pk-filtering-whitepaper-200907.pdf.

First, the Electronic Communications Privacy Act makes any person who "intentionally intercepts . . . any wire, oral, or electronic communication" subject to criminal and civil penalties.  18 U.S.C. § 2511(1)(a) (2012).  Thus, seeking out data transmissions in compliance with a Commission order conflicts with that statute's policy of privacy for communications data.  *Cf.* Bruce E. Boyden, *Can a Computer Intercept Your Email?*, 34 Cardozo L. Rev. 669 (2012), *available at* http://www.cardozolawreview.com/content/34-2/BOYDEN.34.2.pdf (considering whether an Internet service provider automatically processing data can violate the Wiretap Act).

Second, the Digital Millennium Copyright Act provides an online service provider with a safe harbor from copyright liability.  That section specifically states that its safe harbors are *not* conditioned upon "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity."  17 U.S.C. § 512(m)(1) (2012).  Indeed, the safe harbors were intended to codify the de-

cision in *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, which specifically exempted Internet service providers from direct copyright liability because "[b]illions of bits of data flow through the Internet and are necessarily stored on servers throughout the network and it is thus practically impossible to screen out infringing bits from noninfringing bits." 907 F. Supp. 1361, 1372–73 (N.D. Cal. 1995); *see* H.R. Rep. No. 105-551, pt. 1, at 11 (1998). Thus, this statute as well indicates a policy that Internet service providers not be required to monitor data transmissions for infringing content.

Permitting the Commission to maintain jurisdiction over data transmissions thus creates new issues for Internet service providers, of the type that Congress has intentionally sought to avoid creating for them in other areas of law. This Court should seek to avoid creating these unnecessary issues by limiting the Commission's jurisdiction to a proper scope.

### B. Existing Legal Policy Warns Against Inhibiting an Open Internet, and Similar Principles Should Be Followed Here

No citation is necessary for the proposition that the rapid rise of computer technology has been the defining characteristic of this age.[7]   Much of that

---

[7]*But see, e.g., CLS Bank Int'l v. Alice Corp.*, 685 F.3d 1341, 1350 (Fed. Cir. 2012) (panel decision) ("The computer, with all of its hardware and software variations, may be one of the greatest inventions of all time, and there can be no question that advances in computer technology have fostered and will continue to foster innovation in all areas of science and technology."), *vacated and reh'g en banc*

development—both technologically and socially, in the areas of free speech, culture, and expression, for example—can be attributed to the Internet, and particularly the openness of the Internet.[8] The ability of anyone to connect to the Internet and offer content and services, without approval of content gatekeepers, has created innumerable businesses, jobs, innovations, creative works, and other benefits to society as a whole.

Policymakers have long recognized the importance of crafting law that protects this open Internet. Most prominently, in 2010 the Federal Communications Commission issued an order designed "to ensure the Internet remains an open platform—one characterized by free markets and free speech." *Preserving the Open Internet*, 25 F.C.C.R. 17905, 17908 (2010) (report & order), *available at* https://apps.fcc.gov/edocs_public/attachmatch/FCC-10-201A1_Rcd.pdf, *vacated in part sub nom. Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014). Similarly, Congress enacted immunities from liability for Internet service providers, in order to "to promote the continued development of the Internet and other interactive com-

---

*granted*, 484 Fed. Appx. 559 (Fed. Cir. 2012).

[8] *See, e.g., Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010) (describing the Internet as "arguably the most important innovation in communications in a generation"); Janet Abbate, *Inventing the Internet* 182 (1999) ("[T]he openness of the system invited users to create new applications . . . ."); J. Scott Holliday et al., *Policy Brief No. 10, Internet Benefits: Consumer Surplus and Net Neutrality* 7 (2011), http://policyintegrity.org/files/publications/Internet_Benefits.pdf ("The Internet has evolved from an esoteric service to connect university computing labs into the primary communication tool of our age.").

puter services and other interactive media." Communications Decency Act of 1996, 47 U.S.C. § 230(b)(1), (c)(1) (2012). These indicate a policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services." § 230(b)(2); *see also* 17 U.S.C. § 512 (limiting copyright infringement liability for similar reasons).

ITC authority to police Internet data transmissions, particularly at the level of service providers, would be a step in the wrong direction in view of these policies. The threat of a Commission cease and desist order could cause service providers to refuse carriage of new and innovative services, block access to data, and otherwise restrain an open and unfettered arena of technological growth. Such a result would be contrary not only to the Internet itself, but also to the basic principles of patent law, namely to "promote the progress of science and the useful arts." U.S. Const. art. 1, § 8, cl. 8.

Certainly the Commission's specific holding in the present case does not immediately present these problems: the named respondent was the consumer of the data transmission, not a carrier or Internet service provider. But because the construction of "articles" by the Commission is so broad, it is conceivable that this decision could be misused as precedent for testing novel theories of third-party intermediary liability. The Court should put those erroneous theories to bed in this case.

## III. THIS COURT SHOULD REJECT THE COMMISSION'S OVERBROAD CONSTRUCTION OF "ARTICLES"

In view of the above arguments, this Court should reject the Commission's sweepingly overbroad construction of the term "importation . . . of articles." Though the decision purports to deal with "digital data," the Commission's opinion fails to indicate any outer limit on its construction, which could potentially, though wrongly, be read to encompass telecommunications services such as telephone calls and broadcast media—services certainly outside the jurisdiction of the Commission.

Action by this Court is necessary because the decision below, on its face, articulates no limiting principles on the scope of the Commission's authority. The Commission construed the term "articles" highly expansively, seeing no limitations on the term either in the statutory language or the legislative history. *See, e.g., Certain Digital Models*, slip op. at 38 ("It appears to broadly cover infringing imports, without express limitation as to form or type of said articles."); *id.* at 44 ("Congress intended the statute expansively to embrace 'articles' that may be traded in commerce, regardless of form or type."). Indeed, the Commission viewed the term "articles" to encompass essentially anything exchanged in commerce. *See, e.g., id.* at 39 (finding dictionary definitions to indicate a meaning of "an identifiable unit, item, or thing, with examples indicating that such articles may be traded in commerce or used by consumers"); *id.* at 43 (according to the

18

Black's Law Dictionary of 1910, "the term 'articles' broadly covers items that are bought and sold in commerce").

Based on the expansive reading of the term "articles," it is unclear how all telecommunications transmissions, or at least a large portion of them, are not considered articles and thus brought within the jurisdiction of the Commission. All sorts of telecommunications data are commercially exchanged in the marketplace. Buying and selling transmission time runs the gamut of history from per-word telegraph charges to per-minute cellular phone usage. Television stations sell airtime to advertisers. Radio may be streamed for purchase by satellite.[9] All of these—telegraph words, telephone minutes, advertising slots, radio streams—could qualify as "items that are bought and sold in commerce." *Cf. id.* at 16 (Johanson, Comm'r, dissenting) ("In fact, there are things that are not 'articles' under anyone's definition, which could be 'bought and sold'—for example a service.").

It may be tempting to believe that the digital data implicated in this case is easily distinguished from telecommunications data transmissions as a whole. But such a distinction is not so easy to articulate. The digital models of patients' teeth at issue were, at base, a series of bytes, or numbers, sent over a communications

---

[9] *See generally* Christopher H. Sterling & George Shiers, *History of Telecommunications Technology* (2000) (citing historical references).

channel to be interpreted by a computer as a three-dimensional model. *See id.* at 16. But a telephone call in a voice-over-IP system is nothing more than a series of bytes sent over a communications channel to be interpreted by a computer as a sound. *See, e.g.,* Telecomm. Standardization Sector, Int'l Telecomm. Union, *Rec. ITU-T H.323, Packet-Based Multimedia Communications Systems* 14 (2009), *available at* http://www.itu.int/rec/T-REC-H.323-200912-I/en. So too are television and radio broadcasts nothing more than signals—now often digital—interpreted by appropriate receivers as audio or visual performances. *See Superguide Corp. v. DirecTV Enters., Inc.,* 358 F. 3d 870, 881 (Fed. Cir. 2004). The "article" being "imported" superficially looks the same—a series of bytes—whether it is a digital data set, a telephone conversation, or a broadcast.

It is certain, for at least the reasons presented in the previous sections, that the International Trade Commission does not and should not have jurisdiction over telecommunications transmissions such as telephone calls and broadcasts. But the Commission's opinion is indeterminate at best as to why that should be so. This indicates that the Commission's statutory construction is flawed, and necessitates this Court's clarification of the proper scope of the Commission's jurisdiction.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the International Trade Commission.

Respectfully submitted,

Dated: October 16, 2014

/s/ *Charles Duan*

CHARLES DUAN
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
cduan@publicknowledge.org

*Counsel for amici curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B), 28.1(e)(2), and 29(d). The brief contains **4,633** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using the *xelatex* typesetting system, in the font Linux Libertine.


Dated: October 16, 2014          */s/ Charles Duan*
                                 Charles Duan
                                 *Counsel for amici curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2014, I caused the foregoing **Brief of Amici Curiae Public Knowledge and the Electronic Frontier Foundation in Support of Appellants** to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to the following counsel of record:

Michael D. Myers          mike@mmellp.com
Robert Henry Espey, II     bob@mmellp.com
McClanahan Myers Espey, LLP

Gary Hnath                 ghnath@mayerbrown.com
Paul Whitfield Hughes      phughes@mayerbrown.com
Mayer Brown, LLP

Sidney A. Rosenzweig       sidney.rosenzweig@usitc.gov
Wayne W. Herrington        wayne.herrington@usitc.gov
International Trade Commission

Stephen Blake Kinnaird     stephenkinnaird@paulhastings.com
Thomas A. Counts           tomcounts@paulhastings.com
Igor Victor Timofeyev      igortimofeyev@paulhastings.com
Paul Hastings LLP

Dated: October 16, 2014          */s/ Charles Duan*
                                 _____
                                 Charles Duan
                                 *Counsel for amici curiae*