**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

2014-1527

CLEARCORRECT OPERATING, LLC
and CLEARCORRECT PAKISTAN (PRIVATE), LTD.,
*Appellants*,

v.

INTERNATIONAL TRADE COMMISSION,
*Appellee*,

and

ALIGN TECHNOLOGY, INC.,
*Intervenor*.

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-833

# BRIEF OF THE INTERNET ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS AND URGING REVERSAL

JOHN THORNE
AARON M. PANNER
MATTHEW A. SELIGMAN
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Amicus Curiae*
*The Internet Association*

October 16, 2014

## CERTIFICATE OF INTEREST

Counsel for *amicus curiae* certifies the following:

1. The full name of every party or *amicus* represented by me is:

   The Internet Association.

2. The name of the real party in interest represented by me is:

   Not Applicable.

3. All parent corporations and any publicly held companies that own 10% or more of the stock of the party or *amicus curiae* represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this Court are:

John Thorne
Aaron M. Panner
Matthew A. Seligman
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

/s/ *John Thorne*

Dated: October 16, 2014

John Thorne
*Counsel for Amicus Curiae*
*The Internet Association*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF INTEREST ....................................................................1

INTRODUCTION .......................................................................................2

SUMMARY OF ARGUMENT ....................................................................6

ARGUMENT ..............................................................................................10

I. DIGITAL SIGNALS ARE NOT "ARTICLES THAT . . . INFRINGE A . . . PATENT" ....................................................10

II. SECTION 337 DOES NOT APPLY TO A CLAIM BASED ON INFRINGEMENT THAT IS NOT OCCURRING AT THE TIME OF IMPORTATION........................12

III. AN ARTICLE CANNOT INFRINGE A METHOD CLAIM, BECAUSE AN ARTICLE DOES NOT PERFORM STEPS.....................................................................15

IV. THIS COURT'S PRECEDENTS MAKE CLEAR THAT DIGITAL DATA ARE NOT ARTICLES MADE OR PRODUCED BY A PATENTED PROCESS.....................................18

V. STATUTORY LIMITS ON THE ITC'S REMEDIES FURTHER CONFIRM THAT ELECTRONIC TRANSMISSIONS DO NOT VIOLATE § 337.................................23

CONCLUSION............................................................................................27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

## CASES

*Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012), *rev'd and remanded*, 134 S. Ct. 2111 (2014) ........ 15

*American Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) ........ 12

*Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961) ........ 14

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008) ........ 16

*Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367 (Fed. Cir. 2003) ........ 8, 18, 19, 20, 21, 22

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ........ 26

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980) ........ 10-11

*Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014) ........ 11

*Gottschalk v. Benson*, 409 U.S. 63 (1972) ........ 16

*Helvering v. Hallock*, 309 U.S. 106 (1940) ........ 22

*Kollar, In re*, 286 F.3d 1326 (Fed. Cir. 2002) ........ 8

*Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014) ........ 7, 8, 14, 16

*Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206 (Fed. Cir. 1998) ........ 16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ........ 22

*Nassau Precision Casting Co. v. Acushnet Co.*, 566 F. App'x 933 (Fed. Cir. 2014)....................16

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005)....................8, 22

*Nuijten, In re*, 500 F.3d 1346 (Fed. Cir. 2007)....................6, 10, 11

*Sealed Air Corp. v. ITC*, 645 F.2d 976 (C.C.P.A. 1981)....................17

*Suprema, Inc. v. ITC*, 742 F.3d 1350 (2013), *panel decision vacated and en banc review granted*, No. 2012-1170, 2014 WL 3036241 (Fed. Cir. May 13, 2014)....................7, 13

*Textron, Inc. v. ITC*, 753 F.2d 1019 (Fed. Cir. 1985)....................25

*Tyler v. Cain*, 533 U.S. 656 (2001)....................21

*University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013)....................26

*Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014)....................26

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004)....................27

**ADMINISTRATIVE DECISIONS**

Commission Opinion, *Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*, USITC Inv. No. 337-TA-724, 2012 WL 3246515 (Dec. 21, 2011)....................7, 12

Commission Opinion, *Certain Hardware Logic Emulation Systems and Components Thereof*, USITC Inv. No. 337-TA-383, USITC Pub. 3089 (Mar. 1998)....................23

Recommended Determination, *Certain Digital Media Devices, Including Televisons, Blu-Ray Disc Players, Home Theater Systems, Tablets and Mobile Phones, Components Thereof and Associated Software*, USITC Inv. No. 337-TA-882, 2014 WL 4058676 (July 16, 2014)....7, 12

**STATUTES AND RULES**

Copyright Act (17 U.S.C.) ....12

Patent Act (35 U.S.C.) ....8, 13, 22

35 U.S.C. § 101....10

35 U.S.C. § 271....14

35 U.S.C. § 271(a) ....7, 13, 14, 15

35 U.S.C. § 271(b)....13, 14

35 U.S.C. § 271(c) ....7, 13, 14

35 U.S.C. § 271(e)(2) ....14

35 U.S.C. § 271(f) ....14

35 U.S.C. § 271(f)(1) ....14

35 U.S.C. § 271(f)(2) ....14

35 U.S.C. § 271(g)....8, 14, 18, 19, 20, 21

35 U.S.C. § 287(b)(3)(B)(iii)....19

Tariff Act of 1930, 19 U.S.C. § 1304 *et seq.*:

§ 337, 19 U.S.C. § 1337 .................................... 6, 8, 9, 13, 15, 17, 18, 20, 22

§ 337(a)(1)(B), 19 U.S.C. § 1337(a)(1)(B) .............................................5, 12

§ 337(a)(1)(B)(i), 19 U.S.C. § 1337(a)(1)(B)(i)....................2, 5, 6, 11, 12, 27

§ 337(a)(1)(B)(ii), 19 U.S.C. § 1337(a)(1)(B)(ii)..............................2, 6, 8, 9, 17, 18, 20, 21, 27

§ 337(d)(1), 19 U.S.C. § 1337(d)(1)..........................................................24

§ 337(d)(2)(A), 19 U.S.C. § 1337(d)(2)(A)..................................................17

§ 337(d)(2)(B), 19 U.S.C. § 1337(d)(2)(B)..................................................17

§ 337(e)(1), 19 U.S.C. § 1337(e)(1)............................................................24

§ 337(f), 19 U.S.C. § 1337(f)......................................................................25

§ 337(f)(1), 19 U.S.C. § 1337(f)(1)........................................................24, 25

§ 337(i)(1), 19 U.S.C. § 1337(i)(1)............................................................24

§ 337(i)(2), 19 U.S.C. § 1337(i)(2)............................................................24

§ 337(j)(3), 19 U.S.C. § 1337(j)(3)............................................................26

Fed. R. App. P. 29(c)(5)..................................................................................1

**LEGISLATIVE MATERIALS**

S. Rep. No. 93-1298 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186 ................13, 25

S. Rep. No. 100-71 (1987)..............................................................................13

**ADMINISTRATIVE MATERIALS**

United States Int'l Trade Comm'n, *Digital Trade in the U.S. and Global Economies, Part 2* (Aug. 2014)......................................................2

**OTHER MATERIALS**

Inez Hunt & Wanetta W. Draper, *Lightning in His Hand: The Life Story of Nicolai Tesla* (1964)..........................................................2

Yossi Kanizo et al., *Efficient Use of Geographically Spread Cloud Resources*, published in Proceeding of Cluster, Cloud and Grid Computing (CCGrid) 13th IEEE/ACM International Symposium (2013), *preprint available at* http://www.cs.technion.ac.il/users/wwwb/cgi-bin/tr-get.cgi/2012/CS/CS-2012-11.revised.pdf......................................................4

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)......................................................................26

Marcia H. Sundeen et al., *Unfair Competition and the ITC* (2013-14 ed.)...........................................................................................26

## STATEMENT OF INTEREST

The Internet Association represents the interests of leading Internet companies and their customers, including Airbnb, Amazon, AOL, Auction.com, eBay, Etsy, Expedia, Facebook, Gilt, Google, Groupon, IAC, LinkedIn, Lyft, Monster Worldwide, Netflix, Practice Fusion, Rackspace, reddit, Salesforce.com, Sidecar, SurveyMonkey, TripAdvisor, Twitter, Uber Technologies, Inc., Yelp, Yahoo!, and Zynga. The Internet Association seeks to protect Internet freedom, promote innovation and economic growth, and empower customers and users. Members of the Internet Association have an interest in ensuring that an unlawfully expansive interpretation of the ITC Act does not cause harm to customers and users, much less to the efficient functioning of the Internet infrastructure on which so much of American domestic economic interests depends.[1]

[1] All parties to this petition for review have consented to or, in the case of the U.S. ITC, stated that they do not oppose the filing of this *amicus* brief. Pursuant to Federal Rule of Appellate Procedure 29(c)(5), counsel for *amicus curiae* represent that they authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than the Internet Association and its members, made a monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

The ITC's opinion asserting jurisdiction over all electronic signals transmitted into the United States has sweeping implications for the Internet and the ability of companies to operate efficient, dependable global networks. This Court should hold that the ITC is *not* authorized to regulate the Internet on the premise that digital signals may be either "articles that . . . infringe" a patent or "articles . . . produced . . . by means of[] a [patented] process." 19 U.S.C. § 1337(a)(1)(B)(i), (ii).

The Internet is an extraordinary engine of economic growth that operates on a global scale. It should not be restricted to national borders. What Nicolai Tesla imagined a century ago—"[T]he whole earth will be converted into a huge brain, . . . a real and rhythmic whole. We shall be able to communicate with one another instantly, irrespective of distance."—is quickly becoming reality. Inez Hunt & Wanetta W. Draper, *Lightning in His Hand: The Life Story of Nicolai Tesla* 177 (1964). The ITC has acknowledged that the Internet is a "global network for interconnecting computers without regard for national borders" and that "the ability to move data around the world is critical to the success of [U.S.] businesses, as well as that of their large and small customers." ITC, *Digital Trade in the U.S. and Global Economies, Part 2*, at 84 (Aug. 2014) (internal quotation marks omitted).

Today, ubiquitous, high-speed Internet connections create entirely new computing possibilities. "Cloud computing" empowers users worldwide, both big and small, to access, via an Internet connection, massive computing infrastructure and data repositories that would otherwise be unavailable to all but the most well-funded enterprises. Cloud computing networks realize enormous efficiencies through economies of scale, allowing users to benefit from reduced cost and increased reliability. Cloud computing is used for every type of data and many types of services including search, social media, and data storage. It touches every sector of society—including individual consumers, companies large and small, schools and universities, and governments.

Internet companies maintain their cloud computing resources in data centers throughout the world. Because customers demand dependability and speed, which are achieved through the redundancy of storing data in multiple different physical locations, data stored in the United States may also be stored in data centers outside the United States. Algorithms designed to provide the fastest, most efficient service determine which data center responds to any request without regard for national borders. The demand for cloud services in each geographical location changes over time during the day, and the algorithms take advantage of redundant data by serving customers in peak load geographies with data stored in different geographies. For example, if a customer on the East Coast of the United States requests data at peak time, the data might be served from a data center

experiencing less load, e.g., in Asia or Europe. Typical load variances by geography and time are shown in Figure 1:




Fig. 1: Usage Patterns over 24 hours in GMT

Yossi Kanizo et al., *Efficient Use of Geographically Spread Cloud Resources*, published in Proceeding of Cluster, Cloud and Grid Computing (CCGrid) 13th IEEE/ACM International Symposium 450 (2013), *preprint available at* http://www.cs.technion.ac.il/users/wwwb/cgi-bin/tr-get.cgi/2012/CS/CS-2012-11.revised.pdf. At least one study showed that sharing cloud resources across the globe reduced the time to serve data to end users by an average of 40% during peak demand periods and reduced the resources needed to handle the demand by 15-20%. *Id.*

Efficient operation of a global network requires that particular types of data be stored, processed, and served in identical ways throughout the world, without regard for country borders. Thus, an ITC order that, for instance, required a

company to alter its method of generating data outside the United States when those data would be served to U.S. customers would effectively require the company to alter its operations throughout the world, including for data generated, stored, and served either wholly within or wholly outside of the United States, well beyond any conception of the jurisdiction of the ITC.

In the proceeding below, the patents were directed towards systems and methods for using digital data sets to construct dental appliances intended to reposition teeth. Complainant's claims related to the transmission of digital data sets—*i.e.*, digital models, digital data, and treatment plans—that are used in the United States to manufacture 3-D physical models of teeth, which are used to manufacture corrective appliances.

The Commission held that the transmission of such digital data violated § 337(a)(1)(B) in two ways. First, with regard to method claims in two patents that include, as one step, the fabrication of corrective appliances, the Commission found that respondent was liable as a contributory infringer, based on its transmission of digital data sets into the United States, with direct infringement occurring following importation. The Commission held that the electronic transmissions, by contributing to infringement, constituted the importation of "articles that . . . infringe" a valid U.S. patent. *See* 19 U.S.C. § 1337(a)(1)(B)(i). Second, with regard to method claims directed at creation of digital data sets, the

Commission found that respondent practiced every step of the claimed methods abroad and that the electronic transmission of the data sets thus constituted importation of an "article[] . . . produced . . . by means of[] a process covered by" a U.S. patent. *See id.* § 1337(a)(1)(B)(ii). Both decisions risk widespread disruption of the global Internet and to essential American economic interests.

**SUMMARY OF ARGUMENT**

The ITC's stretching of § 337 to reach electronic transmissions of data is contrary to the language of the Act and this Court's precedents, which make clear that such transmissions are neither "articles that . . . infringe a . . . patent" under § 337(a)(1)(B)(i) nor "articles . . . made, produced, [or] processed . . . by means of[] a [patented] process" under § 337(a)(1)(B)(ii). This is true for several mutually reinforcing reasons.

**I.** Electronic transmissions cannot be treated as "articles that . . . infringe a . . . patent" because, as this Court held in *In re Nuijten*, 500 F.3d 1346 (Fed. Cir. 2007), such transmissions cannot be patented. Electronic transmissions lack the tangible, physical embodiment necessary to be eligible for patent-law protection. By definition, there can be no infringement beyond what a patent is permitted to cover.[2]

[2] That determination says nothing about whether such transmissions might, in certain circumstances, constitute articles that infringe a *copyright*, an issue that this Court need not address in this case.

**II.** The holding below improperly treated the electronic transmissions as infringing articles even though the statute requires infringement at the time of importation, as the ITC itself has recognized. *See* Commission Opinion, *Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*, USITC Inv. No. 337-TA-724, 2012 WL 3246515, at *9 (Dec. 21, 2011); Recommended Determination, *Certain Digital Media Devices, Including Televisons, Blu-Ray Disc Players, Home Theater Systems, Tablets and Mobile Phones, Components Thereof and Associated Software*, USITC Inv. No. 337-TA-882, 2014 WL 4058676, at *2 & n.1 (July 16, 2014); *see also Suprema, Inc. v. ITC*, 742 F.3d 1350 (2013), *panel decision vacated and en banc review granted*, No. 2012-1170, 2014 WL 3036241 (Fed. Cir. May 13, 2014). The ALJ correctly found no direct infringement under 35 U.S.C. § 271(a) at the time of importation but nevertheless found a violation based on contributory infringement under § 271(c). That holding is inconsistent with the statute and the Supreme Court's decision in *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111 (2014), which define and limit the word "infringe"—and thus "articles that . . . infringe"—to the conduct set out in § 271(a).

**III.** Even if an electronic signal could be considered an infringing article, the ITC erred in holding that an *article* may infringe a *method* patent, which claims the performance of a series of steps, not a structure. An article cannot infringe a

method claim because infringement of a method requires "doing something, and therefore has to be carried out or performed." *In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002); *see Limelight*, 134 S. Ct. at 2117 ("A method patent claims a number of steps; . . . the patent is not infringed unless all the steps are carried out."). The digital data sets, as imported, do not perform all (indeed any) of the steps of the claimed method.

**IV.** The ITC further erred by holding that digital data sets are "articles that . . . are made [or] produced . . . by means of[] a [patented] process" in violation of § 337(a)(1)(B)(ii). This Court, more than a decade ago, interpreted analogous language in § 271(g) of the Patent Act to refer to tangible products and has reaffirmed that holding in subsequent cases. *See Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1377 (Fed. Cir. 2003); *see also NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1323-24 (Fed. Cir. 2005). The Court's reasoning in *Bayer* was based on the recognition that "section 271(g) was intended to address the same 'articles' as were addressed by section 1337," and, under both § 271(g) and § 337, articles must be tangible. *Bayer*, 340 F.3d at 1374 & n.9. Congress has repeatedly amended the Patent Act since *Bayer*, but has left this Court's interpretation of these provisions untouched. Given the settled interpretation of § 271(g), the ITC should not have expanded the scope of patent holders' exclusive

rights by adopting a reading of § 337(a)(1)(B)(ii) inconsistent with that interpretation.

**V.** The remedial tools that Congress granted to the ITC do not address transmission of electronic signals, reinforcing the conclusion that § 337 was not intended to reach so far. The ITC has recognized that its primary remedy—an exclusion order—is unworkable in patent cases to block electronic transmissions because Customs officers cannot enforce such an order. Customs cannot interdict an "article" that is intangible and is neither infringing at the time of importation nor defined by a patented structure. The term "articles" must have the same meaning in the definition of both violation and remedy, and the unworkability of the principal remedy confirms there should be no finding of violation in the first place. The ITC attempted to impose a cease-and-desist remedy, but the statute makes clear that the authority to issue cease-and-desist orders does not extend to cases where an exclusion order is unavailable—a conclusion that is reinforced by the legislative history and the ITC's prior consistent practice. Enforcement of patents relating to Internet transmissions belongs in federal district court.

# ARGUMENT

## I. DIGITAL SIGNALS ARE NOT "ARTICLES THAT . . . INFRINGE A . . . PATENT"

Digital signals cannot be "articles that . . . infringe a . . . patent" under the ITC Act because "transient electric or electromagnetic transmission[s]" are not patentable. *In re Nuijten*, 500 F.3d at 1356. This Court's holding that digital signals do not fall within any of the four statutory categories of patentable subject matter compels the result that a digital signal cannot infringe a valid U.S. patent.

In *In re Nuijten*, the appellant challenged the determination of the Board of Patent Appeals and Interferences upholding the rejection of several claims of his patent application because they claimed electromagnetic signals and therefore "fell into none of the four statutory categories of patentable subject matter: 'process, machine, manufacture, or composition of matter.'" *Id.* at 1352 (quoting 35 U.S.C. § 101). Under the applied-for claims, "watermarks" would be embedded in signals such as digital audio files to protect against unauthorized copying. This Court affirmed the Board, framing the issue as "whether a transitory, propagating signal is within any of the four statutory categories." *Id.* at 1353. The Court considered and rejected arguments with respect to each of the statutory categories; as most relevant here, the Court held that signals are not "manufactures." "The Supreme Court has defined 'manufacture' (in its verb form) as 'the production of *articles* for use from raw or prepared materials.'" *Id.* at 1356 (quoting *Diamond*

*v. Chakrabarty*, 447 U.S. 303, 308 (1980)). "The term is used in the statute in its noun form, and therefore refers to 'articles' resulting from the process of manufacture." *Id.* (citation omitted). The relevant dictionary definitions of "article" in turn "address 'articles' of 'manufacture' as being tangible articles or commodities. A transient electric or electromagnetic transmission does not fit within that definition." *Id. See Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1348-51 (Fed. Cir. 2014) (two data sets and a "device profile" describing spatial and color properties of an imaging device but having no tangible, physical embodiment are ineligible for patent protection).

The determination that digital signals are not patentable subject matter means that a digital signal cannot be an infringing article. Labeling electronic signals infringing articles would effectively expand the patent's exclusive rights into non-patentable subject matter. For example, data served from an off-shore cloud server based on the instantaneous decision of an algorithm cannot be considered importation of "articles that . . . infringe" because the data signals are not patentable subject matter. Accordingly, the ITC erred in holding that the digital signals at issue in this case are "articles that . . . infringe" any valid U.S. patent.[3]

[3] The foregoing analysis illustrates that the issue presented in this case does not require this Court to address whether digital signals could qualify as "articles that . . . infringe a valid and enforceable . . . United States copyright registered under Title 17." 19 U.S.C. § 1337(a)(1)(B)(i). Just as the meaning of the phrase "articles that . . . infringe a . . . patent" depends on substantive patent law, so too the phrase

## II. SECTION 337 DOES NOT APPLY TO A CLAIM BASED ON INFRINGEMENT THAT IS NOT OCCURRING AT THE TIME OF IMPORTATION

The ITC erred for the independent reason that there can be no violation of § 337(a)(1)(B)(i) when the accused articles are not infringing at the time of importation. Section 337(a)(1)(B) defines three potential violations: "importation," "sale for importation," and "sale within the United States after importation" of "articles that . . . infringe." 19 U.S.C. § 1337(a)(1)(B)(i). The statute thus looks at several points in the chain of distribution, but the "articles" in question are, in each case, the same—that is, the articles that are imported. The temporal requirement that the articles must be infringing when imported follows directly from § 337(a)(1)(B)'s use of the present tense—"articles that . . . infringe"—to define the violation caused by importation of such articles.

The ITC itself has recognized that limitation on its authority: "We also interpret the phrase 'articles that – infringe' to reference the status of the articles at the time of importation. Thus, infringement, direct or indirect, must be based on the articles as imported." *Certain Electronic Devices*, 2012 WL 3246515, at *9; *see Certain Digital Media*, 2014 WL 4058676, at *2 & n.1 ("[i]f the accused

---

"articles that . . . infringe a . . . copyright" incorporates substantive copyright law. The meaning of that phrase is accordingly not presented or implicated by the issue here. *Compare American Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2511 (2014) (questions of how the Copyright Act applies to cloud computing "should await a case in which they are squarely presented") (internal quotation marks omitted).

products are not imported with the accused software and/or functionalities, they cannot serve as the basis for a finding of violation of section 337"). This Court, in the panel decision of *Suprema, Inc. v. ITC*, *supra*, similarly held that the ITC lacks power to issue exclusion orders predicated on a theory of induced infringement under 35 U.S.C. § 271(b) where the imported articles do not infringe the asserted patent at the time of importation and the allegedly induced infringement occurs only *after* importation. "[T]he statutory grant of authority in § 337 cannot extend to the conduct proscribed in § 271(b) where the acts of underlying direct infringement occur post-importation." 742 F.3d at 1360.[4]

The ITC cannot satisfy the requirement that articles be infringing at the time of importation by looking to theories of indirect infringement under § 271(b) or § 271(c). The statutory phrase "infringe a valid and enforceable . . . patent" unmistakably refers to the definition of infringement contained in § 271(a) of the Patent Act. *See* 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention . . . , *infringes the patent*.") (emphasis

[4] Congress's discussion of § 337 as it applies to patent infringement is consistent with this temporal focus. *See, e.g.*, S. Rep. No. 100-71, at 128 (1987) ("[t]he *importation of any infringing merchandise* derogates from the [patent holder's] statutory right"); S. Rep. No. 93-1298, at 196 (1974) ("For example, in patent-based cases, the Commission considers, for its own purposes under section 337, the *status of imports* with respect to the claims of U.S. patents.") (emphasis added), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7329.

added); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341-42 (1961) (noting that § 271(a) "defines infringement").[5] Sections 271(b), (c), (f), and (g), by contrast, do not expand the definition of infringement—*i.e.*, they do not define additional exclusive rights—but instead extend liability to certain persons whose actions do not qualify as an act of patent infringement but who, in the judgment of Congress, demonstrate a level of culpability and should be held "liable as an infringer."[6]

The Supreme Court's decision in *Limelight* confirms that "infringe" is defined by § 271(a). The Court explained that liability for inducement under § 271(b) is not an independent form of "infringement," but rather a form of *liability* that "must be predicated on direct infringement" under § 271(a). 134 S. Ct. at 2117; *see id.* at 2118 (rejecting an interpretation of § 271 that "would require the courts to develop two parallel bodies of infringement law: one for liability for direct infringement, and one for liability for inducement"). Similarly, in a

---

[5] Section 271(e)(2) defines an additional "act of infringement" specific to pharmaceuticals, 35 U.S.C. § 271(e)(2); that provision is irrelevant for present purposes.

[6] *See* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be *liable as an infringer*.") (emphasis added); *id.* § 271(c) ("[w]hoever offers to sell or sells within the United States or imports into the United States" a component or material meeting the statutory criteria "*shall be liable as a contributory infringer*") (emphasis added); *id.* § 271(f)(1) ("*shall be liable as an infringer*") (emphasis added); *id.* § 271(f)(2) ("*shall be liable as an infringer*") (emphasis added); *id.* § 271(g) ("*shall be liable as an infringer*") (emphasis added).

dissenting opinion subsequently vindicated by the Supreme Court, Judge Linn pointed out that Congress in 1952 "defin[ed] 'infringement' in § 271(a) and expressly defin[ed] the *only* situations in which a party could be liable for *something less than an infringement* in § 271(b) and (c)." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1337 (Fed. Cir. 2012) (Linn, J., dissenting) (second emphasis added), *rev'd and remanded*, 134 S. Ct. 2111 (2014).

Something less than an infringement, that occurs only *after* the accused article is combined with other articles or used to perform a patented method, does not infringe under § 271(a) at the time of importation, and therefore § 337 is not implicated. The global Internet should not be held hostage to any concept that data served into the United States from overseas data centers might be understood to contribute to infringement of a patent using those data in the United States after importation.

## III. AN ARTICLE CANNOT INFRINGE A METHOD CLAIM, BECAUSE AN ARTICLE DOES NOT PERFORM STEPS

The ITC compounded the errors above by basing the violation on use of digital data to infringe patented method claims. That theory finds no support in the statute because, assuming the digital data to be "articles," an article—which performs no actions—cannot infringe a method claim.

Infringement under § 271(a) requires that every limitation recited in the patent claim be met. In the case of a device patent, the patent is infringed by

making, using, or selling an article that includes every element of the patented device. *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998) ("To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims."). In the case of a method claim—such as the claims at issue here—the patent is infringed only when "all the steps" recited in the claim "are carried out." *Limelight*, 134 S. Ct. at 2117.

An article cannot "infringe" a method patent, because such a claim involves the *performance* of a series of steps—*i.e.*, "an act[] or a series of acts." *Gottschalk v. Benson*, 409 U.S. 63, 70 (1972) (internal quotation marks omitted). An article does not "perform" anything. By referring to "articles that . . . infringe," Congress indicated that it was referring to infringement of claims that define an invention according to structure—that is, product claims. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008) (noting the importance of not "blurr[ing the] important difference between" "apparatus claim[s]" and "method claim[s]"); *Nassau Precision Casting Co. v. Acushnet Co.*, 566 F. App'x 933, 940 & n.1 (Fed. Cir. 2014) (the patent-law terms have "a stable, unambiguous meaning": "The court has long warned that apparatus and method claims 'are directed toward different classes of patentable subject material under 35 U.S.C. § 101' and that the distinction should not be 'blurred.' ") (quoting *Baldwin Graphic Sys.*, 512 F.3d at 1344).

By contrast, when Congress wanted the ITC to enforce method claims, it specifically said so. Thus § 337(a)(1)(B)(ii) declares unlawful the importation "of articles that . . . are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent." 19 U.S.C. § 1337(a)(1)(B)(ii). Such articles, following their production, processing, or mining, may not satisfy the elements of any patent and therefore may not be "articles that . . . infringe" at the time of importation. Congress added this section to exclude articles produced by a patented method as a separate form of unfair trade. There is no comparable § 337 provision defining a post-importation violation when the article as imported does not include every element of a patent claim but may be employed after importation in an infringing process. *Cf. Sealed Air Corp. v. ITC*, 645 F.2d 976, 986 (C.C.P.A. 1981) (contrasting the two types of patent-related conduct subject to § 337: (1) when "the imported product is alleged to infringe patent claims drawn to a product" and (2) when "the imported product is alleged to have been made by a process that infringes patent claims drawn to a process of making the product").

This is especially important because § 337 actions are *in rem*. An exclusion order operates against the *articles* directly. *See id.* at 985 ("An exclusion order operates against goods, not parties."); 19 U.S.C. § 1337(d)(2)(A), (B) (authorizing a general exclusion order against the articles if an order limited to products of

named persons would be subject to circumvention or there is a pattern of violations and it is difficult to identify the source of the infringing products). Thus, whether the "articles . . . infringe" must be ascertainable by examining the articles themselves, not by how they are used in combination with other steps of a claimed process.

## IV. THIS COURT'S PRECEDENTS MAKE CLEAR THAT DIGITAL DATA ARE NOT ARTICLES MADE OR PRODUCED BY A PATENTED PROCESS

The ITC's determination that digital data can be an "article[] . . . produced . . . by means of[] a process covered by" a U.S. patent in violation of § 337(a)(1)(B)(ii) cannot be reconciled with the analysis and holding of this Court's decision in *Bayer*. Given the lack of any congressional action to modify the result this Court reached in *Bayer*, it would be inappropriate to extend the scope of § 337 in a way that is inconsistent with that decision.

In *Bayer*, Housey filed a counterclaim accusing Bayer of infringement under § 271(g), based in relevant part on Bayer's alleged "import[ation] into the United States" of "research data or information obtained from using the [Housey] patented methods." 340 F.3d at 1370 (second alteration in original). The district court dismissed, and this Court affirmed. This Court held that § 271(g)—which provides that whoever "imports . . . a product which is made by a process patented in the United States shall be liable as an infringer," 35 U.S.C. § 271(g)—reaches only

"physical article[s] that [were] 'manufactured,'" not information generated through a patented process. 340 F.3d at 1377. In so holding, the Court focused on the meaning not of "product," but of the statutory term "made." *Id.* at 1372. The Court found that the term "made" in isolation was ambiguous, and it looked to statutory context and history to resolve that ambiguity. *First*, the Court noted that 35 U.S.C. § 287(b)(3)(B)(iii), a related provision that limits potential damages under § 271(g), refers to "a person that uses a patented process to 'produce' a product as a 'manufacturer.'" *Id.* *Second*, the Court noted that the statutory exceptions to § 271(g) appear "to contemplate a physical product." *Id.* at 1372-73.

*Third*, the Court explained that the "legislative history leads to the same conclusion: that Congress was concerned solely with physical goods that had undergone manufacture." *Id.* at 1373. The Court noted that § 271(g) "was designed to provide new *remedies* to supplement existing remedies available from" the ITC under § 337. *Id.* (emphasis added). "[T]he legislative history suggests that section 271(g) was intended to address the same 'articles' as were addressed by section 1337, but to add additional rights against importers of such 'articles.'" *Id.* at 1374. The Court further noted that, "[e]ven if the legislative history did not affirmatively suggest an intent to limit coverage to manufactured 'articles' in accordance with section 1337, we have been directed to nothing in the legislative

history suggesting that Congress was concerned that the preexisting statutory scheme failed to reach intangible information." *Id.*

The Court also noted that "reading the statute to cover processes other than manufacturing processes could lead to anomalous results" because "importation of information in the abstract . . . cannot be easily controlled." *Id.* at 1376. The Court then concluded that it would be "best to leave to Congress the task of expanding the statute if we are wrong in our interpretation." *Id.* at 1376-77.

It is a short step from the *Bayer* decision to the conclusion that § 337(a)(1)(B)(ii) is limited to "physical article[s]." At the outset, this Court directly said as much when it held that the coverage of § 271(g) is congruent with that under § 337: "section 271(g) was intended to address the same 'articles' as were addressed by section 1337"—that is, tangible articles. *Id.* at 1374. To be sure, the Court also noted that § 337 covers not only articles that were "made" but also "articles that were 'produced, processed, or mined,' " which the Court held "perhaps suggests a broader scope for section 1337 than for section 271(g)." *Id.* at 1374 n.9. But, as the Court also noted, "nothing in section 1337 suggests coverage of information, in addition to articles, under section 271(g)," *id.*—indicating that whatever additional breadth § 337(a)(1)(B)(ii) may have, it does not reach data,

as opposed to tangible articles.[7] There is no warrant for any argument that "an article made by a process" excludes information but that "an article produced by a process" includes it. *See Tyler v. Cain*, 533 U.S. 656, 664 (2001) ("Congress, needless to say, is permitted to use synonyms in a statute.").

Moreover, some of the same practical difficulties that led the Court to decline to extend the remedy in § 271(g) to information rather than tangible articles likewise argue against stretching § 337(a)(1)(B)(ii) to reach intangible, digital data. As discussed further below, the ITC's principal remedy—an exclusion order—cannot apply in the case of digital data. And any "cease and desist" order that depended on whether particular data had crossed a national boundary would give rise to formidable administrability issues and threaten to disrupt Internet communications in unpredictable ways.

More fundamentally, the fact that Congress took no action to expand the coverage of § 271(g) in response to the *Bayer* decision provides further support for the conclusion that the patent laws do not extend to controlling the flow of information across borders. *Bayer* expressly noted that if Congress disagreed with its interpretation of the coverage of § 271(g) it could address any gap in coverage

[7] The additional processes contemplated in § 337(a)(1)(B)(ii) would appear to be those that involve processes other than manufacturing—including, for example, production of natural resources or agricultural products, processing of raw materials, or mining of minerals and other resources. As this Court indicated, the additional terms do not suggest any congressional intent to cover information; if anything, they point in the opposite direction.

through legislation. Yet although *Bayer* has been the law of this Circuit for more than a decade and has been followed in subsequent decisions, *see NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005), there has been no movement by Congress to alter that result including during the substantial rewrite of the patent laws in 2011. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381-82 (1982) ("[T]he fact that a comprehensive reexamination and significant amendment of the [Commodity Exchange Act] left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy."). Although the Court should be cautious before drawing inferences from congressional inaction, *see Helvering v. Hallock*, 309 U.S. 106, 119-20 (1940), the absence of any legislative action—during a period when the Patent Act has been amended repeatedly—counsels against expanding the scope of rights associated with data created using process patents and in favor of leaving the matter to Congress. And Congress does not, by mere silence or implication, create entirely new areas of substantive law, especially in areas already regulated by another federal statute.

## V. STATUTORY LIMITS ON THE ITC'S REMEDIES FURTHER CONFIRM THAT ELECTRONIC TRANSMISSIONS DO NOT VIOLATE § 337

The ITC's lack of statutory authority to remedy violations purportedly caused by electronic transmissions confirms the above basic legal errors. The ITC's primary remedy—an exclusion order—cannot be applied in patent cases involving electronic transmissions over the Internet. The ALJ concluded specifically:

> I do not recommend that the Commission issue a limited exclusion order to the imported digital data sets. The accused digital data sets are imported by electronic transmission. In *Certain Hardware Logic Emulation Systems and Components Thereof*, Inv. No. 337-TA-383, the Commission refused to bar electronic transmissions out of deference to Customs because Customs would have no way to enforce the order.

Recommended Decision at 797 (May 6, 2013) (citing Commission Opinion at 20, *Certain Hardware Logic Emulation Systems and Components Thereof*, USITC Inv. No. 337-TA-383, USITC Pub. 3089 (Mar. 1998)). The Commission's Office of Unfair Import Investigations "agree[d] with the ALJ's recommendation that the issuance of an exclusion order is not appropriate in this case." Commission Opinion at 146 (Apr. 9, 2014); *see* Response of the OUII at 10 (Aug. 8, 2013) ("The Commission has previously considered and rejected requests that exclusion orders cover electronic transmissions . . . out of deference to Customs, which would have no way to enforce the order."). Dissenting Commissioner Johanson

explained that an exclusion order could not be enforced by Customs because "[e]lectronic transmissions do not arrive at ports of entry, are incapable of being held in Customs custody, cannot be presented to Customs, and therefore can never be refused or denied entry." Dissenting Opinion at 6 (Apr. 9, 2014); *compare* 19 U.S.C. §§ 1337(d)(1) (Customs officers shall "refuse . . . entry"), (e)(1) ("refuse such entry"), (i)(1) & (2) (describing when Customs officers enforce "seiz[ure] and forfeit[ure]" of "article[s]"). Construing "articles that . . . infringe" to include (1) intangible electronic transmissions, (2) that do not infringe at the time of importation, and (3) that are not defined by their structure but instead by their role in a process occurring elsewhere would require Customs to perform functions it is incapable of performing.

The Commission adopted the recommendations of the ALJ and its investigative staff, declining to issue an exclusion order and instead issuing a cease-and-desist order to enjoin electronic transmissions into the United States. Commission Opinion at 147. But the Act cannot be read to authorize such orders in cases where an exclusion order is unavailable; to the contrary, the statute makes clear that the cease-and-desist remedy was adopted to provide either a supplement or a more limited step on the road to the exclusion-order remedy. A cease-and-desist order may thus be issued either "[i]n addition to" or "in lieu of" an exclusion order. 19 U.S.C. § 1337(f)(1). Where an exclusion order cannot issue, a cease-

and-desist order cannot be "in addition to" it. And the statute provides that, whenever a cease-and-desist order is issued "in lieu of" an exclusion order, the ITC "may . . . modify or revoke any such order, and, in the case of a revocation, may take action under subsection (d) or (e)," *id.*—that is, the ITC may issue an exclusion order. That language makes sense only if the cease-and-desist order is a more limited remedy that can be strengthened through an exclusion order. It is not an independent alternative.

That conclusion is reinforced by the legislative history. The authority to issue cease-and-desist orders was added to the ITC Act in 1974. The Senate report accompanying the legislation states, consistent with the text of § 337(f), that, "[i]f the cease and desist order were not adhered to, the exclusion order would go into effect." S. Rep. No. 93-1298, at 35, 1974 U.S.C.C.A.N. 7212. And it further stated that the authority was added because an exclusion order might be "so extreme or inappropriate in some cases that it is . . . likely to result in the Commission not finding a violation." *Id.* at 198, 1974 U.S.C.C.A.N. 7331. This reinforces the conclusion that the cease-and-desist order is intended to allow the ITC to craft a more limited and targeted remedy—a "softer" sanction, *Textron, Inc. v. ITC*, 753 F.2d 1019, 1029 (Fed. Cir. 1985)—in appropriate cases, and not to

expand the ITC's authority to classes of cases where the exclusion order remedy is unavailable.[8]

The Commission attempted to compare electronic data to stockpiled inventories of infringing products previously imported, which, having gotten past the ports of entry, cannot be interdicted by Customs officers. *See* Marcia H. Sundeen et al., *Unfair Competition and the ITC* 315, 398 (2013-14 ed.) (describing ITC's "'long-standing' practice of issuing cease and desist orders only to entities with 'significant domestic operations or inventory'"). But, while it makes sense to address existing inventories under a cease-and-desist order as a supplement to the exclusion of additional articles, it makes no sense to expand the ITC's authority to cases where articles cannot be excluded at all.

The statute should be read in a way that it makes sense as a whole under the "harmonious reading" interpretative canon (e.g., Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012)), and "an agency interpretation that is 'inconsisten[t] with the design and structure of the statute as a whole'" does not merit *Chevron* deference. *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2442 (2014) (quoting *University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013)) (alteration in original). It is a familiar

[8] Moreover, as in the case of exclusion orders, articles that are subject to cease-and-desist orders are "entitled to entry under bond." 19 U.S.C. § 1337(j)(3). Again, such a procedure makes sense only if the statute applies only to tangible, infringing articles that can be excluded from entry in the first place.

principle that a statute's commands must be compatible with the available remedies. For example, in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004), the Supreme Court held that antitrust courts' difficulty setting remedial terms for dealing with rivals was a consideration in limiting duties to deal. *Id.* at 414-15. Here, what Congress meant by "articles that . . . infringe a . . . patent" and "articles that . . . are made, produced, processed, or mined under, or by means of, a process . . patent" (19 U.S.C. § 1337(a)(1)(B)(i), (ii)) is informed—and properly limited—by the tools Congress gave the ITC to prevent such articles coming into the United States. Creating a statutory liability that inherently cannot be remedied by the only enforcement tools provided under a statutory scheme is a presumptively unreasonable statutory construction.

The ITC's limited remedial authority shows that enforcement belongs elsewhere—in the federal district courts.

## CONCLUSION

Radical transformations of global communications and commerce, and the unforeseeable but far-reaching results that would follow, should come, if at all, from clearly expressed powers conferred in an agency's enabling statute. Here, however, the ITC's enabling statute contradicts the Commission's decision in important ways. This Court should reverse the ITC's decision below and hold

that the ITC may not invoke U.S. patent law to enjoin the transmission of data over the Internet.

Respectfully submitted,

/s/ *John Thorne*
JOHN THORNE
AARON M. PANNER
MATTHEW A. SELIGMAN
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Amicus Curiae*
*The Internet Association*

October 16, 2014

**FORM 30. Certificate of Service**

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on October 16, 2014 by:

- ☐ US mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means (by email or CM/ECF)

| John Thorne | /s/ John Thorne |
|---|---|
| Name of Counsel | Signature of Counsel |

Law Firm: Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC

Address: 1615 M Street, N.W., Suite 400

City, State, ZIP: Washington, D.C. 20036

Telephone Number: 202-326-7900

FAX Number: 202-326-7999

E-mail Address: jthorne@khhte.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief contains 6,486 words. This certificate was prepared in reliance on the word count of the word-processing system (Microsoft Office Word 2007) used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Times New Roman font.

/s/ *John Thorne*
John Thorne
*Counsel for Amicus Curiae*
*The Internet Association*

October 16, 2014