No. 2014-1527

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

CLEARCORRECT OPERATING, LLC,

CLEARCORRECT PAKISTAN (PRIVATE), LTD.,

*Appellants*,

V.

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

and

ALIGN TECHNOLOGY, INC.,

*Intervenor*.

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-833

**BRIEF FOR BUSINESS SOFTWARE ALLIANCE AS *AMICUS CURIAE*
IN SUPPORT OF APPELLANTS IN FAVOR OF REVERSAL**

Jeffrey A. Lamken
  *Counsel of Record*
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000 (telephone)
(202) 556-2001 (fax)
jlamken@mololamken.com

*Counsel for Amicus Curiae Business Software Alliance*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for *amicus curiae* Business Software Alliance certifies the following:

1. The full name of every party or *amicus* represented by me is:

   Business Software Alliance

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Business Software Alliance

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus* represented by me are:

   None

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this Court are:

   **MoloLamken LLP**
   Jeffrey A. Lamken

October 16, 2014        /s/ Jeffrey A. Lamken
                                          Jeffrey A. Lamken

# <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................2

ARGUMENT ........................................................................................6

I.    An Electronic Transmission Of Digital Data Is Not An "Article" Within The Meaning Of § 1337(a)(1)(B) ...............................................6

    A.   The Text of § 1337 Shows that the Commission's Authority Is Limited to Tangible Materials.....................................................6

    B.   The Structure of § 1337 Confirms that "Articles" and Tangible Goods Are Synonymous ...............................................10

        1.   The Use of the Word "Articles" in Other Sections of the Tariff Act of 1930 Shows that the Word Is Limited to Tangible Goods .........................................................10

        2.   Congress's List of Dutiable Items Confirms that Congress Intended To Reach Only Physical Goods .....................................................11

        3.   The Remedial Framework of the Original 1930 Act Shows that Congress Understood "Articles" To Mean Tangible Goods .........................................................12

    C.   Contemporaneous Legislation Shows that "Articles" Does Not Include Electronic Transmissions .......................................14

    D.   The Commission's Contrary Analysis Defies Principles of Statutory Construction ...............................................16

        1.   The Commission's Textual Argument Reduces to an Exercise in Circular Reasoning.......................................16

i

2.    The Commission's Attempt To Expand the Meaning of the Word "Article" Based on the Tariff Act's Reference to Copyright, Patent, and Trademark Infringement Is Similarly Unfounded ......17

E.    The Legislative History and Purpose of § 1337 Underscore that "Articles" Does Not Extend to Electronic Transmissions .....................19

1.    Silence in the Tariff Act and § 1337's History Confirms § 1337's Limited Scope ...............................................................................19

2.    The Commission's Reference to § 1337's Broad Remedial Purpose Does Not Support Its Conclusion that "Articles" Includes Electronic Transmissions ...............................................................21

II.   The Commission's Construction of "Articles" Is Not Entitled to *Chevron* Deference.........................................................................................24

CONCLUSION ..................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atl. Cleaners & Dryers, Inc. v. United States*, 286 U.S. 427 (1932) ...................... 10

*Bayer AG v. Housey Pharmaceuticals, Inc.*, 340 F.3d 1367
 (Fed. Cir. 2003) ........................................................................ 7, 8, 19

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
 467 U.S. 837 (1984) ........................................................................ 5, 24

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ............................................ 24, 25

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ................................................. 6

*Dewsnup v. Timm*, 502 U.S. 410 (1992) ........................................................... 19

*Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376 (1998) .............................. 24

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) ...................................... 7

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ................................................... 24

*Junge v. Hedden*, 146 U.S. 233 (1892) ............................................................... 7

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340
 (Fed. Cir. 2008) .............................................................................. 6

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301
 (Fed. Cir. 2009) .............................................................................. 23

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) ................................... 22, 23

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
 503 U.S. 407 (1992) ......................................................................... 25

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) .................................................. 6

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
 464 U.S. 417 (1984) ......................................................................... 24

*United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994) ........................................ 6

*United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992).......................................18

**STATUTES**

2 U.S.C. §4106.....................................................................................................8

7 U.S.C. §192(c)...................................................................................................8

8 U.S.C. §1355(b).................................................................................................8

17 U.S.C. §511(b).................................................................................................8

19 U.S.C. §1337...........................................................................................*passim*

19 U.S.C. §1337(i)(1)...........................................................................................11

19 U.S.C. §1337(i)(3)...........................................................................................11

19 U.S.C. §1337(a)(1)............................................................................................6

19 U.S.C. §1337(a)(1)(A).....................................................................................21

19 U.S.C. §1337(a)(1)(B)...........................................................................7, 17, 18

19 U.S.C. §1337(a)(1)(C).....................................................................................18

19 U.S.C. §1337(d)...............................................................................................14

19 U.S.C. §1337(f)................................................................................................14

21 U.S.C. §18.........................................................................................................8

35 U.S.C §271(f)...................................................................................................22

35 U.S.C. §271(c)..................................................................................................23

35 U.S.C. §271(g).........................................................................................7, 8, 20

Communications Act of 1934, Pub. L. 73-416, 48 Stat. 1064 (1934)..............14, 15

Federal Trade Commission Act, Ch. 311, 38 Stat. 717 (1914)............................15

Tariff Act of 1832, Ch. 227, 4 Stat. 583 (1832).................................................20

Tariff Act of 1922, Pub. L. 67-318, 42 Stat. 858 (1922).....................................20

iv

Tariff Act of 1930, Pub. L. 71-361, 46 Stat. 590 (1930) .................................*passim*

Trade Act of 1974, Pub. L. 93-618, 88 Stat. 1978 (1975) .......................................13

OTHER AUTHORITIES

71 Cong. Rec. S3872 (1929) .......................................................................................20

Alexander J. Field, *The Regulatory History of a New Technology: Electromagnetic Telegraphy*, 2001 L. Rev. Mich. St. U. Det. C.L. 245 (2001) .................................................................................................................14

*Certain Digital Models, Digital Data, and Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, and Methods of Making the Same*, Inv. No. 337-TA-833, Commission Opinion (Apr. 9, 2014) ...........*passim*

*Certain Hardware Logic Emulation Systems and Components Thereof*, Inv. No. 337-TA-383, Commission Opinion on Remedies, the Public Interest, and Bonding (Mar. 1, 1998) .......................................8, 9, 10

*In re Certain Welded Stainless Steel Pipe and Tube*, Inv. No. 337-TA-29, Commission Opinion (Feb. 22, 1978) .........................................................14

H.R. Rep. No. 71-7 (1929) .........................................................................................20

S. Rep. No. 67-595 (1922) ...................................................................................20, 21

S. Rep. No. 93-1298 (1974) .......................................................................................13

## INTEREST OF AMICUS CURIAE

The Business Software Alliance ("BSA") is the leading advocate for the global software industry before governments and in the international marketplace. [1] Its members are among the world's most innovative companies, creating software solutions that spark the economy and improve modern life. With headquarters in Washington, D.C., and operations in more than 60 countries around the world, BSA pioneers compliance programs that promote legal software use and advocates for public policies that foster technology innovation and drive growth in the digital economy. BSA's members include: Adobe, Altium, Apple, ANSYS, Autodesk, Bentley Systems, CA Technologies, CNC/Mastercam, Dell, IBM, Intel, Intuit, Microsoft, Minitab, Oracle, PTC, Rockwell Automation, Rosetta Stone, salesforce.com, Siemens PLM, Symantec, Tekla, The MathWorks, and Trend Micro.

Given both the underlying focus of its members' businesses, and the global scope of their operations, BSA members have a strong stake in the proper understanding and enforcement of U.S. trade law as it pertains to the electronic transmission of data.

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), *amicus* certifies that no party's counsel authored this brief in whole or part, that no counsel or party contributed money intended to fund this brief, and that no one other than *amicus*, its members, and its counsel made such a contribution. Appellants ClearCorrect Operating, LLC and ClearCorrect Pakistan, Ltd., Appellee U.S. International Trade Commission, and Intervenor Align Technology, Inc., (all parties) consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The International Trade Commission (the "Commission") plays a critical role in enforcing U.S. trade law. Section 337 of the Tariff Act of 1930 ("Tariff Act") charges the Commission with investigating and remedying the unlawful importation of "articles" that infringe a U.S. patent, copyright, or trademark. But the Commission's authority does not reach electronic transmissions of digital data into the U.S., because those transmissions are not "articles" within the meaning of the Tariff Act. In reaching a contrary conclusion, the Commission's decision below misconstrues the Act's meaning, history, and purpose.

**I. A.** The text of § 1337—the provision of the Tariff Act that governs the Commission's jurisdiction—demonstrates that it extends only to the importation of tangible goods. Both today and when the Tariff Act was enacted, the term "articles" meant physical objects. By the time the Tariff Act was enacted, the Supreme Court had already explained that the term "articles," as it appeared in the Tariff Act's predecessor, referred to tangible goods. And Congress showed no indication that it intended the term to mean anything different in the Tariff Act. This Court has similarly recognized that the term "articles" encompasses tangible goods and does not include electronic transmissions. The Commission could cite no precedent supporting its conclusion that electronic transmissions are "articles"

within the meaning of § 1337.  In fact, the only authority the Commission could muster—one of its own prior decisions—suggests they are not.

**B.**    Section 1337's structure and its relationship to other statutes further demonstrates that electronic transmissions are not "articles" subject to the Commission's jurisdiction.  Congress used the term "article" throughout the Tariff Act, and in each instance it was clearly referring to physical goods.  Indeed, construing "articles" to cover transmissions of information would render multiple key provisions within § 1337 nonsensical.  The Tariff Act's remedial framework in particular shows that Congress understood "articles" to mean tangible goods.  As originally enacted, the only remedy for violating § 1337 was that the offending "article" would be *excluded from entering* the U.S.—a remedy the Commission could not possibly impose with respect to transmissions of information.

**C.**    In the 1930s, Congress was well aware that electronically transmitted information and communications were entering the U.S.  Far from delegating authority over these to the Commission, it entrusted such regulation to other agencies, like the Federal Communications Commission.  And when Congress sought to extend an agency's authority beyond physical "articles" to all commerce, it used far more expansive language—authorizing the regulation of "commerce"— as Congress did with the Federal Trade Commission.

3

**D.**    The Commission's rationales for deeming electronic transmissions of data "articles" within the meaning of §1337 defy principles of statutory construction.    The Commission employs circular and unsupported reasoning to conclude that "articles" includes any commerce, regardless of the mode of importation.    And the Commission returns to circular reasoning to justify its conclusion that its jurisdiction is coextensive with the scope of the intellectual property laws.

**E.**    The Commission attempts to rely on §1337's legislative history and purpose to support its conclusion.    But the Tariff Act's legislative history is devoid of any indication that Congress intended "articles" to include electronic transmissions.    And the legislative history the Commission does cite actually suggests a definition of "articles" limited to tangible goods.    Congress's repeated use of the term "articles" in successive tariff acts to address the levying of duties on tangible goods further demonstrates that the Commission's interpretation of §1337 is erroneous.

The Commission's invocation of §1337's broad remedial purpose is also flawed.    The Commission assumes, without support, that in enacting §1337 Congress intended to treat an electronic transmission that infringes a U.S. patent, copyright, or trademark as an "unfair act" in "import trade."    Properly understood, however, §1337 is intended to deal with unfair competition in the importation of

4

tangible goods, not to prevent all intellectual property violations regardless of origin.

Nor can a putatively broad remedial purpose overcome § 1337's plain meaning. While the Commission urged that adherence to § 1337's text would leave gaps in the remedial framework, the district courts are well positioned to remedy a wide range of the intellectual property right violations to which the Commission seeks to extend its powers. Besides, no statute pursues its objectives at all costs in all contexts. If there are any gaps in the remedial framework, that is for Congress, not the Commission, to consider.

Finally, the changing technological landscape cannot justify the Commission's interpretation of the word "articles." The adaptation of otherwise unambiguous statutes in the face of technological change is for Congress, not agencies or the courts. And, as the Commission's own analysis highlights, Congress has shown itself to be more than capable of amending § 1337 to account for changing technologies.

**II.**    The Commission's construction of "articles" in § 1337 is not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Section 1337 is not ambiguous and the Commission's construction of "articles" is not a reasonable one.

## **ARGUMENT**

Because the International Trade Commission "is a creature of statute," it "must find authority for its actions in its enabling statute." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1355 (Fed. Cir. 2008). The Commission's assertion of authority in this case finds no support in—and in fact defies—the very source of authority the Commission invokes. Section 337 of the Tariff Act of 1930 empowers the Commission to "deal[ ] with" the "*importation* into the United States . . . of *articles* that . . . infringe" a valid U.S. patent, copyright, or trademark. 19 U.S.C. § 1337(a)(1) (emphasis added). The text, structure, and history of that provision make clear that the term "articles" refers to tangible items and does not encompass electronic transmissions. The Commission's reading of the statute is contrary to § 1337's clear terms.

I. **AN ELECTRONIC TRANSMISSION OF DIGITAL DATA IS NOT AN "ARTICLE" WITHIN THE MEANING OF § 1337(a)(1)(B)**

A. **The Text of § 1337 Shows that the Commission's Authority Is Limited to Tangible Materials**

"When interpreting a statute, we look first and foremost to its text." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 356 (1994). Where the text is clear, that should end the matter. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Here, § 1337 limits the Commission's jurisdiction to the "importation

6

into the United States ... of articles that ... infringe" a valid U.S. patent, copyright, or trademark. 19 U.S.C. § 1337(a)(1)(B). Both today and when the Tariff Act of 1930 was enacted, the term "articles" unambiguously meant physical objects and did not extend to intangibles such as data flows or electronic transmissions.

When Congress enacted the Tariff Act in 1930, the Supreme Court had already explained the meaning of that critical term. Interpreting an earlier version of the Tariff Act in *Junge v. Hedden*, 146 U.S. 233 (1892), the Court explained that, "[i]n common usage, 'article' is applied to almost every separate *substance* or *material*, whether as a member of a class, or as a particular *substance* or *commodity*." *Id*. at 238 (emphasis added). There is no reason to believe Congress intended "article[s]" to have a meaning in the 1930 Tariff Act different from the one the Supreme Court ascribed to it in the Act's predecessor. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

This Court too has recognized that the term "articles" encompasses only tangible goods, and excludes information and electronic transmissions. In *Bayer AG v. Housey Pharmaceuticals, Inc.*, 340 F.3d 1367 (Fed. Cir. 2003), the Court considered the scope of 35 U.S.C. § 271(g), which "was intended to address the same 'articles' as were addressed by section 1337." *Id*. at 1374 (emphasis added). The Court ultimately held that § 271(g) covers "only products that have been

7

'manufactured,'" and that it "necessarily follows that the statute applies *only to physical goods* and that *information is not included.*"  *Id.* at 1371 (emphasis added).  If §271(g) addresses the "same 'articles' as [are] addressed by §1337," and §271(g) only covers "physical goods" but not "information," then the same is true of §1337 as well.  That conclusion is supported by Congress's repeated use of "articles" in the U.S. Code to refer to tangible goods.[2]

Tellingly, the Commission's decision below did not and could not cite any opinion of any court, nor any provision of the U.S. Code, construing the term "articles" to mean electronic data flows or similar intangibles.  It could muster only its own prior decision in *Certain Hardware Logic Emulation Systems and Components Thereof*, Inv. No. 337-TA-383, Commission Opinion on Remedies, the Public Interest, and Bonding, 1998 WL 307240 (Mar. 1, 1998) ("Hardware Logic").  *See Certain Digital Models, Digital Data, and Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances*

---

[2] For example, 2 U.S.C. §4106 refers to "articles which may be purchased by or through the stationery rooms of the House and Senate."  *Id.*  In the agricultural context, "articles" is used to refer to "livestock, meats, meat food products, or livestock products in unmanufactured form."  7 U.S.C. §192(c).  The immigration laws authorize the sale of "articles determined by the Attorney General to be necessary to the health and welfare of aliens detained at any immigrant station . . . through Government canteens" operated by the Immigration and Naturalization Service.  8 U.S.C. §1355(b).  In the food and drug context, the President may suspend the importation of "adulterated articles" that are dangerous to human health.  21 U.S.C. §18.  And in the copyright context, 17 U.S.C. §511(b) refers to the "impounding and disposition of infringing articles."  *Id.*

*Made Therefrom, and Methods of Making the Same*, Inv. No. 337-TA-833, Commission Opinion at 22 (Apr. 9, 2014) ("Digital Models"). But that decision hardly supports expanding the term "articles" to encompass electronic transmissions. That decision (never reviewed by this Court) nowhere purports to construe the word "article," much less examine how Congress used that term in § 1337. And to the extent it is relevant at all, it shows that the Commission understood that "articles" *excludes* electronic transmissions.

In *Hardware Logic*, the Commission clearly had jurisdiction: The case involved the importation of *physical* hardware logic emulation systems that infringed a U.S. patent, and the complainant sought an exclusion order prohibiting the importation of those tangible goods into the U.S. *Hardware Logic* at 13. A violation of § 1337 having already been established, the Commission determined that its "*remedial authority* extend[ed] to the prohibition of all acts reasonably related to the importation of [the] infringing products and *[was] not limited to articles* that directly infringe a United States patent." *Id.* at 27 (emphasis added). Exercising that broad, remedial authority, the Commission adopted a cease and desist order addressing electronic transmissions of the defendants' software. Such a remedy, the Commission explained, was necessary to effectuate an exclusion order directed at a tangible good that was an "article." *Id.* at 28.

9

The Commission, however, nowhere suggested that the electronic transmissions were themselves "articles." To the contrary, the Commission concluded that it had authority to proscribe such transmissions only because its remedial authority "extends to the prohibition of all acts reasonably related to the importation of infringing products and *is not limited to articles* that directly infringe a United States patent." *Hardware Logic* at 27 (emphasis added). Thus, far from suggesting that data transmissions are "articles," *Hardware Logic* suggests they are not.

### B.    The Structure of §1337 Confirms that "Articles" and Tangible Goods Are Synonymous

The use of the word "articles" in other sections of the Tariff Act of 1930, and Congress's contemporaneous list of dutiable articles, confirm Congress's intent to reach only tangible goods.

### 1.    *The Use of the Word "Articles" in Other Sections of the Tariff Act of 1930 Shows that the Word Is Limited to Tangible Goods*

"[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dryers, Inc. v. United States*, 286 U.S. 427, 433 (1932). Congress's use of the term "article" throughout the Tariff Act makes clear that, in each context, Congress meant physical goods or items, not intangibles like electronic transmissions.

For example, §1337(i)(1) declares that: "[i]n addition to taking action under subsection (d) of this section [to exclude infringing articles], the Commission may issue an order providing that any article imported in violation of the provisions of this section be *seized* and *forfeited* to the United States" under certain conditions. 19 U.S.C. §1337(i)(1) (emphasis added). The Commission's proposed construction of "article" would render that forfeiture provision anomalous—an electronic transmission cannot be "seized" or "forfeited" as contemplated by §1337(i)(1). Courts are duty-bound to make sense, not nonsense, of the statutory terms. But the Commission's construction makes nonsense of §1337(i)(1).

The Commission's construction has a similar effect on §1337(i)(3). That subsection provides for the Secretary of the Treasury to notify "all ports of entry" upon the "attempted entry" of prohibited articles. 19 U.S.C. §1337(i)(3). An electronic transmission into the U.S. cannot be the subject of an "attempted entry" through a port of entry. Similarly, an electronic transmission cannot be intercepted at such a port as contemplated by §1337(i)(3). If Congress had intended §1337 to encompass intangibles such as electronic transmissions, it would not have limited the directive to ports of entry but would have included notice to telecommunications carriers as well.

2. *Congress's List of Dutiable Items Confirms that Congress Intended To Reach Only Physical Goods*

The remainder of the Tariff Act makes clearer still that "articles" refers to tangible items. The Tariff Act was, at its core, a *tariff* provision that imposed duties on specified imports. It provided that, "on and after the day following the passage of this Act . . . there shall be levied, collected, and paid upon *all articles* when imported from any foreign country into the United States . . . the rates of duty which are prescribed by the schedules and paragraphs of the dutiable list of this title." Tariff Act of 1930, Pub. L. 71-361, 46 Stat. 590 (1930) (emphasis added).

Together with the Tariff Act, Congress provided *95 pages* of schedules identifying specific dutiable and non-dutiable goods. Each of those schedules refers *exclusively* to tangible goods. *See* 46 Stat. 590-685. There is no reference to any intangible item of any sort, much less data communicated by telegraph or other means. The fact that Congress intended the term "article" to extend only to physical items is clearer still from the "catch-all" duties it provided. Those catch-alls, for example, provided different default rates of duty for "raw," "un-manufactured," and "manufactured" articles. The catch-alls declared that articles "similar, either in material, quality, texture, or . . . use" to enumerated articles shall be subject to the same rate of duty. *Id.* at 672. These descriptions clearly contemplate that "articles" are tangible goods; they make no sense if applied to electronic transmissions.

12

3.    *The Remedial Framework of the Original 1930 Act Shows that Congress Understood "Articles" To Mean Tangible Goods*

The original version of §1337 provided a single remedy for violations: "Whenever the existence of any such unfair method or act shall be established to the satisfaction of the President," the Act provided, "he shall direct that the articles concerned in such unfair methods or acts, imported by any person violating the provisions of this Act, *shall be excluded from entry into the United States*." 46 Stat. 704 (emphasis added).  That too strongly indicates that Congress was concerned with physical imports.  For decades, that sole remedy—exclusion—could have no effect on electronic transmissions, which do not pass through U.S. ports and cannot be *excluded* by Customs.  It is unlikely that Congress intended to cover an entire category of activities but, for decades on end, offer no effectual remedy for them.

Congress did authorize the Commission to issue cease and desist orders in 1974.  *See* Trade Act of 1974, Pub. L. 93-618, 88 Stat. 1978, 2055 (1975).  In providing for that additional remedy, however, Congress made clear that "*[n]o change* [was] made in the substance of the *jurisdiction conferred* under section 337(a) with respect to unfair methods of competition or unfair acts in the import trade."  S. Rep. No. 93-1298, 1974 U.S.C.C.A.N. 7186, 7327 (1974) (emphasis added).  Instead, the provision's purpose was merely to add "needed flexibility" because "the existing statute, which provides no remedy other than the exclusion of

13

articles from entry, is so extreme or inappropriate in some cases that it is often likely to result in the Commission not finding a violation of this section." *Id.* at 7331. In other words, Congress created § 1337(f) as a less extreme alternative to the exclusion remedy of § 1337(d), not as an independent remedy that would, for the first time, reach importation of intangibles.[3]

### C.  Contemporaneous Legislation Shows that "Articles" Does Not Include Electronic Transmissions

At the time Congress enacted the Tariff Act of 1930, it was well aware that communications and information were entering this Nation from abroad by telephone and telegraph. But far from giving the Commission authority over such electronic transmissions, Congress vested authority in other agencies, such as the Federal Communications Commission.

By the late 19th and early 20th centuries, large American companies like Western Union and AT&T transmitted information electronically both within the U.S. and from abroad.[4] Congress comprehensively regulated the industry in the Communications Act of 1934. *See* Pub. L. 73-416, 48 Stat. 1064 (1934). By its terms, the Communications Act "appl[ied] to *all* interstate and foreign communica-

---

[3] For example, in a decision rendered soon after the enactment of the new remedy, the Commission employed § 1337(f) to order a steel pipe importer to cease and desist from pricing its products below the cost of production or risk being subjected to an exclusion order. *See In re Certain Welded Stainless Steel Pipe and Tube*, Inv. No. 337-TA-29, Commission Opinion (Feb. 22, 1978).

[4] *See, generally*, Alexander J. Field, *The Regulatory History of a New Technology: Electromagnetic Telegraphy*, 2001 L. Rev. Mich. St. U. Det. C.L. 245 (2001).

tion by wire or radio." *Id.* (emphasis added). The Communications Act also created the Federal Communications Commission ("FCC") and empowered it to "regulat[e] *interstate and foreign commerce* in communication by wire and radio . . . [and to exercise] additional authority with respect to *interstate and foreign commerce* in wire and radio communication." *Id.* (emphasis added). Thus, in delegating authority to the FCC, Congress contemplated—and indeed specifically referenced—regulation of electronic transmissions. By contrast, in enacting the Tariff Act of 1930, Congress excluded any mention of the International Trade Commission having authority over such transmissions. Instead, Congress limited the International Trade Commission's jurisdiction to "[u]nfair methods of competition and unfair acts *in the importation of articles*," *i.e.*, traditional trade in physical goods. 46 Stat. 703 (emphasis added).

When Congress sought to extend an agency's authority beyond physical "articles" to all commerce, it did so by using that term—"commerce"—on its own, authorizing the agency to regulate "commerce" for specific purposes. For example, in the Federal Trade Commission Act, Ch. 311, 38 Stat. 717 (1914), Congress declared "unfair methods of competition in *commerce*" to be unlawful and charged the newly-created Federal Trade Commission ("FTC") with preventing such unfair methods of competition. 38 Stat. 719 (emphasis added). By extending the FTC's jurisdiction to *all* "commerce" (not just articles) Congress

15

signaled it was not limiting that agency's authority to physical goods. Indeed, because that grant of authority would otherwise be too broad, Congress found it necessary to incorporate specific language limiting the FTC's authority so as to exclude areas of "commerce" that were regulated by other agencies, such as banking and common carriers (like phone companies, railroads, and trucking companies then regulated by the Interstate Commerce Commission).[5] Congress did not, however, give the International Trade Commission any authority to regulate "commerce" generally in the Tariff Act of 1930. Instead, Congress limited the International Trade Commission's jurisdiction to "articles."

### D.    The Commission's Contrary Analysis Defies Principles of Statutory Construction

#### 1.    *The Commission's Textual Argument Reduces to an Exercise in Circular Reasoning*

The Commission's putative analysis of § 1337's text is self-defeating and circular. In assessing § 1337's use of the term "articles," the Commission looked to the dictionary definition of "article," and stated that "the term 'article' was understood at the time of the enactment of the Tariff Act to carry the meaning of an *identifiable unit, item, or thing*, with examples indicating that such articles may

---

[5] At the time, banks were supervised by the recently-created Federal Reserve. *See* Federal Reserve Act, Pub. L. 63-43, 38 Stat. 251 (1913). Many common carriers, including companies engaged in sending electronic communications, were regulated by the Interstate Commerce Commission. *See, e.g.*, Mann-Elkins Act, Pub. L. 61-218, 36 Stat. 539 (1910).

be traded in commerce or used by consumers." *Digital Models* at 39 (emphasis added). That dictionary definition, however, is plainly inapt. The term "articles" may in some contexts include an "identifiable unit, item," etc., such as when one speaks of "an article of clothing." But attempting to import that definition into § 1337 turns it into nonsense. Section 1337 speaks of importation of "articles that . . . infringe." 19 U.S.C. § 1337(a)(1)(B). It seems inconceivable that Congress meant to give the Commission jurisdiction over importation of "units" that infringe.

More fundamentally, that definition is entirely consistent with the ordinary meaning of "articles," *i.e.*, physical objects. Nothing in the cited definition extends it to intangibles. Perhaps for that reason, the Commission noted that "'articles' appears in conjunction with the terms 'importation' and 'sale,' indicating that articles subject to the statute are imported items that are bought and sold in commerce." *Digital Models* at 40. But that does not alter the result. The fact that the terms "importation" and "sale" encompass some things traded in commerce, or that "articles" appears in context with the word "commerce," does not mean that *everything* traded in commerce is an "article." The Commission's reasoning is akin to saying that because trucks are driven on roads, all things driven on roads are trucks. That reasoning is clearly fallacious, and so is the Commission's. If Congress had intended to give the Commission the authority it claims, Congress

would have given it authority over imports in commerce generally—not just articles.  *See* pp. 15-16, *supra*.

2.    *The Commission's Attempt To Expand the Meaning of the Word "Article" Based on the Tariff Act's Reference to Copyright, Patent, and Trademark Infringement Is Similarly Unfounded*

The Commission again employed circular reasoning to conclude that its jurisdiction is coextensive with the scope of the patent, trademark, and copyright laws.  The Commission noted that "the term 'articles' appears in the phrase 'articles that infringe' a patent, a registered trademark, and a registered copyright." *Digital Models* at 41 (quoting 19 U.S.C. § 1337(a)(1)(B), (C)).  From that observation, the Commission concluded that "the meaning of 'articles' is intended to encompass imported items of commerce as to which a finding of infringement of a patent, trademark, copyright or protected hull design may be sustained." *Id.* at 42.

Once again, the Commission's conclusion does not follow from its premise. The fact that §1337 encompasses "articles that infringe" does not mean *everything* that can infringe a patent, trademark, or copyright is an "article" within the meaning of the statute.  Indeed, such a construction reads the word "article" completely out of the statute, and contravenes the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992).  While the Tariff Act covers "articles" "that infringe" a patent, trademark, or copyright, such

18

as a physical DVD containing a pirated movie, that does not answer the question of whether electronic transmissions are "articles."

The pedigree of the Tariff Act also shows that electronic transmissions are not covered.  Section 1337 is not a remedy under the Copyright Act, Patent Act, or Lanham Act, designed to redress all infringing activities.  Rather, § 1337 is part of the Tariff Act of 1930, one of a long line of tariff acts that have dealt exclusively with tangible goods.  Congress has consistently treated § 1337 within the overall framework of its trade laws, not its intellectual property laws.  Its meaning therefore derives not from copyright, patent, or trademark legislation, but trade legislation—specifically, the Tariff Act—of which it forms a part.  Neither the Tariff Act nor subsequent amendments thereto gives the Commission plenary power to remedy infringing acts related to U.S. borders.

### E.    The Legislative History and Purpose of § 1337 Underscore that "Articles" Does Not Extend to Electronic Transmissions

1.    *Silence in the Tariff Act and § 1337's History Confirms § 1337's Limited Scope*

The Tariff Act's legislative history confirms that electronic transmissions are not "articles."  "In the face of silence in the legislative history . . . courts are reluctant to broadly interpret the legislation."  *Bayer*, 340 F.3d at 1376 (citing *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992)).  The Commission cites no legis-

19

lative history indicating that Congress intended "articles" to include electronic transmissions.

The Tariff Act's legislative history is devoid of any such references.  The Commission attempts to bolster its conclusion that electronic transmissions are "articles" within the meaning of §1337 by noting that the "House and Senate Reports of the 1922 and 1930 Acts and Congressional debate refer to articles as synonymous with goods, commodities, and merchandise." *Digital Models* at 43 (citing S. Rep. No. 67-595, at 3 (1922); H.R. Rep. No. 71-7, at 3 (1929); 71 Cong. Rec. S3872, 4640 (1929)).  But to the contrary, that strongly suggests that "articles" means tangible goods.  In *Bayer*, this Court found that the "legislative history [of §271(g)]'s very silence . . . suggests that Congress did not intend to expand coverage beyond manufactured articles." *Bayer*, 340 F.3d at 1376.  So too here, the legislative history of §1337's "very silence" demonstrates that electronic transmissions are not "articles."

Moreover, the origin of the word "articles" and its use in successive tariff acts confirms its limited scope.  The first tariff act to apply to the "importation of [] articles" was the Tariff Act of 1832.  Ch. 227, 4 Stat. 583 (1832).  For the next ninety years, subsequent tariff acts only addressed the duties to be applied to imported "articles," all of which were tangible goods. *See, e.g.*, 4 Stat. 583; Tariff Act of 1922, Pub. L. 67-318, 42 Stat. 858 (1922).  It was not until the Tariff Act of

1922 that Congress expanded the statute beyond imposing duties to include the prohibition of "unfair methods of competition and unfair acts." 42 Stat. 943. But in increasing the scope of the Tariff Act of 1922, Congress continued to use the word "articles" and never provided any indication that it intended to expand the scope of the word.

2.    *The Commission's Reference to §1337's Broad Remedial Purpose Does Not Support Its Conclusion that "Articles" Includes Electronic Transmissions*

Absent any legislative history to support its interpretation of "articles," the Commission relies heavily on §1337's purportedly broad remedial purpose, which it characterizes as preventing "every type of unfair act or practice in import trade that harms U.S. industries." *Digital Models* at 45 (citing S. Rep. No. 67-595, at 3 (1922)). The Commission argues that, in the name of effectuating this purpose, the term "articles" should be interpreted broadly enough to include electronic transmissions. *Id*. at 55.[6]

The Commission's analysis is untenable. No statute pursues its purpose in all contexts and at all costs. *See Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). And the Commission's conclusion assumes, but fails to prove, that Congress, in enacting §1337, intended to treat an electronic transmission that

---

[6] The Commission also cites to legislative history it interprets as requiring §1337 to be interpreted broadly. However, that legislative history refers to the phrase "unfair methods of competition and unfair acts" in §1337(a)(1)(A), not the whole of §1337. *See, e.g.*, S. Rep. No. 67-595, at 3 (1922).

21

infringes a U.S. patent, copyright, or trademark as an "unfair act" in "import trade" covered by § 1337—despite its use of the word "articles."

In fact, § 1337's purpose is to address unfair competition in the importation of tangible goods, not to prevent all copyright, patent, and trademark infringement regardless of origin.  Congress has consistently treated § 1337 within the overall framework of its trade laws, not its intellectual property laws.  For example, the 1974 amendment to § 1337, which added the cease and desist remedy upon which the Commission relied, listed the amendments to § 1337 under "Title III. Relief from Unfair *Trade Practices*."  *See* S. Rep. No. 93-1298, at 7208 (emphasis added).  It further disclosed the "[Senate Finance] Committee's intention . . . to assure a swift and certain response to foreign import restrictions, export subsidies, and price discrimination (dumping) and other unfair foreign trade practices."  *Id*. While these statements demonstrate a concern with protecting American industries from unfair foreign competition, they are grounded in the framework of trade law and trade acts that deal exclusively in tangible goods.

Besides, alleging a broad remedial purpose cannot overcome §1337's plain meaning. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 457 (2007) (rejecting an invocation of the "remedial nature of [35 U.S.C.] §271(f)" in interpreting a jurisdictional term in the statute).  Even if the Commission believes §1337 would be a better remedy for infringement, Congress already provides the district courts

with expansive authority to remedy a wide range of activity that infringes copyrights, patents, and trademarks. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) (describing a finding of indirect patent infringement); 35 U.S.C. § 271(c), (g) (creating liability for indirect patent infringement). Moreover, as the Supreme Court made clear in *Microsoft*, the fact that § 1337's plain meaning prevents the Commission from fully enforcing what it perceives to be the statute's broad remedial purpose does not warrant "dynamic judicial interpretation of [the statute]." *Microsoft*, 550 U.S. at 457. Instead, such concerns are "properly left for Congress to consider" and address "if it finds such action warranted." *Id.*

Finally, in seeking to support its interpretation of "articles," the Commission concluded that the changing technological landscape requires the term to be construed "flexibly to fit new technologies." *Digital Models* at 47. In reaching that conclusion, the Commission highlighted Congress's actions over time to strengthen § 1337 in response to technological changes. *Id.* at 47-48. The Commission's argument, however, merely demonstrates why its attempt to rewrite the statute usurps Congress's role. The adaptation of otherwise unambiguous statutes in the face of technological change is for Congress, not agencies or the courts. As the Supreme Court has recognized, "as new developments have occurred in this country, it has been the Congress that has fashioned the new rules

that new technology made necessary." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 430-31 (1984). And, as the Commission's own account of Congress's actions attests, Congress has shown itself perfectly capable of amending § 1337 to account for changing technologies.

## II. THE COMMISSION'S CONSTRUCTION OF "ARTICLES" IS NOT ENTITLED TO *CHEVRON* DEFERENCE

Reference to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) does not change the analysis. To the extent *Chevron* applies, the Commission's construction of § 1337 would receive deference only if the statute is ambiguous (*Chevron* step one). *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013); *see also Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1381 (1998).

Here, there is no ambiguity for the Commission to resolve. Where "the ordinary tools of statutory construction" demonstrate that "the intent of Congress is clear, that is the end of the matter." *City of Arlington*, 133 S. Ct. at 1868 (quotation marks omitted). Such tools include looking at the text, structure, purpose, and history of the statute. *Id.* at 1876; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987). As discussed above, the text, structure, purpose, and history of § 1337 all show that Congress understood the word "articles" to refer to tangible goods and not to include electronic transmissions. And the Commission was

24

unable to cite any authority suggesting otherwise. Given §1337's clarity, no deference is warranted here.

In any event, even if the statute were ambiguous, the Commission's construction could be upheld only if it falls "within the bounds of reasonable interpretation" (*Chevron* step two). *City of Arlington*, 133 S. Ct. at 1868; *see also Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417-18 (1992) ("[A] reviewing court need not accept an interpretation which is unreasonable.") The Commission's construction of "articles" is not reasonable. As discussed above, the Commission employed circular and unsupported reasoning many times over to reach a definition of "articles" that includes electronic transmissions. It also relied on clearly irrelevant definitions of "articles," including newspaper articles, to reach its conclusion. *Digital Models* at 39; *See* pp. 16-19, *supra*. Such missteps defy principles of statutory construction and push the Commission's construction of §1337 far beyond what any "ambiguity will fairly allow." *City of Arlington*, 133 S. Ct. at 1874.

## CONCLUSION

The Commission's decision should be vacated and remanded for further proceedings.

October 16, 2014

Respectfully submitted,

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken
*Counsel of Record*
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Telephone: (202) 556-2000
Facsimile: (202) 556-2001

*Counsel for Amicus Curiae*
*Business Software Alliance*

## **CERTIFICATE OF SERVICE**

I certify that on October 16, 2014, I electronically filed the foregoing Brief of Business Software Alliance as *Amicus Curiae* in Support of Appellants with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit using the appellate CM/ECF system.  Pursuant to ECF-10(B) of this Court's May 17, 2012 Administrative Order Regarding Electronic Case Filing, I certify that I will submit to the Court six paper copies of this Brief within five days of this Court's acceptance of the brief in ECF.  I certify that on October 16, 2014, a copy of the foregoing brief was served electronically through the Court's CM/ECF system on the following counsel:

Michael D. Myers
McClanahan Myers Espy, LLP
3355 West Alabama
Suite 210
Houston, TX 77098
(713) 223-2005
mike@mmellp.com

Sidney A. Rosenzweig
U.S. International Trade Commission
500 E Street, S.W., Suite 707
Washington, D.C. 20436
(202) 708-2532
sidney.rosenzweig@usitc.gov

*Counsel for Appellants*
*ClearCorrect Operating, LLC and*
*ClearCorrect Pakistan Ltd.*

*Counsel for Appellee United States*
*International Trade Commission*

Stephen B. Kinnaird
Paul Hastings, LLP
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1842
stephenkinnaird@paulhastings.com

*Counsel for Intervenor Align
Technology, Inc.*

October 16, 2014                    /s/ Jeffrey A. Lamken

                                   Jeffrey A. Lamken

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

_X_    this brief contains 5,740 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

___    this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

_X_    this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font, or

___    this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

October 16, 2014                    /s/ Jeffrey A. Lamken